## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **NICOLE ESPOSITO,** | : | **CIVIL ACTION NO.** |
| **Plaintiff** | : | |
| | : | **3:21-cv-1149 (SRU)** |
| **v.** | : | |
| | : | |
| **BOARD OF REGENTS OF HIGHER** | : | |
| **EDUCATION; CONNECTICUT STATE** | : | |
| **COLLEGES AND UNIVERSITIES;** | : | |
| **ROBERT STEINMETZ, in his individual** | : | |
| **and official capacities;** | : | |
| **ALICE PRITCHARD, in her individual** | : | |
| **and official capacities; and** | : | |
| **ANDREW KRIPP, in his individual** | : | |
| **and official capacities.** | : | |
| **Defendants** | : | |
| | : | **MARCH 10, 2022** |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION

I.  **INTRODUCTION**

This is a unique case in which the Court should exercise its authority to issue a temporary restraining order and preliminary injunction against Defendants, reverse the termination of Plaintiff's employment for cause, reinstate Plaintiff to her employment as Campus CEO at Manchester Community College ("MCC"), enjoin Defendants from taking any further retaliatory actions against Plaintiff, and also enjoin Defendants from retaliating against any individuals because they are identified as witnesses, or because they provide testimony or other assistance to Plaintiff in connection with her claims of discrimination or retaliation.  Given the overwhelming evidence demonstrating that Defendants retaliated against Plaintiff and violated Plaintiff's federal constitutional and statutory rights, and the evidence supporting a finding of irreparable harm, this Court should also enjoin Defendants from hiring someone else to fill the position of

Campus CEO at Manchester Community College during the pendency of this motion.  To that end, the Court should immediately issue an Order requiring Defendants to show cause why they should not be enjoined from hiring someone else as Campus CEO of MCC during the pendency of this motion, and enjoined from retaliating against employees because they are identified as witnesses or engage in protected activities opposing discrimination or retaliation.

This is a unique case because there is direct evidence demonstrating that Defendants violated Plaintiff's federal constitutional and statutory rights.  For instance, Defendant Kripp, the Vice President of Human Resources and one of the decision makers, admitted under oath that, if Plaintiff accepted the terms of Defendants' unlawful and retaliatory release agreement and covenant not to sue that Kripp offered to Plaintiff in August 2021 (Exhibit 10) and if Plaintiff did not file her federal court lawsuit, then Defendants would not have terminated her employment for cause and Defendants would have continued to employ Plaintiff at her full salary and benefits for another year.  Through that testimony, Defendant Kripp admitted under oath to violations of Plaintiff's federal constitution and statutory rights, including that:  (1) Defendants conditioned Plaintiff's continued employment on her waiver of rights to oppose discrimination and retaliation, and on a promise by Plaintiff that she would (a) not file claims of discrimination or retaliation in a judicial forum or with a government agency such as the EEOC, and (b) also not disparage Defendants; and (2) that Plaintiff's refusal to relinquish her rights to oppose discrimination and retaliation and to speak on matters of public concern, and Plaintiff's filing of her lawsuit in federal court which addressed matters of public concern, were but-for causes for Defendants' actions to terminate Plaintiff's employment for cause.  (Plaintiff's Declaration ¶¶ 54-55, 58, Exhibit 1.)

In addition to those admissions, there is even more abundant evidence that Defendants retaliated against Plaintiff and manufactured false and pretextual justifications, after Plaintiff filed her federal court lawsuit, in order to terminate Plaintiff's employment for cause, and treated Plaintiff differently than other similarly situated individuals.  The very documents that Defendants prepared to argue for the termination of Plaintiff's employment for cause, after Plaintiff filed her federal court lawsuit, include powerful evidence of retaliation and pretext. (CSCU 10/26/21 position statement & exhibits, Exhibit 2; Plaintiff's November 10, 2021 response, Exhibit 3.)  Plaintiff pursued an appeal to a committee appointed by the Chair of the Board of Regents, the legal entity responsible for oversight of CSCU, but that committee, which included a member of the Board of Regents and two CSCU employees, expressly relied on unlawful reasons when they affirmed Defendants' action to terminate Plaintiff's employment, including when the committee wrote that Defendants properly terminated Plaintiff's employment for cause, in part, because Plaintiff expressed concerns to the United States Department of Education.  (February 9, 2022 findings, Exhibit 4.)

Although the blatant violation of Plaintiff's federal constitutional rights, by itself, is sufficient to warrant a preliminary injunction, *Elrod v. Burns*, 427 U.S. 347 (1976)(preliminary injunction appropriate when an employer threatened to discharge employees who refused to compromise their First Amendment rights), this case is also unique because there is evidence that Defendants' retaliatory actions against Plaintiff has already chilled other employees from exercising their rights.  By taking these public retaliatory actions against Plaintiff, a Campus CEO of a college, Defendants conveyed an unmistakable message to other witnesses and complainants about what happens to individuals who come forward, exercise their federal constitutional and statutory rights, and oppose discrimination and retaliation at CSCU.  During

the termination process, multiple employees who are currently employed by Defendants and who possess highly relevant information relating to issues of retaliation and pretext declined to exercise their rights to provide certain assistance and participation, such as signing a statement that could be submitted as part of the termination process, because they were afraid of retaliation. (Plaintiff's Declaration ¶ 61, Exhibit 1; Lisa Dresdner Declaration ¶¶ 12-14, Exhibit 5.)

This case is also unique and warrants preliminary injunctive relief because an award of monetary damages at a future trial will be inadequate to remedy the tremendous harm caused by Defendants' unlawful actions.  First, by terminating Plaintiff's employment for cause, Defendants have likely destroyed Plaintiff's career as a college President/CEO, and they have done so when Plaintiff is younger than 40 years of age and decades away from a normal retirement age.  (Plaintiff's Declaration ¶ 62, Exhibit 1.)  The retaliatory termination of Plaintiff's employment for cause must be reversed.  Second, injunctive relief is necessary now in order to ensure that reinstatement is available as a remedy at trial.  Defendants terminated Plaintiff from a rare and unique position, Campus CEO at Manchester Community College, that they are likely planning to fill.  If Plaintiff is not reinstated to her employment now, Defendants will hire someone else for the role and the Court will not be able to provide Plaintiff with reinstatement as a remedy after a trial in the future.  Given the limited number of comparable college president/CEO positions that exist within a reasonable distance of Plaintiff's residence, and the manner in which Defendants terminated Plaintiff's employment, it is unlikely that Plaintiff will be able to obtain a comparable position as a college President or CEO in the near future.  (Plaintiff's Declaration ¶ 62, Exhibit 1.)  Therefore, a court order reinstating Plaintiff to her position with Defendants is likely necessary to preserve Plaintiff's career as a college

President/CEO.  No award of monetary damages at trial can adequately compensate Plaintiff for the destruction of her career as a college President/CEO before she is even forty years of age.

 As other federal courts have done, this Court should grant Plaintiff preliminary injunctive relief that reinstates Plaintiff to her employment.  *See Zorzi v. County of Putnam*, 30 F.3d 885, 895-898 (7th Cir. 1994); *Chalk v. United States Dist. Ct.*, 840 F.2d 701 (9th Cir. 1988); *Mariani Giron v. Acevedo Ruiz*, 834 F.2d 238 (1st Cir. 1987); *Potkay v. Ament*, 34 F. Supp. 3d 937 (E.D. Wisc. 2014); *Conn. v. Bd. of Educ.*, 586 F. Supp. 2d 852 (E.D. Mich. 2008); *Olmeida v. Schneider*, 889 F. Supp. 228 (D.V.I. 1995); *Milliron v. Louisville & Jefferson County Metro Sewer Dist.*, 867 F. Supp. 559 (W.D. Ky. 1994); *EEOC v. Target Stores*, Civ. No. 4-83-963, 1984 U.S. Dist. LEXIS 24210 (D. Minn. Aug. 21, 1984); *EEOC v. Electronic Data Systems*, No. C83-151C, 1983 U.S. Dist. LEXIS 19293 (W.D. Wash. Feb. 14, 1983); *Perry v. Ft. Wayne*, 542 F. Supp. 268 (N.D. Ind. 1982); *Oshiver v. Court of Common Pleas*, 469 F. Supp. 645 (E.D. Pa. 1979); *Keyer v. Civil Service Comm'n*, 397 F. Supp. 1362 (E.D.N.Y. 1975); *Hunter v. Ann Arbor*, 325 F. Supp. 847 (E.D. Mich. 1971); *McGinnis v. USPS*, 512 F. Supp. 517 (N.D. Cal. 1980)(enjoining termination after employee received notice of dismissal).

Defendants' flagrant disregard for the laws prohibiting retaliation warrants an immediate injunction from this Court.  In order to protect Plaintiff's constitutional and statutory rights, and also make clear to other witnesses and complainants that retaliation by CSCU will not be tolerated, the Court should reverse the termination of Plaintiff's employment for cause, order Defendants to immediately reinstate Plaintiff to her position as Campus CEO of Manchester Community College, enjoin Defendants from taking any further retaliatory actions against Plaintiff, and also enjoin Defendants from retaliating against any individuals because they are

identified as witnesses, or because they provide testimony or other assistance to Plaintiff in

connection with her claims of discrimination or retaliation.

## II.    BACKGROUND

Plaintiff has been working towards the goal of becoming a college or university

President, CEO, or Chancellor for over a decade.  (Plaintiff's Declaration ¶¶ 2-19, Ex. 1.)  After

a previous period of employment at Manchester Community College in which Plaintiff served as

a member of the faculty and on various committees, on April 28, 2020, Defendant CSCU offered

Plaintiff the position of Campus Chief Executive Officer ("CEO") for MCC, effective July 6,

2020.  As Campus CEO for MCC, Plaintiff reported to Defendant Robert Steinmetz (Regional

President for Region One/Capital-East), who in turn reported to Defendant Alice Pritchard

(Chief of Staff for the CSCU System).  (Plaintiff's Declaration ¶¶ 17, 20, Exhibit 1.)

In July 2020, Plaintiff opposed what she reasonably believed were sexist comments by

Steinmetz.  For instance, Steinmetz repeatedly stated to Plaintiff that he did not like her "tone of

voice" and that he did not like the way that Plaintiff spoke.  When Plaintiff asked Steinmetz for

specifics, he was unable to offer any specific criticisms, but he stated further that Plaintiff was

"off-putting."  Early in Plaintiff's tenure as Campus CEO, Steinmetz also made sexist comments

about another professional woman.  When Plaintiff communicated an intention to hire an

extremely qualified and highly educated woman for an important leadership position in her

administration at MCC, Steinmetz objected and stated that he did not like her.  When Plaintiff

asked Steinmetz to provide the basis for his opposition, he did not question her qualifications or

her credentials.  Instead, Steinmetz responded with concerns that included how much the female

applicant talked during her interview.  Plaintiff informed Steinmetz that she was going to hire the

female applicant despite his objection because Plaintiff felt strongly that she was the best candidate.  (Plaintiff's Declaration ¶ 21, Exhibit 1.)

In July 2020, after Steinmetz repeatedly criticized Plaintiff's tone and characterized Plaintiff as off-putting based on her communication style and delivery, and after Steinmetz objected to Plaintiff's desire to hire another highly qualified female for a leadership position because he felt that she talked too much, Plaintiff expressed to Steinmetz directly that his comments were sexist.  Steinmetz responded directly by threatening Plaintiff's job security and stated, "you are only a week in and already acting like this.  We will see if you work out here." (Plaintiff's Declaration ¶ 22, Exhibit 1.)

Shortly thereafter in July 2020, Plaintiff communicated concerns to Pritchard about Steinmetz and his conduct, including Plaintiff's concerns that Steinmetz was treating her differently than other male campus CEOs, and that Steinmetz threatened Plaintiff's job after Plaintiff attempted to address these issues with him.  (Plaintiff's July 18, 2020 complaint to Pritchard is attached as Exhibit 6; Plaintiff's Declaration ¶ 23, Exhibit 1.)

In response to Plaintiff's July 2020 complaint, which expressed concerns about sexism by Steinmetz against Plaintiff and another woman, and alleged disparate treatment by Steinmetz between Plaintiff and similarly situated men, Pritchard failed to address the serious concerns that Plaintiff raised.  Pritchard sent Plaintiff an e-mail which essentially advised Plaintiff to go back and work things out with Steinmetz.  (Pritchard July 2020 e-mail to Plaintiff, attached as Exhibit 7; Plaintiff's Declaration ¶ 24, Exhibit 1.)

Following July 2020, and following CSCU's failure to investigate Plaintiff's complaints, Steinmetz continued to act in ways that belittled and demeaned Plaintiff, and he refused to acknowledge Plaintiff's positive job performance.  For instance, despite the challenges presented

by the COVID-19 pandemic, MCC finished the year with a $2 million budget surplus and was

recognized as the top community college in Connecticut.  In February 2021, Connecticut

Magazine also recognized Plaintiff in the publication's 40 under 40 leaders for 2021.  Despite

those accomplishments, and others, Steinmetz never acknowledged Plaintiff's positive

performance nor provided Plaintiff with a performance evaluation.  (Plaintiff's Declaration ¶ 25,

Exhibit 1.)

As the end of Plaintiff's first year appointment as Campus CEO approached, Defendants

attempted to carry out the threat to Plaintiff's job that Steinmetz made back in July 2020 when

Steinmetz indicated in response to Plaintiff's opposition to his sexist remarks that she would not

last here.[1]  On Wednesday, June 16, 2021, Steinmetz sent Plaintiff an e-mail, copied to CSCU

General Counsel Ernestine Weaver, mandating that Plaintiff appear for a meeting the following

afternoon at 4:00 p.m.  In advance of the meeting with Steinmetz and Attorney Weaver on June

17, 2021, Plaintiff communicated concerns to Diane Mazza in Human Resources, and also to

David Levinson, Interim President of the Connecticut Community College.  In these

communications, Plaintiff expressed concern about the meeting to which Steinmetz had

summoned her and once again reiterated concerns that Steinmetz had a pattern of discriminating

against women and provided examples of other women who had also raised concerns regarding

Steinmetz's conduct.  When Plaintiff conveyed her concerns to Levinson on June 17, Levinson

agreed that Steinmetz should not be treating women that way and confirmed that Plaintiff was

not the first person who expressed concerns to him about Steinmetz's treatment of women, but

---

[1] Defendants only waited until June 2021 to carry out the threat that Steinmetz conveyed in July 2020 because of necessity. The first year of Plaintiff's term as Campus CEO ended on June 30, 2021.  Since Defendants had no basis to terminate Plaintiff's employment for cause before the end of her term, they moved to non-continue Plaintiff's employment without cause in June 2021 at their first opportunity to do so.  *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009)(recognizing the plausibility of defendants waiting to "exact their retaliation at an opportune time").

Levinson deflected responsibility.  As Levinson expressed it to Plaintiff, because Steinmetz

reported to Pritchard, there was not much that he could do.  (Plaintiff's Declaration ¶¶ 26-27,

Exhibit 1.)

Later in the afternoon on June 17th, Steinmetz and Weaver met with Plaintiff and notified

her that Steinmetz would be moving to non-continue her appointment as CEO of MCC, but

failed to explain why Steinmetz and CSCU were taking that action.  During the meeting on June

17th, Plaintiff repeatedly asked Steinmetz and Attorney Weaver to explain the basis for the

decision, but neither Weaver nor Steinmetz offered any justification or rationale.  At no time

during the June 17th meeting did Weaver or Steinmetz allege that the decision to not renew

Plaintiff's appointment was based on any deficiencies in Plaintiff's performance.  In fact, neither

Steinmetz nor Weaver identified any deficiencies in Plaintiff's performance during that meeting.

Instead, Weaver and Steinmetz attempted to pressure Plaintiff into resigning from her position as

Campus CEO of MCC and signing a stipulated agreement proposed by CSCU that included a

general release and waiver of claims, and an agreement to refrain from making any public or

private disparaging remarks.  (Plaintiff's Declaration ¶ 28, Exhibit 1.)

During the June 17th meeting, Weaver implied that if Plaintiff did not agree to resign

from her position and sign the agreement offered by CSCU that things would become public and

that would not be good for Plaintiff.  During the June 17th meeting, Weaver indicated to Plaintiff

that the CSCU Board of Regents was already on board with the decision to not renew her

appointment, which surprised Plaintiff since the Board of Regents is subject to Connecticut's

public meetings rules and had not convened any public meetings regarding the non-continuation

of her appointment.  (Plaintiff's Declaration ¶ 29, Exhibit 1.)

During the June 17th meeting, Weaver indicated that Plaintiff needed to provide an answer as to whether Plaintiff would be accepting the proposed stipulated agreement by 3:00 p.m. on June 23, 2021 because, according to Weaver, the Board of Regents would be meeting and voting on the non-continuation of Plaintiff's employment at their public meeting on June 24, 2021 if Plaintiff did not resign from her position and accept the stipulated agreement by that time.  (Plaintiff's Declaration ¶ 30, Exhibit 1.)

On June 23, 2021, Plaintiff's legal counsel sent a letter to Weaver on Plaintiff's behalf opposing discrimination and retaliation against Plaintiff, as well as a pattern and practice of discrimination against others, and demanded that CSCU refrain from taking any further adverse actions against Plaintiff.  (June 23, 2021 letter, Exhibit 24.)  In response to the June 23, 2021 letter from Plaintiff's legal counsel, Weaver sent a letter to Plaintiff's legal counsel on June 23, 2021, which confirmed that the Board of Regents would not be taking action regarding the non-continuation of Plaintiff's employment the following day.  (June 23, 2021 response, Exhibit 8.)

After June 30, 2021, by operation of CSCU's Human Resources Policies and Procedures, Plaintiff's appointment as CEO of MCC renewed for another annual term.  (See CSCU Policies and Procedures Section 5.3, Exhibit 9)("College Presidents/Campus CEOs are appointed by the Board. . . . Non-temporary appointments are for a term of one year or less and expire June 30 of each year. *Non-temporary appointments are subject to annual renewal*.")(emphasis added).  As such, during the term of Plaintiff's appointment that renewed for another year after June 30, 2021, Plaintiff could only be suspended or terminated for cause, as defined in Section 8.2 of the CSCU Policies and Procedures.  (CSCU Policies and Procedures § 8.2, Exhibit 9.)

In July 2021, after Plaintiff's appointment as CEO automatically renewed for another annual term, Plaintiff and her legal counsel met with the law firm hired by CSCU and provided

10

that law firm with details and documents regarding discrimination and retaliation against Plaintiff, as well as numerous examples demonstrating a pattern and practice of discrimination and retaliation at CSCU against other women.    (Plaintiff's Declaration ¶ 32, Exhibit 1.)

On August 3, 2021, Plaintiff filed a complaint of discrimination and retaliation alleging violations of Title VII of the Civil Rights Act of 1964 and the Connecticut Fair Employment Practices Act with the Connecticut Commission on Human Rights and Opportunities.[2] (Plaintiff's Declaration ¶ 33, Exhibit 1.)

On August 18, 2021, Kripp presented Plaintiff with another proposed stipulated agreement by CSCU which included terms requiring Plaintiff to resign from her position as Campus CEO of MCC, release and waive all claims, covenant to not file claims, promise to not make disparaging comments, and agree to the false factual statement that Plaintiff wished to resign from her position as CEO.  (August 18, 2021 Proposed Stipulated Agreement, Exhibit 10.) Kripp further notified Plaintiff by e-mail that, if she did not accept the proposed agreement by 12:00 noon on August 24, 2021, the Board of Regents would be convened to consider the non-renewal of Plaintiff's appointment.[3]  (Plaintiff's Declaration ¶¶ 34-35, Exhibit 1.)

At approximately 12:00 noon on August 24, 2021, Plaintiff notified Kripp that her lawyers would be communicating with the Office of the Attorney General for the State of Connecticut later that day regarding this matter.  (Plaintiff's Declaration ¶ 36, Exhibit 1.)

---

[2] It is not yet clear when Defendants first became aware of Plaintiff's filing with CHRO.  CHRO did not officially serve the complaint upon CSCU until September 15, 2021.  (CHRO service notice, Exhibit 11.)
[3] On August 18, 2021, Kripp also provided Plaintiff with a report provided to CSCU by a law firm hired by CSCU to review Plaintiff's allegations.  (Filed by Defendants as Doc. No. 27-2, pp. 22-32.)  Plaintiff maintains that the report includes serious deficiencies, and Plaintiff's counsel delivered a detailed letter to the Office of the Attorney General identifying some of those flaws on the afternoon of August 24, 2021. (August 24, 2021 letter, Exhibit 12.)

Before 1:00 p.m. on August 24, 2021, after Plaintiff failed to sign the stipulated agreement by the 12:00 p.m. deadline communicated by Kripp, Kripp called Plaintiff.  During that call, Kripp acknowledged that he was in receipt of the e-mail from Plaintiff indicating that her legal counsel would be communicating with the Office of the Attorney General, referenced the fact that Plaintiff had not signed the agreement, and informed Plaintiff that, effective immediately, he was placing her on leave, that she was no longer acting in the capacity as the CEO of Manchester Community College, and that she was prohibited from communicating with any member of the CSCU community, including employees, faculty, staff, and students.  Kripp also directed Plaintiff to remove her belongings from campus.  Defendants also discontinued Plaintiff's access to her e-mail and CSCU information technology systems.  Other than the fact that Plaintiff failed to sign the stipulated agreement by the deadline imposed by Kripp on August 24, 2021, Defendants provided no explanation to Plaintiff in support of the actions taken against her.  (Plaintiff's Declaration ¶ 37, Exhibit 1.)

On the afternoon of August 24, 2021, Plaintiff's counsel sent correspondence to the Office of the Attorney General of the State of Connecticut objecting to the most recent act of discrimination and retaliation committed by Defendants against Plaintiff on that date, demanded that Plaintiff be immediately reinstated to her position as Campus CEO, communicated that Plaintiff had filed claims of discrimination and retaliation with the Connecticut Commission on Human Rights and Opportunities ("CHRO") alleging violations of Title VII of the Civil Rights Act of 1964, and also provided significant details regarding the deficiencies and failures in the report provided by CSCU's law firm.  (August 24, 2021 letter, Exhibit 12.)

After Kripp suspended Plaintiff on August 24, 2021, Steinmetz assumed Plaintiff's responsibilities and CSCU broadcast the change.  (Plaintiff's Declaration ¶ 38, Exhibit 1.)

On August 27, 2021, Plaintiff filed her Complaint in federal court alleging Defendants violated her federal constitution and statutory rights, as well as a pattern and practice of discrimination and retaliation at CSCU.  (Doc. No. 1.)

On August 27, 2021, Plaintiff also submitted a request for a hearing relating to her suspension as Campus CEO under CSCU's Human Resources Policies and Procedures. (Plaintiff's Declaration ¶ 40, Exhibit 1; CSCU Policies and Procedures § 8.5, Exhibit 9.)  On August 27, 2021, Plaintiff wrote to Kripp, the CSCU President, and the Board of Regents, and requested a hearing relating to her August 24, 2021 suspension under CSCU's Human Resources Policies and Procedures, which identify suspension as a form of discipline that can only imposed for cause, and also require that CSCU provide due process to employees before and after imposing discipline such as suspension.  (Plaintiff's August 27, 2021 Request for Hearing, Exhibit 13; CSCU Policies and Procedures § 8.2, § 8.4, § 8.5, Exhibit 9.)

When CSCU imposes discipline, including suspension, against a Campus CEO, CSCU's Policies and Procedures require that the Chair of the Board of Regents appoint a committee of three persons to hold a hearing within thirty (30) days of an employee's request for a hearing, and mandate that the committee issue a decision within ten (10) days after the conclusion of the hearing.  (CSCU Policies and Procedures § 8.5, Exhibit 9.)  Even though Plaintiff submitted a timely request for a hearing on August 27, 2021 relating to her suspension on August 24, 2021, Defendants never provided Plaintiff with any due process relating to that action against her.  Not only did Defendants fail to provide Plaintiff with any pre-disciplinary due process before they suspended her, but Defendants also never provided Plaintiff with a hearing relating to her suspension after she requested one.  (Plaintiff's Declaration ¶¶ 39, 42, Exhibit 1.)

On September 15, 2021, the CHRO served CSCU with a copy of the charge of discrimination and retaliation that Plaintiff filed in August, 2021, and in which Plaintiff alleged sex discrimination and retaliation in violation of Title VII, in addition to state law.  (Copy of September 15, 2021 notice from CHRO, Exhibit 11.)

On September 16, 2021, Plaintiff filed a motion in U.S. District Court seeking a preliminary injunction and asking the Court to reinstate Plaintiff and enjoin Defendants from any further acts of retaliation against Plaintiff.  (Doc. No. 11.)

The following day, on September 17, 2021, Kripp notified Plaintiff for the first time that Defendants were moving to terminate Plaintiff's employment for cause.  Kripp's September 17, 2021, notice of discipline claimed vague and general alleged deficiencies by Plaintiff that Defendants had not previously communicated to Plaintiff before she filed her complaint in U.S. District Court.  (Plaintiff's Declaration ¶¶ 43-44, Exhibit 1.)  Kripp's September 17, 2021 notice of discipline neither disclosed the factual basis for the charges, nor the evidence supporting the charges, nor an explanation of the evidence supporting the charges.  (September 17, 2021 notice of discipline, Exhibit 14.)  Kripp's September 17, 2021, notice of discipline claimed that Steinmetz recommended Plaintiff's termination for cause, and informed Plaintiff that Kripp was advancing the recommendation to terminate Plaintiff's employment for cause to Jane Gates, who was then CSCU's Provost and Senior Vice President for Academic Affairs, and that Plaintiff would have an opportunity to meet with Jane Gates on September 23, 2021.  (September 17, 2021 notice of discipline, Exhibit 14.)

In response to the September 17, 2021, notice of discipline, Plaintiff's counsel requested that CSCU provide additional evidence and information supporting the charges made by CSCU against her in accordance with Plaintiff's constitutional rights to due process, and that CSCU

14

delay the September 23, 2021 meeting with Jane Gates until CSCU provided Plaintiff with that information.  (September 17, 2021 letter, Exhibit 15.)  CSCU refused to postpone the September 23, 2021, meeting with Jane Gates and refused to provide Plaintiff with additional information or documents supporting the charges against her before the September 23, 2021 meeting. (Communications relating to September 23, 2021 meeting, Exhibit 16.)

On September 23, 2021, Plaintiff and her counsel attended a meeting with Jane Gates.  At the September 23, 2021 meeting, Plaintiff provided Jane Gates with documents supporting her allegations of discrimination and retaliation, including her filings in U.S. District Court, the complaint Plaintiff filed with the CHRO, the correspondence from Plaintiff's counsel dated June 23, 2021 and August 24, 2021, and the communications from Plaintiff's counsel in response to the September 17, 2021, notice of discipline.  (September 23, 2021 cover letter to Gates, Exhibit 17.)  At the September 23, 2021 meeting, Plaintiff conveyed how CSCU had interfered with and prejudiced her ability to respond to the charges against her, and that Plaintiff would be able to respond further if CSCU provided additional information relating to the charges against her. (September 23, 2021 cover letter to Gates, Exhibit 17.)

More than a month later, on October 26, 2021, Kripp provided Plaintiff with a position statement, along with Exhibits A through W, that Defendants prepared and submitted to Jane Gates in connection with Jane Gates's review of the recommendation to terminate Plaintiff's employment for cause.  In the October 26, 2021, position statement, Defendants set forth arguments why CSCU should terminate Plaintiff's employment for cause.  (CSCU October 26, 2021 position statement with exhibits, numbered CSCU 10/26/21 position 0001 through 000683, Exhibit 2.)

Defendants' October 26, 2021 position statement and supporting exhibits included direct evidence of retaliation.  For instance, in their October 26, 2021 position statement, Defendants argued that CSCU should terminate Plaintiff's employment for cause, in part, because of her July 18, 2020 e-mail to Alice Pritchard that included protected activity, and which is attached here as Plaintiff's Exhibit 6.  (See Exhibit 2, CSCU 10/26/2021 Position 0004, referencing documents as Exhibit H, and CSCU 10/26/2021 Position 000136-000139, which included Plaintiff's July 18, 2020 e-mail as part of CSCU's Exhibit H.)  This was also one example, out of many, in which, shortly after Plaintiff filed her federal court lawsuit, Defendants argued for the first time that Plaintiff should be terminated for cause based on issues and events that occurred many months earlier, and in some cases more than a year earlier, and for which Defendants never disciplined Plaintiff at the time.

Defendants' October 26, 2021, position statement and supporting exhibits are also replete with evidence of pretext and disparate treatment, (*see generally* Plaintiff's November 10, 2021 response to Defendants' October 26, 2021 position statement, Exhibit 3), of which the following are just a few illustrative examples.

Defendants falsely accused Plaintiff of insubordination without providing any evidence of insubordination.  (See Exhibit 2, CSCU 10/26/21 Position 0004-0005; Exhibit 3, Plaintiff's November 10, 2021 Response, 00015-00017.)

Defendants also singled out Plaintiff and subjected Plaintiff to disparate treatment, as compared to other Campus CEOs who engaged in similar conduct but whom Defendants never disciplined or terminated.  For instance, Defendants terminated Plaintiff for cause because she expressed support for concerns raised by another male Campus CEO, Steven Minkler, but Defendants never disciplined Steven Minkler for initially expressing the concerns, nor another

female Campus CEO/President, Mary Ellen Jukoski, who not only agreed with Steven Minkler, but also expressed additional concerns that went beyond those expressed by Steven Minkler. (See Exhibit 2, CSCU 10/26/2021 Position 0004, referencing documents as Exhibit E, and CSCU 10/26/2021 Position 00102-000107, which constitute CSCU's Exhibit E; Exhibit 3, Plaintiff's November 10, 2021 Response, at 00011-00012.)

Defendants also claimed that Plaintiff's employment should be terminated for cause because she allegedly did not share access to her outlook calendar with Steinmetz's assistant almost a year earlier.  (See Exhibit 2, CSCU 10/26/2021 Position 0007, referencing documents as Exhibit P, and CSCU 10/26/2021 Position 000378-000385, which constitute CSCU's Exhibit P.)  In support of this allegation, Defendants included, as their Exhibit P, e-mails from almost a year earlier in which Steinmetz requested that Plaintiff and other Campus CEOs share calendar access with his assistant, and in which the Campus CEOs expressed alternative calendar management suggestions to Steinmetz.  (See Exhibit 2, CSCU 10/26/21 Position 000378-000385.)  By even relying on this issue as a basis to terminate Plaintiff's employment for cause, Defendants revealed the retaliatory nature of Defendants' entire effort to terminate Plaintiff's employment.  However, Defendants withheld other evidence from their position statement which demonstrates the pretexual nature of this allegation even more clearly.  As part of Exhibit P to their October 26, 2021 position statement, Defendants included an e-mail from Plaintiff to Steinmetz and his assistant on November 17, 2020 at 5:17 p.m. in which Plaintiff communicated to Steinmetz that his assistant should be able to view when Plaintiff is in meetings on her calendar.  (Exhibit 2, CSCU 10/26/21 Position 000380.)  However, Defendants omitted the e-mails which followed later that same day, and the following morning.  Later on November 17, 2020, after Plaintiff communicated to Steinmetz that his assistant should be able to view

Plaintiff's calendar, Steinmetz responded that his assistant was copied on the message and could confirm that she is able to see Plaintiff's calendar.  The following morning, November 18, 2020, Steinmetz's assistant confirmed to both Plaintiff and Steinmetz that she can now see Plaintiff's calendar.  (November 2020 e-mail chain re calendar access, Exhibit 18.)  After that November 18, 2020, communication, Steinmetz never expressed any concerns to Plaintiff about Plaintiff allegedly not sharing her calendar with his assistant as he requested until almost a year later, on October 26, 2021, when Defendants argued that Plaintiff should be terminated for cause because she never provided the calendar access to Steinmetz's assistant as requested "with no explanation for this failure."  (Exhibit 2, CSCU 10/26/21 Position 00007, referring to Exhibit P.)

Defendants also subjected Plaintiff to disparate treatment and retaliation when it argued for the termination of Plaintiff's employment for cause because Plaintiff expressed concerns relating to Service Level Agreements ("SLAs") and federal financial aid PPA forms, and based on the date when Plaintiff signed those documents.  (CSCU 10/26/21 Position 00005 – 00006, and referenced Exhibit K, CSCU 10/26/21 Position 000152-000197, and referenced Exhibit L, CSCU 10/26/21 Position 000198-000245; Plaintiff's November 10, 2021 Response, at 00017-00021, Exhibit 3.)  Plaintiff, as well as other Campus CEOs, had concerns about signing these documents, but Defendants only terminated Plaintiff's employment.  (Plaintiff's Declaration ¶¶ 56-57, Exhibit 1; Lisa Dresdner Declaration ¶ 11, Exhibit 5; Lisa Dresdner December 2021 statement ¶¶ 13-16, Exhibit 5.)  Lisa Dresdner signed her SLA and PPA documents in the same time frame as Plaintiff, and expressed similar concerns as Plaintiff relating to those documents, but Defendants did not discipline or terminate Lisa Dresdner.  (Lisa Dresdner Declaration ¶ 11, Exhibit 5; Lisa Dresdner December 2021 statement ¶¶ 13-16, Exhibit 5.)  Steven Minkler, another Campus CEO who reported to Steinmetz, also did not sign his SLA by the alleged

deadline, but Steinmetz never disciplined him.[4]  (Plaintiff's Declaration ¶¶ 54-56, Exhibit 1;

Recording of January 7, 2022 Hearing, being manually filed as Exhibit 26.)

In their October 26, 2021 position statement arguing for Plaintiff's termination,

Defendants also contradicted arguments that they previously made to this Court.  Even though

Defendants previously argued to this Court that Plaintiff's "administrative leave" was not a

"suspension," (see, e.g., Doc. No. 27, p. 16), in Defendants' October 26, 2021 position statement,

Defendants argued that they had authority to place Plaintiff on administrative leave on August

24, 2021 under the Article 8.4 of the CSCU Policies and Procedures, which governs suspensions.

(Exhibit 2, CSCU 10/26/21 Position 00003)("Administrative leave is allowable under Article 8.4

. . . ."; CSCU Policies and Procedures § 8.4, Exhibit 9.)  On October 28, 2021, Plaintiff's counsel

wrote to Defendants' counsel to demand that, since CSCU had admitted that it acted under the

Article of the CSCU Policies and Procedures which govern suspensions when it placed Plaintiff

on administrative leave on August 24, 2021, and since Defendants had not complied with the due

process requirements which limited CSCU's authority to suspend employees under that Article,

that CSCU must immediately reinstate Plaintiff to her position.  (October 28, 2021 letter, Exhibit

19.)

On November 10, 2021, Plaintiff submitted a written response to Defendants' October

26, 2021 position statement, along with attached exhibits.  Plaintiff provided her November 10,

2021 response to Jane Gates, and also to Defendants' counsel.  (Plaintiff's November 10, 2021

Response, Exhibit 3.)  In her November 10, 2021 response, Plaintiff identified some examples of

---

[4] In addition to evidence of retaliation and pretext supporting Plaintiff's federal claims that are currently pending in federal court, Defendants' October 26, 2021 position statement and supporting exhibits, and the February 9, 2022 findings by the Board of Regents Committee, constitute direct evidence of retaliation in violation of other laws, including Conn. Gen. Stat. § 4-61dd.  Defendants cannot rely on purported justifications that are unlawful on their face.

her positive performance and accomplishments which Defendants neglected to recognize. (Plaintiff's November 10, 2021 Response, at 0001-0006, Exhibit 3.)  In her November 10, 2021 response, Plaintiff documented that the October 26, 2021, position statement and supporting exhibits included direct evidence of retaliation, and constituted direct evidence that CSCU was moving to terminate her employment for unlawful reasons.  In her November 10, 2021, response, Plaintiff documented that CSCU's October 26, 2021 position statement relied on the e-mail that Plaintiff sent to Pritchard in July 2020, which included protected activity, as one of the reasons that CSCU was seeking to terminate Plaintiff's employment.  In her November 10, 2021, response, Plaintiff documented that CSCU's October 26, 2021 position statement and attached exhibits claimed that Plaintiff's employment should be terminated for other reasons that also violated other federal and state laws.  In her November 10, 2021, response, Plaintiff demonstrated how the reasons identified in CSCU's October 26, 2021, position statement were false and/or pretextual, and how the Exhibits A through W attached to the October 26, 2021, position statement did not support the arguments included in CSCU's position statement.  In her November 10, 2021, response, Plaintiff documented that CSCU was moving to terminate her employment based on events which occurred many months earlier, and in some cases more than a year earlier, and for which CSCU had never disciplined Plaintiff at the time.  In her November 10, 2021 response, Plaintiff documented that CSCU was singling Plaintiff out for disparate treatment and treating her differently than other Campus CEOs, including another male Campus CEO who reported to Steinmetz.  (Plaintiff's November 10, 2021 Response, Exhibit 3.)

On December 3, 2021, Plaintiff provided Jane Gates with a statement from Lisa Dresdner, another Campus CEO, that contained information demonstrating that CSCU was relying on false and/or pretextual charges as a basis for seeking to terminate Plaintiff's

employment for cause, and that CSCU was treating Plaintiff differently than other Campus

CEOs.  Plaintiff's counsel delivered a copy of the December 3, 2021, statement to Defendants'

counsel.  (Plaintiff's Declaration ¶ 49, Exhibit 1; Lisa Dresdner Declaration ¶ 11, Exhibit 5; Lisa

Dresdner December 2021 statement, Exhibit 5.)

When Plaintiff was exercising her rights to challenge the intended termination of her

employment through the due process procedures afforded to her by Defendants, other CSCU

employees who possessed relevant information and who wanted to support Plaintiff and oppose

the termination of Plaintiff's employment declined to exercise their rights and did not provide

statements for Plaintiff to submit to CSCU in opposition to the termination of her employment

because they were afraid that CSCU would retaliate against them if they did so.  (Plaintiff's

Declaration ¶ 61, Exhibit 1.)  Employees confirmed their fear of retaliation to Lisa Dresdner, in

addition to Plaintiff.  (Lisa Dresdner Declaration ¶¶ 12-14, Exhibit 9.)

Notwithstanding the documentation provided to Jane Gates demonstrating the obvious

acts of retaliation against Plaintiff, on December 8, 2021, Jane Gates issued a notice in which she

stated that she found cause.  The December 8, 2021, notice from Jane Gates did not identify what

she found to be cause, or provide any explanation or analysis regarding how she found cause.

(December 8, 2021 notice from Gates, Exhibit 20.)

On December 9, 2021, Kripp notified Plaintiff that her employment with CSCU was

terminated, effective immediately.  (December 9, 2021 termination notice, Exhibit 21.)

On December 10, 2021, Plaintiff requested a hearing relating to the termination of her

employment pursuant to the CSCU Human Resources Policies and Procedures, and also

requested that the Board of Regents and CSCU reinstate Plaintiff to her employment until there

was a final decision following the hearing.  (Plaintiff's December 10, 2021 Request for Hearing, Exhibit 22.)

In January 2022, Steinmetz, Kripp, and Pritchard provided testimony under oath as part of a remote hearing before panel members appointed by the Chair of Board of Regents. (Plaintiff's Declaration ¶¶ 54, Exhibit 1.)  During the hearing, which occurred in January 2022, Plaintiff elicited additional testimony which confirmed that Defendants retaliated against Plaintiff in violation of federal law.  For instance, on January 13, 2022, the third day of testimony, Defendant Kripp admitted under oath that, if Plaintiff signed the agreement that Kripp communicated to Plaintiff on August 18, 2022 (Exhibit 10), and if Plaintiff did not file her federal court lawsuit, then Defendants would not have terminated Plaintiff's employment for cause and Defendants would have paid Plaintiff her full salary and benefits through August 23, 2022.  (Plaintiff's Declaration ¶ 54-55, 58, Exhibit 1; Recording of January 13, 2022 hearing testimony is being manually filed with the Court as Plaintiff's Exhibit 23.)

On February 9, 2022, the three-person committee appointed by the Chair of the Board of Regents issued written findings and did not reverse the termination of Plaintiff's employment. Through its findings, the committee committed additional violations of Plaintiff's rights, including basing its decision on facially unlawful and/or pretextual reasons.  For instance, the committee's decision found that Defendants had cause to terminate Plaintiff's employment for cause, in part, because Plaintiff expressed concerns to the United States Department of Education.  (February 9, 2022 Committee Findings, Exhibit 4.)

By terminating Plaintiff's employment for cause, Defendants have caused additional harm to Plaintiff that would not have occurred from a termination of employment without cause. (Plaintiff's Declaration ¶¶ 62-63, Exhibit 1.)

### III.    STANDARD OF REVIEW

Rule 65 of the Federal Rules of Civil Procedure grants the Court the authority to issue preliminary injunctions.  In the Second Circuit, a party seeking a preliminary injunction must demonstrate "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd*., 598 F.3d 30, 35 (2d Cir. 2010)(citations omitted).  While Plaintiff's arguments are framed around the likelihood of success standard, Plaintiff's evidence and arguments can satisfy either standard and Plaintiff moves alternatively under both standards.  In addition, the Court must find that "the balance of equities tips in [her] favor, and that an injunction is in the public interest."  *Townsend v. Castillo*, No. 3:20-cv-1241 (SRU), 2021 U.S. Dist. LEXIS 145714 *2 (D. Conn. Aug. 4, 2021)(quoting *Glossip v. Gross*, 576 U.S. 863, 876 (2015)).  *See also Lazor v. University of Connecticut*, No. 3:21-cv-583 (SRU), 2021 U.S. Dist. LEXIS 99490 *3-4 (D. Conn. May 26, 2021).  The Court can rely on hearsay evidence when considering a request for preliminary injunctive relief. *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010).

As this Court recognized in *Townsend* and *Lazor*, the standard of review is partially dependent on whether the motion seeks to maintain or alter the status quo.  *Townsend v. Castillo*, No. 3:20-cv-1241 (SRU), 2021 U.S. Dist. LEXIS 145714 *2-3 (D. Conn. Aug. 4, 2021) *Lazor v. University of Connecticut*, No. 3:21-cv-583 (SRU), 2021 U.S. Dist. LEXIS 99490 *3-4 (D. Conn. May 26, 2021).  "Because the proposed injunction's impact on the status quo drives the standard, courts must first identify the 'status quo' –that is, the 'last actual, peaceable uncontested status which preceded the pending controversy.'" *Lazor*, 2021 U.S. Dist. LEXIS

23

99490 *3-4 (quoting *North American Soccer League LLC v. United States Soccer Federation*, 883 F.3d 32, 37 (2d Cir. 2018)).  In this case, the last actual, peaceable uncontested status which preceded the pending controversy was when Plaintiff was fully active in her capacity as CEO of MCC, before CSCU removed her from her position and suspended her on August 24, 2021. Accordingly, Plaintiff's motion which seeks an order restoring the status quo in which Plaintiff is CEO of MCC should be adjudicated under the less stringent standards for a prohibitory injunction.  *Lazor*, 2021 U.S. Dist. LEXIS *3-5; *Townsend*, 2021 U.S. Dist. LEXIS 145714 *2-3.

## IV.   ARGUMENT

### A.  Likelihood of Success on Retaliation Claims

Other federal courts have granted motions for preliminary injunctions reinstating employees where the plaintiffs presented evidence demonstrating that it was likely that employers violated their federal constitutional rights, or federal statutory rights prohibiting discrimination.  In *Zorzi v. County of Putnam*, 30 F.3d 885 (7th Cir. 1994), the Seventh Circuit affirmed a preliminary injunction order based on the plaintiff's claim that the defendants retaliated against her because of her lawsuit in violation of the First Amendment and required the defendants to reinstate the plaintiff.  *Id.* at 895-898.  *See also Mariani Giron v. Acevedo Ruiz*, 834 F.2d 238 (1st Cir. 1987)(affirming injunction in favor of plaintiff in First Amendment political firing case); *Conn. v. Bd. of Educ.*, 586 F. Supp. 2d 852 (E.D. Mich. 2008)(granting injunction where plaintiffs likely to prevail on First Amendment retaliation claim); *Milliron v. Louisville & Jefferson Cty. Metro. Sewer Dist.*, 867 F. Supp. 559 (W.D. Ky. 1994)(same); *Perry v. Ft. Wayne*, 542 F. Supp. 268 (N.D. Ind. 1982)(First Amendment claim); *Potkay v. Ament*, 34 F. Supp. 3d 937 (E.D. Wisc. 2014)(granting injunction where plaintiff likely to prevail on due process claim); *Keyer v. Civil Serv. Comm'n*, 397 F. Supp. 1362 (E.D.N.Y. 1975 (same); *Hunter*

*v. Ann Arbor*, 325 F. Supp. 847 (E.D. Mich. 1971)(due process claim); *McGinnis v. USPS*, 512

F. Supp. 517 (N.D. Cal. 1980)(granting injunction where plaintiff likely to prevail on Title VII

religious accommodation claim); *EEOC v. Target Stores*, No. 4-83-963, 1984 U.S. Dist. LEXIS

24210 (D. Minn. Aug. 21, 1984)(temporary restraining order granted in Title VII retaliation

claim); *Chalk v. U.S. District Court*, 840 F.2d 701 (9th Cir. 1988)(granting injunction where

plaintiff demonstrated strong probability of succeeding on Rehabilitation Act claim).

      The Court should issue an injunction in favor of Plaintiff because she is likely to succeed

on her retaliation claims under the First Amendment, Fourteenth Amendment, Title IX, and Title

VII. *Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 80-82 (2d Cir.

2015)(recognizing retaliation claims for complaining about discrimination under the Fourteenth

Amendment and 42 U.S.C. § 1983); *Brown v. Office of State Comptroller*, 456 F. Supp. 3d 370

(D. Conn. 2020)(analyzing retaliation claim under First Amendment); *Jackson v. Birmingham Bd*

*of Educ.*, 544 U.S. 167 (2005)(recognizing cause of action under Title IX for employee who was

allegedly fired for engaging in conduct protected by Title IX).  Under each of these claims,

Plaintiff must satisfy similar requirements:  (a) Plaintiff engaged in protected activity; (b)

Plaintiff suffered an adverse employment action; and (c) there is a causal connection between

Plaintiff's protected activity and the adverse employment action.  *Vega*, 801 F.3d at 91-92

(analysis of retaliation claims opposing discrimination under Fourteenth Amendment and 42

U.S.C. § 1983 are similar to claims under Title VII); *Brown v. Office of State Comptroller*, 456

F. Supp. 3d 370 (D. Conn. 2020)(analyzing retaliation claim under First Amendment); *Summa v.*

*Hofstra Univ.*, 708 F.3d 115, 131 (2d Cir. 2013)(Title IX retaliation claim governed by same

standards as claims under Title VII).  With respect to the claims under 42 U.S.C. § 1983, there is

also a requirement to show action under the color of state law, but that is easily satisfied here

since all individual defendants are state employees holding senior management level positions.
*West v. Atkins*, 487 U.S. 42, 49-50 (1988).

1.    *Protected Activity for Opposing Discrimination*

Plaintiff engaged in protected activity under Title VII, Title IX, and the Fourteenth
Amendment when she opposed sex discrimination by Steinmetz beginning in July 2020,
including when she complained to Steinmetz directly that his comments were sexist, and when
she complained about Steinmetz's conduct to Pritchard on July 18, 2020.  (Plaintiff's Declaration
¶¶ 21-23, Exhibit 1; July 18, 2020 e-mail, Exhibit 6.)  The scope of protected activity for
opposing discrimination under Title VII is broad.  *See Crawford v. Metro. Gov't of Nashville &
Davidson Cty.*, 555 U.S. 271, 276 (2009).  *See also Hubbard v. Total Communs. Inc.*, 347 F.
App'x 679, 681 (2d Cir. 2009)(internal e-mail claiming differential treatment between the
plaintiff and the men in her department was protected).  Plaintiff's July 18, 2020 e-mail to
Pritchard includes protected opposition to sex discrimination, including: (a) Plaintiff opposing
statements by Steinmetz criticizing her "tone" and her "delivery" and calling her "off-putting,"
(b) Plaintiff complaining about Steinmetz threatening Plaintiff's job security immediately in
response to Plaintiff objecting to his sexist comments; (c) Plaintiff hiring a highly qualified
female applicant over Steinmetz's objection when Steinmetz's opposition to hiring the female
candidate was based in part on his criticism that the female applicant spoke too much during her
job interview, and (d) Plaintiff reporting concerns that Steinmetz was treating Plaintiff
differently than other similarly situated male Campus CEOs who reported to him, Steven
Minkler and Duncan Harris.  (Plaintiff's Declaration ¶¶ 21-23, Exhibit 1; July 18, 2020 e-mail,
Exhibit 6.)  During the January 13, 2022 hearing, Pritchard admitted that Plaintiff raised issues in
her July 18, 2020 e-mail that could, as a general matter, reflect problems relating to gender.

(Plaintiff's Declaration ¶ 54-55, 59, Exhibit 1; Recording of January 13, 2022 hearing being manually filed as Exhibit 23.)

Plaintiff also engaged in protected activity under the First Amendment, the Fourteenth Amendment, Title IX, and Title VII, when she complained about, and opposed, a pattern and practice of discrimination and CSCU's alleged failure to respond to the alleged discrimination, and when she opposed retaliation based on her protected complaints. *Vega v. Hempstead Union Free School Dist.*, 801 F.3d at 80-82 & 91-92; *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. at 173-74; *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 413 (1979)(First Amendment retaliation claim based on complaints by teacher regarding policies and practices which were allegedly discriminatory); *Konits v. Valley Stream Cent. High Sch. Dist.*, 394 F.3d 121, 125 (2d Cir. 2005)("Gender discrimination in employment is without doubt a matter of public concern.").

Plaintiff engaged in protected activity when she filed her federal court lawsuit opposing discrimination and retaliation in violation of federal law and the U.S. Constitution and moved for a preliminary injunction, and when she filed her charge of discrimination with the CHRO/EEOC alleging a violation of Title VII.   Plaintiff also engaged in protected activity when she complained about discrimination and retaliation directly to Defendants, (e.g., June 23, 2021 letter, Exhibit 24; August 24, 2021 letter, Exhibit 12; November 10, 2021 Response, Exhibit 3), and when she provided additional information as part of the investigation into her allegations of discrimination and retaliation.  (Plaintiff's Declaration ¶ 32, Exhibit 1.)

Plaintiff did not only oppose discrimination and retaliation against herself.  Rather, she complained about a pattern and practice of discrimination, as well as CSCU's systemic failure to properly respond to alleged violations of women's rights.  In her original federal court complaint, filed on August 27, 2021, Plaintiff alleged a pattern and practice of discrimination, and also

sought injunctive relief targeted at systemic issues broader than just her own employment. (Complaint, Doc. No. 1.)  In the June 23, 2021 letter sent on Plaintiff's behalf from Plaintiff's counsel, Plaintiff also opposed systemic discrimination and claimed retaliation for speaking on matters of public concern.  (June 23, 2021 letter, Exhibit 24.)  Plaintiff also engaged in additional acts of protected activity when she complained about further retaliation, such as in the August 24, 2021 letter from Plaintiff's counsel (Exhibit 24), when she filed her motion for preliminary injunction in federal court (Doc. No. 11), and when she documented how Defendants' move to terminate her employment for cause was a flagrant and transparent act of unlawful retaliation, (Plaintiff's November 10, 2021 Response, Exhibit 3).

2.   <em>Protected Activity Based on Refusal to Sign Agreement</em>

Plaintiff also engaged in protected activity when, after already complaining about discrimination and retaliation in June and July 2021, she refused to sign the proposed agreement that Defendants attempted to impose upon her in August 2021.  In rejecting Defendants' proposed agreement, Plaintiff:  (a) refused to agree to the false factual statement that Plaintiff "wishes to resign as CEO of the College"; (b) denied Defendants' request that she sign a general release and waiver of claims, including her claims of discrimination and retaliation; (c) refused to agree to a covenant not to sue which would have prevented Plaintiff from filing claims in court as well as claims with administrative agencies such as the EEOC; and (d) rejected a request from the State that Plaintiff agree to a non-disparagement provision which would have restrained Plaintiff's ability to exercise her First Amendment rights and her rights to oppose discrimination. (August 18, 2021 proposed agreement, Exhibit 10.)

By including a general release and covenant not to sue which would have prohibited Plaintiff from exercising her rights to file complaints with administrative agencies such as the

EEOC and CHRO, Defendants retaliated against Plaintiff and attempted to stifle Plaintiff's ability to oppose discrimination and retaliation.  *Connecticut Light & Power Co. v. Secretary of the United States Dep't of Labor*, 85 F.3d 89 (2d Cir. 1996)(affirming Department of Labor determination under ERA that an employer's request that an employee who had already engaged in protected activity agree to a provision which would have restricted the employee's access to provide information to, and file claims with, administrative agencies was a retaliatory adverse action under the ERA).  The Supreme Court has made it clear that "it is crucial that the Commission's ability to investigate charges of systemic discrimination not be impaired."  *EEOC v. Shell Oil Co.*, 466 U.S. 54, 69 (1984).  *See also EEOC v. Astra USA, Inc.*, 94 F.3d 738, 743-745 (1st Cir. 1996)(enjoining employer's use of non-assistance agreements which prohibited employees from participating in EEOC's investigation into allegations of discrimination); *EEOC v. Cosmair, Inc., L'Oreal Hair Care Div.*, 821 F.2d 1085, 1090 (5th Cir. 1987)(granting injunction and holding that agreement to waive right to file charge of discrimination with EEOC is void and unenforceable as against public policy).  For decades, the EEOC has maintained that agreements which seek to waive an employee's right to file charges of discrimination with administrative agencies such as the EEOC are unlawful.  (The EEOC's 1997 guidance is available at https://www.eeoc.gov/laws/guidance/enforcement-guidance-non-waivable-employee-rights-under-eeoc-enforced-statutes and also attached as Exhibit 27.)  *See also U.S. EEOC v. Lockheed Martin Corp.*, 444 F. Supp. 2d 414 (D. Md. 2006)(granting summary judgment in favor of EEOC regarding facially retaliatory agreement which attempted to restrict ability to file charges with EEOC).

Accordingly, by rejecting Defendants' request that she waive and release her claims of discrimination and retaliation, and by refusing to Defendants' unlawful request that she promise

to not file claims of discrimination and retaliation in Court or with administrative agencies such as the EEOC – after she had already engaged in protected activity by opposing discrimination and retaliation – Plaintiff engaged in additional protected activity and signaled to Defendants that she intended to continue pursuing her claims of discrimination and retaliation in the very judicial and administrative forums which Defendants targeted through their proposed agreement.

Plaintiff also engaged in protected activity under the First Amendment and Fourteenth Amendment by refusing Defendants' request that she make a factually false statement.  *See Jackler v. Byrne*, 658 F.3d 225 (2d Cir. 2011)(First Amendment protects right to refuse to make false statements).  Plaintiff refused to agree to the factually false statement that she "wishes to resign as CEO of the College," which Defendants asked her to affirm in a public record that would be subject to disclosure in response to any citizen request and in furtherance of Defendants' effort to interfere with Plaintiff's continued opposition to discrimination and retaliation.  (Defendants' proposed agreement, Exhibit 10).  Defendants requested that Plaintiff affirm that factually false statement even after Plaintiff made clear that she wanted to continue as CEO and complained that Defendants' effort to remove her from her position was an act of discrimination and retaliation.  (*See, e.g*., June 23, 2021 letter, Exhibit 24.)  Accordingly, Defendants knew that they were asking Plaintiff to agree to a false statement in connection with their request for an unlawful and retaliatory release agreement and covenant not to sue.

Plaintiff also engaged in protected activity under the First Amendment and Fourteenth Amendment when she refused to agree to the State's request that she refrain from making public or private disparaging remarks, which was an effort by the State to restrain Plaintiff from exercising her rights as a citizen and to silence Plaintiff's ability to continue speaking out on

matters of public concern, including issues relating to discrimination and retaliation at CSCU. (Defendants' proposed agreement, Exhibit 10.)

### 3.    *Adverse Action*

Defendants' termination of Plaintiff's employment for cause certainly qualifies as an adverse action because it could dissuade a reasonable person from engaging in protected activity, as does Defendants' action to suspend Plaintiff, indefinitely, and without due process, on August 24, 2021. *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006); *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010); *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 226 (2d Cir. 2006); *Patane v. Clark*, 508 F.3d 106, 116 (2d Cir. 2007).

### 4.    *Causal Connection*

Plaintiff can also demonstrate a causal connection between her protected activity and the termination of her employment. Consistent with the Second Circuit's decision in *Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 846 & n.5 (2d Cir. 2013), the Supreme Court made clear in *Bostock* that there can be multiple but-for causes for an employment decision.[5] *Bostock v. Clayton County*, 140 S. Ct. 1731, 2020 U.S. LEXIS 3252 *15 (2020). Under a but-for causation standard, if a plaintiff can prove that her protected activity "was one but-for cause" of an adverse action, "that is enough to trigger the law." *Id.* Moreover, a prohibited reason can be a but-for cause of an employment decision in violation of the law even when it was not the sole reason, or primary reason, or the main cause, of the employment decision, and even if the employer identifies some other factor that also contributed to the decision. *Id.*, 2020 U.S. LEXIS 3252 **15, 29. As if to emphasize the point, throughout its opinion in *Bostock*, the Supreme Court repeatedly stated that an employer violates the statute, under a but-for standard, when it makes

---

[5] Plaintiff assumes for purposes of this motion that a "but-for" causation standard applies to all of Plaintiff's federal constitutional and statutory retaliation claims.

an employment decision based "in part" on a protected characteristic.  *See id.* 2020 U.S. LEXIS 3252 **19, 20, 21, 24, 25, 26, 29, 35, 36.  The Court also mandated an expansive view of discriminatory intent.  *See id.* 2020 U.S. LEXIS 3252  *23("Intentionally burning down a neighbor's house is arson, even if the perpetrator's ultimate intention (or motivation) is only to improve the view.").

The Eleventh Circuit recently affirmed that it is unlawful for an employer to condition the continued employment of an employee who has engaged in protected activity on the employee's acceptance of a release agreement, and that it is unlawful for an employer to retaliate against an employee who has engaged in protected activity because of the employee's refusal to sign a release agreement.  *Knox v. Roper Pump Co.*, 957 F.3d 1237, 1246 (11th Cir. 2020).  *See also Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261 (11th Cir. 2008).

Plaintiff's protected activity, including her refusal to agree to Defendants' proposed agreement by the deadline of 12:00 noon on August 24, 2021 communicated by Kripp, was at least one but-for cause of Defendants' action to terminate Plaintiff's employment.  Defendant Kripp has admitted, under oath, that if Plaintiff signed Defendants' proposed agreement by the August 24, 2021 deadline and did not file her federal court lawsuit, then Defendants would not have moved to terminate Plaintiff's employment for cause and would have continued to pay Plaintiff her full salary and benefits through August 23, 2022.  (Plaintiff's Declaration ¶¶ 54-55, 58, Exhibit 1; Recording of January 13, 2022 hearing, being manually filed with the Court as Exhibit 23.)  Additional circumstantial evidence confirms the clear causal connection.  Kripp called Plaintiff on August 24, 2021, less than one hour after the deadline for Plaintiff to accept the agreement expired and less than one hour after Plaintiff communicated to Kripp that her attorneys would be communicating with the Office of the Attorney General.  During the August

24, 2021 call in which Kripp notified Plaintiff of the adverse action, Kripp specifically referenced the fact that Plaintiff failed to sign the agreement, and failed to communicate any other reason to Plaintiff for the actions being taken against her.  (Pl's Declaration ¶ 37, Ex. 1.)

The broader record, and the sequence and timing of events, also demonstrates that Defendants' entire effort to terminate Plaintiff's employment for cause was an act of retaliation. *Mullins v. City of N.Y.*, 626 F.3d 47, 54 (2d Cir. 2010)(sequence and timing of events demonstrated retaliation in case where preliminary injunction was affirmed).  When Kripp wrote to Plaintiff on August 18, 2021, he indicated that, if Plaintiff did not sign the agreement by the August 24, 2021 deadline, Defendants would convene the Board of Regents to consider the non-continuation of Plaintiff's employment.  (August 18, 2021 e-mail, Exhibit 25.)  Non-continuation is different than a termination for cause, and a termination for cause results in additional personal and professional harm to the person disciplined.  (CSCU Policies and Procedures, Article 8, Exhibit 9; Plaintiff's Declaration ¶¶ 62-63, Exhibit 1.)

However, after Plaintiff refused to accept the terms of Defendants' unlawful and retaliatory agreement by the deadline of August 24, 2021, and Defendants became aware that Plaintiff engaged in several additional acts of protected activity, Defendants abandoned the plan to pursue non-continuation that Kripp had communicated as recently as August 18, 2021, and instead moved to terminate Plaintiff for cause.  After Kripp's August 18, 2021 e-mail, Defendants learned that Plaintiff engaged in several acts of protected activity that Defendants were specifically attempting to preclude through their proposed agreement, including, but not limited to: (a) on August 24, 2021, Plaintiff complained about retaliation to the Attorney General's Office and notified Defendants that Plaintiff had filed claims of discrimination with the CHRO and EEOC (August 24, 2021 letter, Exhibit 12); (b) on August 27, 2021, Plaintiff

filed her complaint in federal court alleging that Defendant Kripp and other Defendants violated

her federal constitutional and statutory rights (Doc. No. 1); (c) on September 15, 2021, CHRO

served CSCU with notice that Plaintiff filed claims of discrimination and retaliation with the

CHRO and EEOC (September 15, 2021 CHRO service notice, Exhibit 11); and (d) on September

16, 2021, Plaintiff moved for a preliminary injunction requesting that this Court reinstate

Plaintiff to her position and enjoin any further acts of retaliation (Doc. No. 11.)

On September 17, 2021, three weeks after Plaintiff filed her federal court lawsuit,

Defendant Kripp sent Plaintiff a notice informing Plaintiff, for the first time, that Defendants

would be moving to terminate her employment for cause, effective immediately.  Before

September 17, 2021, Defendants had never before communicated to Plaintiff that her

performance or conduct provided a justification for Defendants to terminate her employment for

cause.  Before September 17, 2021, Defendants had never before communicated to Plaintiff that

her performance as Campus CEO was deficient in the areas identified in Defendant Kripp's

September 17, 2021 letter.  (Plaintiff's Declaration ¶¶ 28, 31, 43.)  The retaliatory nature of

Defendants' action is self-evident from the fact that Defendants offered to continue employing

Plaintiff for at least another year if she accepted Defendants' proposed agreement by August 24,

2021 and refrained from filing legal claims, and then moved to terminate Plaintiff for cause just

weeks after she rejected that agreement and filed legal claims.

The very documents that Defendants prepared in support of their effort to terminate

Plaintiff's employment for cause constitute additional direct and circumstantial evidence of

retaliation.  For instance, Defendants offered direct evidence of retaliation when they identified

Plaintiff's protected July 18, 2020 e-mail to Pritchard as one of the reasons that they were

moving to terminate Plaintiff's employment for cause.  (Exhibit 2, CSCU 10/26/21 Position

00004, referencing Exhibit H, 10/26/2021 Position 000136-000139, included as part of CSCU's Exhibit H.)  By relying on Plaintiff's July 18, 2020 e-mail to Pritchard as one of the reasons to terminate Plaintiff's employment for cause, Defendants have retaliated against Plaintiff because of her protected opposition in violation of Title IX, Title VII, and the Fourteenth Amendment.

In addition to direct evidence, Defendants' actions and documents have produced overwhelming circumstantial evidence proving retaliatory causation and pretext.  "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, non-retaliatory reasons for its action."  *Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 846 (2d Cir. 2013).  Every one of the issues relied upon by Defendants in their October 26, 2021 position statement is either false, pretextual, or facially unlawful.  (Plaintiff's November 10, 2021 response, Exhibit 3; Dresdner Declaration, Exhibit 5; November 18, 2020 e-mail re calendar access, Exhibit 18.)

The timing of Defendants' actions also demonstrates causation and pretext.  *Mullins*, 626 F.3d at 54-55; *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 770 (2d Cir. 1998)(pretext can be found based on temporal proximity); *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)(protected activity followed closely by discriminatory treatment can prove causation); *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 171 (2d Cir. 1993)(pretext can be found based on "whether the putative non-discriminatory purpose was stated only after the allegation of discrimination.").  When the Second Circuit affirmed a preliminary injunction in a retaliation case in *Mullins*, the Court noted that the defendant took no action to investigate alleged misconduct by one of the plaintiffs for an extended period of time, but then moved to investigate the plaintiff three months after the District Court issued its summary judgment decision.

*Mullins*, 626 F.3d at 55.  The Court can make a similar finding of pretext here.  Defendants

moved to terminate Plaintiff's employment for cause just weeks after Plaintiff filed her federal

court lawsuit, and they did so based on actions and events that occurred many months, and in

some cases more than a year, earlier, and for which Defendants never disciplined Plaintiff at the

time.  (See Plaintiff's November 10, 2021 Response, Exhibit 3.)

Causation and pretext can also be established through evidence of disparate treatment

compared to other employees who engaged in similar conduct.  *Gordon*, 232 F.3d at 117.  With

respect to the reasons identified by Defendants for terminating Plaintiff's employment for cause,

there is also abundant evidence of disparate treatment between Plaintiff and other Campus CEOs,

which further demonstrates causation and pretext.  (*See supra* at pp. 16-19; Plaintiff's November

10, 2021 Response, 00011-12, 00017-21, 00026-27, Exhibit 3; Dresdner Declaration, Exhibit 5.)

Defendants' disregard for Plaintiff's procedural due process rights under CSCU's own

policies and procedures relative to Plaintiff's suspension further reinforces the conclusion that

Defendants acted with an improper motive.  *See, e.g., Stern v. Trs. of Columbia Univ.*, 131 F.3d

305, 313 (2d Cir. 1997)(evidence of procedural irregularity can support inference of pretext);

*Norris v. Metro-North Commuter R.R. Co.*, 522 F. Supp. 2d 402, 409 (D. Conn.

2007)(procedural irregularity could support a fact-finder's determination of discriminatory

intent).  In their October 26, 2021, position statement, Defendants admitted that they acted under

the Article 8.4 of the CSCU Policies and Procedures governing suspensions when they placed

Plaintiff on "administrative leave."  (CSCU 10/26/21 Position 00003, Exhibit 2.)  A suspension

under Article 8.4 requires cause as defined under Article 8.2, and due process as set forth in

Article 8.5, but Defendants completely disregarded their own process and exercised authority

that does not exist under their own procedures – an indefinite suspension, without due process,

and without cause – and then denied Plaintiff due process relating to her suspension when she requested it.  (Plaintiff's Declaration ¶¶ 39-42, Exhibit 1; October 28, 2021 letter, Exhibit 19.)

      B.    <u>Irreparable Harm</u>

Plaintiff can establish irreparable harm in three different ways.

First, Plaintiff's likelihood of success on her claims that Defendants violated her constitutional rights under the First and Fourteenth Amendments supports a finding of irreparable harm.  *Townsend v. Castillo*, 2021 U.S. Dist. LEXIS 145714 *24-25 (D. Conn. Aug. 4, 2021).  The Supreme Court held in *Elrod v. Burns*, 427 U.S. 347 (1976), that a preliminary injunction was appropriate when an employer threatened to discharge employees who refused to compromise their First Amendment rights.  *Id.* at 373.

Second, the Court can find irreparable harm based on evidence that Defendants' retaliation against Plaintiff has chilled other employees from exercising their rights to oppose discrimination and retaliation and abuse of power by public officials.  As the Second Circuit has held, "retaliatory discharge carries with it the distinct risk that other employees may be deterred from protecting their rights . . . or from providing testimony for the plaintiff in her effort to protect her own rights. These risks may be found to constitute irreparable injury." *Holt v. Continental Group, Inc*., 708 F.2d 87, 91 (2d Cir. 1983).  "The standard for preliminary injunctive relief requires a *threat* of irreparable harm, not that irreparable harm already have occurred.  We have held that the 'risk' of deterrence is sufficient to satisfy the irreparable harm standard."  *Mullins*, 626 F.3d at 55.  *See also id.* ("Unchecked retaliation subverts the purpose of the FLSA' and 'the resulting weakened enforcement of federal law can *itself* be irreparable harm in the context of a preliminary injunction application'; however, a plaintiff 'must show some evidence of actual chill that would be cured by the requested injunction.'")(citation omitted).

*See also Bailey v. Gulf Coast Transp., Inc.*, 280 F.3d 1333, 1337 (11th Cir. 2002)("[e]mployees may be much less likely to stand up for their substantive rights under the statute if they know that months or years will pass before a court can act to halt prohibited intimidation by their employer.").  The chilling effect is even more pronounced because Defendants retaliated against a high-ranking female Campus CEO who opposed discrimination in a public way.  *EEOC v. Target Stores*, 1984 U.S. Dist. LEXIS 24210 *5 (D. Minn. 1994)(employees chilled due to retaliatory termination of high-level Black manager who opposed discrimination).

When Plaintiff was challenging Defendants' retaliatory effort to terminate her employment through the CSCU due process procedures, multiple employees who possess relevant knowledge relating to issues of retaliation and pretext communicated to Plaintiff and to Lisa Dresdner that they wanted to come forward and provide assistance to Plaintiff, but they declined to provide written statements for Plaintiff to submit as evidence because they feared retaliation by CSCU.  (Plaintiff's Declaration ¶ 61, Exhibit 1; Lisa Dresdner Declaration ¶¶ 12-14, Exhibit 5.)  The "chilling" of these employees from exercising their rights harmed Plaintiff's ability to oppose discrimination and retaliation and to challenge the termination of her employment through the due process procedures afforded by CSCU.  However, the chilling effect has much broader implications relating to irreparable harm beyond the harm to Plaintiff and Plaintiff's rights.  As long as these employees are afraid of retaliation by Defendants, the chilling effect will continue to operate during these federal court proceedings, which will result in continuing harm to Plaintiff, as well as interfere with the effective enforcement of federal law.  These employees also possess their own independent rights to oppose discrimination and retaliation by Defendants, including by providing assistance and evidence in support of Plaintiff's claims.  *Crawford*, 555 U.S. 271; *Konits*, 394 F.3d at 124.  However, multiple

employees declined to exercise those rights because they feared retaliation by Defendants after

Defendants retaliated against Plaintiff in response to Plaintiff's complaints of discrimination and

retaliation.  Therefore, the Court should not only issue an Order reversing the termination of

Plaintiff's employment, but also make clear that Defendants are enjoined from retaliating against

any individual because they are identified as a witness, or because they exercise their rights to

provide assistance or testimony in support of Plaintiff's claims of discrimination or retaliation.

Third, absent expedited injunctive relief reversing Defendants' actions, the termination of

Plaintiff's employment for cause will likely destroy Plaintiff's career as a college President or

CEO before she is even forty years old.  (Plaintiff's Declaration ¶ 2, 18-19, 62-64, Exhibit 1.)

*EEOC v. Chrysler Corp.*, 733 F.2d 1183, 1186 (6th Cir. 1984)(injunction in age discrimination

case where irreparable harm included loss of work and loss of future prospects for work).  If the

Court does not reverse the termination of Plaintiff's employment for cause, and reinstate her as

Campus CEO of MCC, now, it is likely that reinstatement will not be available as a remedy after

trial and, given the actions taken by Defendants against Plaintiff, it is unlikely that Plaintiff will

be able to secure a comparable position at another institution.  (Pl's Decl. ¶ 62, Ex. 1.)  Thus,

"[i]rreparable harm [also] exists [here because] but for the grant of equitable relief, there is a

substantial chance that upon final resolution of the action the parties cannot be returned to the

positions they previously occupied.'"  *Townsend*, 2021 U.S. Dist. LEXIS 145714 *2 (citation

omitted).

C.     Balance of Equities and Public Interest

Balancing the equities and the public interests implicated in this case also favors the

issuance of a preliminary injunction.  *Townsend*, 2021 U.S. Dist. LEXIS 145714 *27

(recognizing public interest favored protecting Plaintiff's rights under the First Amendment –

"the bedrock of our liberties"); *Lazor*, 2021 U.S. Dist. LEXIS 99490 *23 (recognizing public interest in protecting rights under civil rights laws, including Title IX).  There are no equities and public interests which favor Defendants being permitted to retaliate against Plaintiff and violate federal law and the U.S. Constitution.  The Court need not defer to Defendants' judgment when Defendants are violating the Constitution.  *Elrod*, 427 U.S. at 352-53 (there is no infringement on state executive power by prohibiting state actors from taking unconstitutional actions).

## V.     CONCLUSION

The Court should issue a preliminary injunction against Defendants, reverse the termination of Plaintiff's employment for cause, reinstate Plaintiff to her employment as Campus CEO, enjoin Defendants from taking any further retaliatory actions against Plaintiff, and also enjoin Defendants from retaliating against any individuals because they are identified as witnesses, or because they provide testimony or other assistance to Plaintiff in connection with her claims of discrimination or retaliation.  Given the overwhelming evidence demonstrating that Defendants retaliated against Plaintiff and violated Plaintiff's federal constitutional and statutory rights, and the evidence supporting a finding of irreparable harm, this Court should also enjoin Defendants from hiring someone else to fill the position of Campus CEO at MCC during the pendency of this motion.  To that end, the Court should issue an immediate Order to show cause requiring Defendants to show cause why they should not be enjoined from hiring someone else as Campus CEO of MCC during the pendency of this motion, and immediately enjoined from retaliating against other employees because they are identified as witnesses, or engage in other protected activities to oppose discrimination or retaliation.

PLAINTIFF,
NICOLE ESPOSITO

By:____/s/Todd Steigman_____
Todd Steigman (ct26875)
Madsen, Prestley & Parenteau, LLC
402 Asylum Street
Hartford, CT 06103
Tel: (860) 246-2466
Fax: (860) 246-1794
tsteigman@mppjustice.com


## CERTIFICATION OF SERVICE

I hereby certify that on March 10, 2022 a copy of the foregoing was filed electronically. Notice of this filing was sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

 /s/ Todd Steigman____