# EXHIBIT 3

**November 10, 2021**


**Via Hand Delivery**

Dr. Jane Gates
Connecticut State Colleges & Universities
61 Woodland Street
Hartford, CT 06105

Dear Dr. Gates,

     My employment with CSCU should not be terminated for cause.

     The question before you is limited to whether CSCU has demonstrated that I engaged in conduct which satisfies the stringent requirements set forth in the HR Manual for terminating my employment for cause. CSCU, which has the burden of proving that I engaged in conduct which meets the criteria for termination for cause, has failed to sustain its burden. In fact, CSCU has not only failed to demonstrate that I committed misconduct justifying termination for cause, but the position statement shared by CSCU on October 26, 2021 entitled "Employer's Reasons for Terminating Dr. Nicole Esposito's Employment" (hereinafter "Position Statement") actually represents more proof that CSCU is attempting to terminate my employment for unlawful and retaliatory reasons. While it is not your role to decide whether CSCU is engaging in unlawful discrimination or retaliation, it is important that you understand that CSCU is requesting that you decide to terminate my employment for unlawful reasons. Furthermore, evidence that CSCU is unlawfully retaliating against me undermines CSCU's claim that I engaged in any conduct which warrants my immediate termination for cause.

     1.  Positive Performance as Campus CEO

     Before addressing each of the alleged reasons identified by CSCU in its Position Statement, it is appropriate to recognize some of the positive accomplishments that I achieved in just one year as Campus CEO of MCC which refute the claim that there is a basis to terminate my employment for cause. While this is not an exhaustive list or accounting of my positive performance and accomplishments, this information helps to demonstrates that I performed my job well under difficult circumstances and should not be terminated for cause.

     When I started in my role in July 2020 as the new CEO of MCC, I faced a significant budget crisis, steep enrollment declines, vacant leadership positions (or folks brand new to their positions, with the exception of Jim McDowell) a state-wide hiring freeze, a global pandemic, poor campus morale, and a very disorganized and controversial consolidation of the CT Community Colleges. In addition, MCC was up for a 10-year re-accreditation visit from NECHE set for April 2022. This is something that typically takes years to develop and write in preparation for the NECHE visit. However, upon my arrival at MCC, I learned that a significant amount of work still needed to be accomplished to prepare for our 10-year self-study and re-

accreditation. I was tasked with pulling together teams and to motivate the NECHE leads, and workgroups, to accomplish an enormous amount of work in a very short window of time. I met with the NECHE leads every two weeks to monitor progress and, to my knowledge, we were on track to have an initial draft of the 10-year self-study by late summer/early fall.  However, I was suspended from my CEO position just prior to the draft being completed and I have not seen the draft self-study report.

I am not aware of any other CEO/President before me that faced all of these challenges, especially at the same time. However, in my first year, I was able to deliver a balanced budget, successfully pivoted the college to remote operations, made some improvements in morale, kicked-off and made significant progress with our 10-year self-study, successfully handled various crises (such as the student tragedy before graduation), developed strong internal and external relationships, improved the working relationship with the MCC Foundation, improved processes in the Advancement office, hired new leadership, focused efforts on Diversity, Equity and Inclusion, successfully managed the institution during a global pandemic, and was recognized in CT Magazine, in addition to other accomplishments.

In my first year as CEO, I helped to deliver a balanced budget for MCC.  As CSCU's own finance documents show, MCC's budgetary performance was more positive than any other college in the system for the 2020-2021 academic year.  The document attached as **Exhibit 1**, which was presented at a June 2021 BoR meeting, shows that MCC had more than a balanced budget for my first year as Campus CEO.  In contrast, other community colleges in the system had budget deficits of millions of dollars for the same time period.  Some examples of how I focused on balancing the budget (for both current and future fiscal years) include:  (1) tasking the Interim Dean of AA and SA with reviewing every faculty course release, chair release, overload etc., which had impact on our part-time lecturer budget as well; and (2) holding back certain vacancies when folks retired and, when able, would add job duties to existing positions that supported enrollment efforts and did not require hiring a new position.

I also helped to improve campus communication, transparency, and morale.  This is evident by reviewing some of the comments in the climate survey from 2020, and comparing those comments to the comments from the previous climate survey from 2019.  For instance, in the July 2019 survey, from a time period before I began my tenure as Campus CEO, there were multiple comments indicating that the morale on campus is low and multiple respondents claimed that the previous leadership at MCC at the time was "vindictive."  (Esposito – FOI 2 – 10/3/21 – 000429-000438, included in **Exhibit 2**.)  In contrast, in the December 2020 survey results, after only one semester of my leadership as Campus CEO, there are no comments in the survey claiming that leadership at MCC was vindictive.  Furthermore, multiple respondents made positive comments about the CEO and initiatives that I instituted, such as chats and coffee hours.  (Esposito –FOI 2 – 10/3/21 – 000397-000428, including in **Exhibit 3**.)

I gained support from external stakeholders, including local legislators.  This is evidenced by the public statement released by Representative Luxenburg in June 2021 in opposition to the initial effort to recommend to the BoR to non-continue my employment.  (**Exhibit 4**.)

ESPOSITO - 11/10/21 RESPONSE - 000002

I developed relationships and strong support from internal constituents.  This is reflected by two supporting petitions (one that was state-wide and the other from MCC faculty and staff), as well as by the letter sent directly to Terrence Cheng from MCC Academic Senate Chair, Professor Angelo Messore, the e-mail sent from longstanding MCC CFO Jim McDowell to Alice Pritchard, and the letter sent to Terrence Cheng by Professor Burcin Calafiore.  (**Exhibit 5**.) (Esposito FOI 1 – 8/5/21 – 000180, 000188-000189, 000200-000202, 000205-000216, 000222-000224, Doc. No. 27-2, pp. 44-46, included in **Exhibit 5.)**

I initiated, led, and/or supported several events and activities that brought awareness to issues of Diversity, Equity and Inclusion (among college personnel and the student experience). This is evidenced by the ATD Capacity Café virtual event where we reviewed the data collected related to these issues. We held a successful BLM virtual event, I put out a campus-wide survey to gain anonymous input from faculty and staff, and I launched the CEO Coffee Hours to open dialogue for the difficult conversations that needed to occur. Additionally, I approved holding a DEI workshop in lieu of opening day events this fall 2021 and made this mandatory for all faculty and staff.  In November 2020, I asked if we could use a Diversity & Inclusion Awareness Training (CSCU 10/26/21 Position 000430) and the System Office responded with a different resource that CSCU already used, and I used that information and developed and advanced the idea of a DEI workshop in lieu of opening day for fall 2021.

I worked effectively with the MCC Foundation and was able to raise funds in a virtual setting.  For example, the virtual "Bid to Give" event successfully raised a significant amount of funds in a few weeks.  I also successfully hired a new Dean of Advancement that was tasked with completing a full audit of Foundation dollars that resulted in the discovery of unused funds and also the development of new policies and procedures to increase the efficiency of the advancement office. Some of the unused funds were then utilized as additional financial aid for students identified as having a tuition balance. I was able to gain immediate approval by the Foundation board for up to $100,000 for this purpose.  I had such a positive working relationship with the Foundation's leadership that they were willing to expedite the release of $100,000 without going through full Board approval.   This $100,000 was part of more than $800,000 that I was able to get the Foundation to use for MCC student scholarships.  Also, please see the letter drafted in my support by the President of the MCC Foundation, Peter Grose. This letter of support is also attached to the BOR minutes.  (**Exhibit 6**.)

I also motivated, coached, and developed a number of faculty, staff and administrators at MCC. For example, I selected three tenured faculty to serve as Division Coordinators. This served two purposes….1) It provided an opportunity for faculty to step into this role to gain leadership and coordinating experience for succession planning and 2) I did this because faculty expressed frustration over the lack of leadership at the Division level since previous administration eliminated the Division Director positions a few years prior to my return to MCC.

I hired a Female, first-generation Immigrant from Egypt as my Interim Dual Dean of AA and SA. This created additional diversity within leadership, and was clearly a way to develop internal faculty and staff. (She was a Dept. Chair at MCC.)  I hired this person over objection from Rob Steinmetz, and she exhibited outstanding performance in her role.

**ESPOSITO - 11/10/21 RESPONSE - 000003**

I held bi-weekly Leadership meetings and one on one meetings with my Deans on a regular basis. However, I was in contact with my leadership team as frequently as my schedule would allow. I was more often in direct contact with my CFO due to the many budget challenges the college was facing.

I consistently analyzed and implemented solutions across the campus to identify and eliminate waste, reduce cost, promote academic excellence, and improve student experience. Some examples include, the restructuring of Student Affairs at MCC. This was done because the SA areas were operating in silos that did not enhance communication and efficiency. Bringing them together under one structure ensured they were collaborating across the departments. This change also helped to advance the goal of the future one college. I understood that the EMSA areas would eventually change reporting lines to the system office and would need to work collaboratively across these specific departments in preparation for the change in reporting lines. This was part of a larger overall effort to ensure that MCC continued to be aligned with the future One College and my support for that initiative.  Additionally, there was a hiring freeze across the state so I needed to maximize the efficiency of staff already employed. Another example of this is when I added, "Outreach" to the job description of an existing employee to capture more enrollment. This was a cost saving measure, did not require a new hire, increased focus on pulling in enrollment, and provided the employee with an opportunity to diversify his experience because his role as "Director of Student Activities" was limited by the pandemic.

There is also evidence that I am an effective leader with strong interpersonal skills. This is evident in the support I have gained across the state. It is also evident in the CT Magazine "40 under 40" most influential leaders in the state. I demonstrate a deep commitment to student access and success. For example, I asked legislators (in my legislative breakfast) to help provide funding and pass laws that support student mental health needs and wraparound services. I also held open forums with students and worked with SGA and the honor society for research proposals and projects to support student interest. One example of this is Zeph Farmby, the BLM artist the students were working with to purchase artwork for MCC.  I successfully gained agreement from the MCC Foundation to match the money raised by MCC students to show the support from the college for this initiative.  I told the MCC students that I worked with the Foundation to match the money that the students raised on their own to provide additional motivation and incentive to the students.

I am a critical thinker, have the ability to understand complex processes, and I am clearly willing to ask the tough questions. For example, I asked about the SLA agreements and offered ways to improve them, I asked about the future use of Federal Financial Aid money and how a non-accredited future college would receive federal funding prior to being accredited. In preparation for the submission of the substantive change proposal, I also brought attention to the potential challenges we could face with NECHE accreditation. Specifically, I suggested some areas of improvement related to NECHE standard 3 and brought attention to potential concerns with Standard 7.  I also asked about the use of Federal COVID relief funding and ensuring that the money was properly used. For example, I expressed concern about using the COVID money to fund the Guided Pathways consolidation initiative. My understanding was the federal money

ESPOSITO - 11/10/21 RESPONSE - 000004

could not be used for supplanting and the Guided Pathways initiative was planned out long before COVID. Therefore, using the money for this purpose could be viewed as supplanting. I also questioned the use of the COVID money for construction/renovation and hiring personnel that would remain on our payroll. I learned that I was correct; COVID money could NOT be used for construction/renovations (the system office did originally intend to use some of the money for this reason).

I have significant experience in a highly unionized environment and have worked very effectively with union representatives. Meg Finley is an example of this. I also know the CBA very well and have even made suggestions to Andy Kripp along the way to avoid violating the CBA. One example is when I recommended to Andy Kripp that he avoid using the word "closed" in his email communication to the faculty and staff regarding snow day closures because the CBA has very clear expectation when administration used the word "closed." I recommended that if he intended to ask folks to telework, then he should consider using the phrase "shift to remote operations". He was very condescending when he responded to my suggestion in an open meeting. He stated something to effect of, Nicole, you don't need to worry about the Unions. I will handle the unions, ok?---- However, my understanding is that the union objected.  Following the union's objection, Andy Kripp changed the language and avoided using the word "closed."  He ultimately did shift to using "remote operations."

I have proven myself as having high ethical standards, and have a strong ability to gain agreement on necessary change.  I have a long history of supporting the system prior to serving at the CEO of MCC. The most compelling evidence of this is my service as the FIRC representative. I served as the elected FIRC (Framework and Implementation Review Committee) This committee was charged with aligning the curriculum across every community college in the state and then overseeing the TAP process (Transfer and Articulation Program) so students could seamlessly transfer from a 2-year to a 4-year college in the state. This was a major step in the consolidation process and a very controversial position to hold. I was one of the longest standing members of this committee as a faculty member. This position was met with so much adversity that many decided to remove themselves from the committee. However, I ensured this was successful at MCC.

Some other notable examples of my accomplishments include:

- I pulled together the Accessibility and Inclusion Think Tank and immediately began implementing the suggestions they offered to improve inclusivity on campus;
- I helped the institution shift to remote operations due to the pandemic and worked with my Dean of Administration to develop a COVID re-opening plan;
- I developed an innovative way to hold commencement this year that incorporated a variety of on campus and virtual events. This was very well received and I developed and managed the project from concept to completion. This was also accomplished at no additional cost to the college because I effectively utilized internal resources and talent.

5

- At the very end of the year our community suffered a significant tragedy. One of our candidates for graduation went missing and her body was found only a few weeks before graduation. It was determined that she was murdered. This event deeply impacted our MCC, and larger, community. I took the initiative to meet with her family privately. I then held a private evening ceremony that allowed Jessica Edwards sister to receive her degree on her behalf. The event was recorded (with family permission) and the recorded ceremony was added to the commencement video, along with additional photos submitted by her family, to honor her academic achievement. I also attended her services to show support from the MCC community.
- Placed emphasis on enrollment initiatives.

2. <u>CSCU Never Moved To Discipline for Cause Until After Federal Court Lawsuit</u>

In the original version of the agreement presented to me by CSCU in June 2021, I would not be terminated for cause. Rather, CSCU was offering me a different job regarding an important mental health initiative intended to directly help students. (June 2021 stipulated agreement, **<u>Exhibit 7</u>**.) Before the alternative position was offered to me, Andrew Kripp acknowledged that they were discussing a role that he thought would be "potentially actually valuable." (Esposito FOI 1 – 8/5/21 – 000167-000173, **<u>Exhibit 8</u>**.) On June 17, 2021, Ernestine Weaver informed me that I needed to notify her by June 23, 2021, four business days later, if I would be accepting their proposed agreement. On June 21, 2021, Rob Steinmetz shared a communications plan with Kathleen Czarnota which outlined various scenarios – depending on whether I signed the agreement or failed to sign. (Esposito FOI 1 – 8/5/21 – 000185 – 000187, included in **<u>Exhibit 9</u>**.) As of June 21, 2021, even if I failed to sign the agreement, Rob Steinmetz indicated that the communication to the MCC community may still include language about an ongoing position at the system office. (Esposito FOI 1 – 8/5/21 – 000187, included in **<u>Exhibit 9</u>**.)

On August 18, 2021, Andrew Kripp presented me with another proposed agreement under which CSCU would continue my employment for another year, until August 2022, working on special projects under the direction of Alice Pritchard. In Andrew Kripp's cover e-mail on August 18, 2021, he communicated that if I did not sign the proposed agreement, CSCU would move to non-continue my employment as previously communicated. (August 18, 2021 e-mail from Kripp, CSCU 10/26/21 Position 00035-00036, included as **<u>Exhibit 10</u>**.) Therefore, even as of August 18, 2021, CSCU did not intend to terminate my employment for cause.

On August 24, 2021, CSCU suspended me when I failed to sign CSCU's illegal and retaliatory release agreement by the deadline. (See September 16, 2021 memo of law in support of preliminary injunction previously provided to you.)

On August 27, 2021, three days after CSCU suspended me, I filed my lawsuit in federal court and requested a hearing under Article 8.5 of the CSCU HR Manual relating to my suspension.

6

On September 16, 2021, I filed my motion for preliminary injunction in federal court.

The next day, September 17, 2021, CSCU notified me for the first time that it was attempting to terminate my employment for cause, but it failed to specify the factual basis for the allegations against me.

It was not until October 26, 2021 that CSCU provided additional details regarding its claims against me.  However, as this response demonstrates, CSCU is desperately trying to distort and mischaracterize issues in order to claim that events which occurred months (and in some cases more than a year) ago now constitute cause to terminate my employment when CSCU never claimed that those actions constituted misconduct at the time, and CSCU never claimed that those actions constituted misconduct warranting termination for cause before I filed my federal court lawsuit.

The fact that CSCU never considered any of these issues as a basis to terminate my employment for cause before I filed my federal court lawsuit demonstrates that my conduct did not actually satisfy the criteria for immediate termination for cause in the HR Manual.  If my conduct met the requirements for a termination for cause under the HR Manual, then presumably CSCU would have attempted to discipline me for my actions when they occurred.  CSCU's failure to act as though my conduct warranted discipline for cause when the events transpired, when there was no federal lawsuit pending, reveals that none of my actions actually warranted termination for cause.

3.      Discussions to non-continue appointment as CEO in June 2021

In their Position Statement, CSCU asserts that "[d]iscussions to end the employment relationship were fully underway in June 2021," and cited to CSCU's **Exhibit B**.  (Esposito Discipline Position Statement 1.)  However, none of those discussions included as part of Exhibit B demonstrate that I engaged in any misconduct which satisfies the requirements to terminate my employment for cause under the HR Manual.  Instead, the communications included in Exhibit B support the opposite conclusion.

Those e-mails included as part of CSCU's **Exhibit B** (attached hereto as CSCU 10/26/21 Position 00012 – CSCU 10/26/21 Position 00042), demonstrate that there was no discussion by CSCU of terminating my employment for cause before I filed my federal court lawsuit.  Instead, Rob Steinmetz and Alice Pritchard were recommending that the Board of Regents non-continue my appointment as Campus CEO without cause, and CSCU intended to continue my employment in another position.  Since only the Board of Regents has the authority to non-continue my appointment as Campus CEO at the end of my term under Article 8.1 of the HR Manual, Rob Steinmetz, Alice Pritchard, and Andrew Kripp, could only make a recommendation to the Board of Regents.  To my knowledge, the Board of Regents, the only entity which had the authority to non-continue my appointment as Campus CEO at the end of my term on June 30, 2021, did not take any action against me in June 2021.

The e-mails included as part of CSCU's **Exhibit B** (attached hereto as CSCU 10/26/21 Position 00012 – CSCU 10/26/21 Position 00042), also demonstrate that CSCU was offering me

other employment for another year regarding a mental health initiative for students, which is an incredibly important issue. Presumably, if CSCU actually believed that I had engaged in misconduct warranting immediate termination for cause under the HR Manual, it would not have been offering me continued employment for at least another year on such an important issue as the mental health of our students.

When Rob Steinmetz and Ernestine Weaver met with me on June 17, 2021, they also did not communicate to me that CSCU was recommending that the Board of Regents non-continue my appointment as Campus CEO because of any deficiencies in my performance. Presumably, if I had engaged in misconduct warranting termination for cause, CSCU would have acted as if I had engaged in such misconduct, notified me that I had engaged in misconduct, and attempted to discipline me for engaging in misconduct - - instead of offering me continued employment for at least another year addressing an important issue impacting the health of our students. Also, because they had no basis to terminate my employment for cause, CSCU tried to pressure me into accepting their agreement in June 2021 to voluntarily resign against my wishes.

It is also appropriate to understand that CSCU's attempted action against me in June 2021 represented CSCU's first opportunity to follow through on the threat that Rob Steinmetz previously communicated to me in July 2020 when I objected to his sexist and discriminatory comments. In July 2020, I complained directly to Rob Steinmetz when he made sexist comments about me and another woman. Steinmetz responded immediately by threatening my continued employment and telling me that I would not last. I then complained to Alice Pritchard about Rob Steinmetz's sexist comments, and the fact that he was treating me differently than male Campus CEO's who reported to him. I previously provided you with documentation regarding those issues, including the affidavits that I signed under oath for filing in federal court and with the CHRO. Rob Steinmetz, Alice Pritchard, and CSCU only waited until June 2021 to carry out the threat that Steinmetz conveyed in July 2020 because of necessity. The first year of my term as Campus CEO ended on June 30, 2021. Since CSCU had no basis to terminate my employment for cause before the end of my term, they moved to non-continue my employment without cause in June 2021 at their first opportunity to do so.

4.  Findings of Investigation Do Not Demonstrate Cause for Termination

In their Position Statement, CSCU also references the investigation which concluded on August 15, 2021 and claims that it "did not substantiate any of her allegations." (Esposito Discipline Position Statement 1.) I have previously provided you with correspondence from my attorney dated August 24, 2021, which outlined the numerous deficiencies in that investigation report. Importantly, even though my attorney's August 24, 2021 letter offered to provide additional information to demonstrate the numerous deficiencies in the investigation report, including additional evidence of discrimination and retaliation that the investigator apparently did not rely upon, CSCU never responded to that offer and never demonstrated any interest in receiving any of the additional information that my attorney expressed a willingness to share in the August 24, 2021 letter. By not responding to my attorney's August 24, 2021 letter, and then continuing to take additional disciplinary and retaliatory actions against me following August 24,

2021, CSCU demonstrated that they had no interest in receiving any additional information which would show discrimination or retaliation by CSCU's leadership.

Regardless, nothing in the investigation report demonstrates that I engaged in any conduct which warrants immediate termination for cause.

5.    Suspension on August 24, 2021 in violation of HR Manual

In their Position Statement, CSCU stated that I was placed on administrative leave with pay effective August 24, 2021 and CSCU claims that "Administrative leave is allowable under Article 8.4 of the Connecticut State Colleges and Universities Human Resources Policies for Management & Confidential Professional Personnel ("HR Manual") attached hereto as **Exhibit D**."  (Esposito Discipline Position Statement 1.)

Article 8.4 of the HR Manual addresses "Suspension," not "Administrative leave." Article 8.4 of the HR Manual, which is what CSCU invoked as the authority for the action taken against me on August 24, 2021, does not grant CSCU the authority to place an employee on administrative leave, indefinitely, and without any due process.  In fact, it is my understanding that when Mary Ellen Jukoski expressed concerns to you about retaliation and discrimination by Rob Steinmetz and requested that CSCU place Rob Steinmetz on administrative leave during the pendency of the investigation, you responded to Mary Ellen with words to the effect that "we don't just put people on administrative leave."

When CSCU suspended me on August 24, 2021, they did so without providing me with any notice or due process and in violation of Article 8.2, 8.4, and 8.5 of the HR Manual.  When Andrew Kripp called me on August 24, 2021 and indicated that I was being placed on administrative leave and communicated that I was being placed under certain restrictions, he did not provide me with any explanation for why those actions were being taken other than the fact that I did not sign CSCU's proposed agreement by the deadline of 12:00 noon on August 24, 2021.  Suspending me, or placing me on administrative leave, because I refused to sign away my rights to file claims of discrimination and retaliation in federal court and with the EEOC and CHRO, is illegal.  (See September 16, 2021 motion for preliminary injunction and supporting legal memorandum and supporting exhibits.)  On August 27, 2021, I filed an appeal of my suspension to the Board of Regents under Article 8.5, but the Chair of the Board of Regents failed to appoint a committee of three to hear my appeal, and the committee of three failed to hold a hearing on my appeal within 30 days.  There is no authority under Article 8 of the HR Manual for CSCU to suspend a Campus CEO, indefinitely, without due process, and while refusing to give the Campus CEO a hearing to challenge the suspension within 30 days of the appeal.  Article 8.2 of the HR Manual defines suspension as a form of discipline and mandates that no form of discipline, including suspension, shall be imposed except for cause.  Article 8.5 requires that its processes be followed for all forms of discipline as defined by Article 8.2, which includes suspensions.

As my attorney explained in the attached letter dated October 28, 2021, CSCU is violating the HR Manual by suspending me indefinitely and without due process.  (October 28, 2021 letter, attached as **Exhibit 11**.)  CSCU's blatant violation of my rights under the HR

9

Manual provides additional support for the conclusion that I am being subjected to retaliation and that CSCU's current claims that I should be terminated for cause, made for the first time after I filed my federal lawsuit, should be rejected.

6.    Alleged Poor Performance Does not Demonstrate Cause for Termination

In their Position Statement, CSCU claims that "Over the course of her employment, Dr. Esposito's performance has been unacceptable, as evidenced by the attached exhibits." (Esposito Discipline Position Statement 2.)  This statement is not accurate or supported by the exhibits that CSCU has offered.  In addition, "poor performance" is not a basis for termination for cause as defined in the HR Manual.  Each of the reasons identified by CSCU in the Position Statement with any specificity will be rebutted in this response.  Through the responses to the specific examples identified in CSCU's Position Statement, I will show that my performance was not unacceptable or poor.  But, in addition to the specific explanations provided for each issue, the fact that CSCU never claimed that any of these examples constituted a basis to terminate my employment for cause until after I filed my federal court lawsuit, and the fact that CSCU was willing to continue my employment for at least another year under the agreements that they proposed to me in June 2021 and August 2021 before I filed my federal court lawsuit confirms that I did not actually engage in any misconduct satisfying the definition of cause.

In their Position Statement, CSCU charges in a summary fashion and without specifics or citation to examples or evidence that "Dr. Esposito has been offensive toward her superior, insubordinate, and has engaged in activity detrimental to the Board of Regents for Higher Education." (Esposito Discipline Position Statement 2.)  Despite the serious nature of the allegations, CSCU does not provide any specific examples or cite to any evidence to support that sentence.  Even though CSCU failed to provide any specific examples or evidence to support that particular sentence, it is still important to remember that CSCU never made these allegations until after I filed my federal court lawsuit and these allegations are inconsistent with CSCU offering me continued employment for at least another year in both June 2021 and August 2021. If I had actually engaged in serious misconduct satisfying the definition of cause in the HR Manual, and engaged in offensive behavior towards my superior, insubordination, and activity detrimental to the Board of Regents, CSCU would presumably have not offered me other employment for at least another year in both June 2021 and August 2021 and CSCU would have disciplined me at the time that I engaged in serious misconduct.

In June 2021 and August 2021, CSCU was willing to continue employing me for at least another year and not subject me to any discipline if I agreed to not file claims against CSCU in court and agreed to not file claims with the CHRO and EEOC.  After I filed my lawsuit in federal court and filed claims with the CHRO and EEOC, CSCU acted for the first time to terminate my employment for cause, contrary to their previous offers to continue my employment for at least another year.  CSCU's actions represent obvious acts of retaliation and they would not be moving to terminate me for cause if I agreed to not file claims in federal court and with the CHRO and EEOC.

7.    I Have Not Failed to be Supportive of the Merger

In their Position Statement, CSCU falsely asserts that I have "consistently failed to be supportive of the CT State Community College Merger. See, for example. **Exhibit E**." (Esposito Discipline Position Statement 2.) The documents cited by CSCU in **Exhibit E**, attached hereto as CSCU 10/26/21 Position 000102 – 000107, certainly do not show that I have consistently failed to be supportive of the merger. In the e-mail chain included as Exhibit E, Steve Minkler, a male Campus CEO, raises certain issues regarding whether the payments by the colleges to the shared services budget can be cut because the shared services budget and expected expenditures are being reduced. (CSCU 10/26/21 Position 000104.) In response to Steve Minkler's questions, I wrote that "This makes sense to me as well. I agree that we need to take a look at the cost of shared services and the impact on the college budgets in general." (CSCU 10/26/21 Position 000103.) Indicating that questions raised by another male Campus CEO make sense and expressing that we should take a look at the cost of shared services and the impact on the college budgets in general" does not constitute serious misconduct that warrants immediate termination for cause. Furthermore, this single e-mail does not demonstrate that I have "consistently" failed to support the merger. This e-mail does not even prove that I was not supportive of the merger in this particular example, much less that I was "consistently" not supportive of the merger.

Following my e-mail, another Campus CEO, Mary Ellen Jukoski, wrote "I also agree, Steve. I think this along with eliminating the regional structure could significantly reduce cost to the system." (CSCU 10/26/21 Position 000103.) In her e-mail, Mary Ellen Jukoski not only agreed with Steve Minkler's questions, but she went further than anything that Mr. Minkler or I wrote and expressed that the system could significantly reduce costs by eliminating the regional structure. (CSCU 10/26/21 Position 000103.)

This e-mail chain was shared in May 2021 with CSCU's senior leaders, including Rob Steinmetz, Alice Pritchard, and David Levinson. At the time of the e-mails in question, CSCU never claimed that my comments in this e-mail chain constituted serious misconduct which warranted immediate termination for cause, and CSCU failed to take any action to discipline me for my comments in this e-mail at the time. CSCU's claim that my comments in this e-mail chain constitute misconduct which warrants termination for cause is absurd on its face.

After not taking any action against me for my comments in this e-mail chain at the time, after I filed my federal court lawsuit and filed claims with CHRO and EEOC, CSCU claimed for the first time that my comments in this e-mail chain warranted my immediate termination for cause. The timing of CSCU's use of this e-mail and the absurd claim that my comments in this e-mail warrant termination for cause expose that CSCU is retaliating against me, but this e-mail does not support terminating my employment for cause.

CSCU's decision to use this e-mail to terminate my employment for cause, while not attempting to terminate Steve Minkler or Mary Ellen Jukoski for their comments in this e-mail chain, also reveal that CSCU's action against me are retaliatory and that my comments in this e-

mail chain do not constitute evidence supporting a decision to terminate my employment for cause. Steve Minkler wrote more extensive comments and questions in this e-mail chain than I did, and I was simply indicating that Mr. Minkler's comments made sense that we should take a look at the cost of shared services and the impact on the college budgets in general. Yet CSCU is only attempting to terminate my employment for cause, and is not attempting to terminate Mr. Minkler's employment for cause. Mary Ellen Jukoski not only agreed with Mr. Minkler's comments and questions, but she went much further in this e-mail and expressed that eliminating the regional structure entirely would significantly reduce cost to the system. Yet, CSCU is not attempting to terminate Mary Ellen Jukoski's employment; it is only attempting to terminate me for cause. By treating me differently than other people, CSCU is exposing that I did not actually engage in misconduct that warrants termination for cause, but that CSCU is simply retaliating against me.

The charge that I have consistently failed to be supportive of the merger is not only not supported by Exhibit E, but it is also false. Dating back to my time as a faculty member at MCC, I have taken actions that supported the consolidation. As a faculty member, I served as the elected FIRC (Framework and Implementation Review Committee). This committee was charged with aligning the curriculum across every community college in the state and then overseeing the TAP process (Transfer and Articulation Program) so students could seamlessly transfer from a 2-year to a 4-year college in the state. This was a major step in the consolidation process and a very controversial position to hold. I was one of the longest standing members of this committee as a faculty member. This position was met with so much adversity that many decided to remove themselves from the committee. However, I ensured this was successful at MCC. As Campus CEO at MCC, I have asked important questions relating to the merger, but I have done so from the perspective that those questions should be addressed in order to make the merger successful. Asking important questions so that an initiative can be more successful does not prove that I have not been supportive of that initiative. I have also requested that I be permitted to be more involved in issues relating to the merger, which is inconsistent with the claim that I am have consistently failed to be supportive of the merger. For instance, I have attached one example of an e-mail that I exchanged with David Levinson when I requested an opportunity for myself and the other CEOs to be more involved in Students First planning. (E-mail with Levinson attached as **Exhibit 12**.)

In this same paragraph of the Position Statement, CSCU asserts that "Dr. Esposito's actions over the course of the past year in support of the merger have been absent." (Esposito Discipline Position Statement 2.) CSCU provides no specific examples to support that statement and also fails to cite to any evidence or exhibits to support that assertion. This statement is not correct, but it is difficult to respond more specifically without CSCU offering any specifics to support the allegation against me. That unsupported sentence does not demonstrate that I have engaged in any misconduct which warrants immediate termination for cause.

In this same paragraph of the Position Statement, CSCU asserts that "Her approach is often disruptive and combative as evidenced by many of the attached exhibits." (Esposito Discipline Position Statement 2.) But CSCU provides no specific examples to support that

statement and also fails to cite to any evidence or exhibits to support that assertion.  This statement is not correct, but it is difficult to respond more specifically without CSCU offering any specifics to support the allegation against me.  That unsupported sentence does not demonstrate that I have engaged in any misconduct which warrants immediate termination for cause.  Other individuals who have experience working with me can also refute this claim.  In fact, I have actually worked consistently to foster collaboration and an inclusive decision-making process at MCC.  To the extent that CSCU falsely characterizes me as "disruptive or combative" and relies on that false characterization as a basis to fire me for cause when CSCU fails to use similar characterizations to describe a man in a leadership position who behaved similarly, I believe that this is further evidence of gender stereotyping and sex discrimination.  For instance, in July 2020, when Rob Steinmetz took issue with my tone and called me off-putting but failed to take issue with the content of my communications, and objected to me hiring a highly qualified female candidate in part because she talked too much during her interview, I objected to his statements and told him that I believed that he was being sexist.  Falsely characterizing me as "combative" and trying to use that false label as a basis to terminate me for cause when CSCU fails to label and discipline men in leadership positions in that same fashion constitutes further evidence of sex discrimination.

CSCU's contention in that same paragraph that "While Dr. Esposito has been open with her criticism, she has not been forthcoming with suggestions or solutions to assist in moving the process forward, something required of a CEO. See, for example, **Exhibit G**" is also not accurate and is not even supported by the evidence cited in **Exhibit G** by CSCU.  Exhibit G is a January 26, 2021 e-mail where I stated, "in my humble opinion" and only speaking for myself, that I did not believe that the draft communication was accurate in its assertion that CEO's were a part of developing or creating this plan.  I explained that, "in my humble opinion, I do not believe I was part of developing or creating this plan.  I believe we were informed of the plan and offered our input/feedback about it after it was drafted by the CT State Community College leadership." (CSCU 10/26/21 Position 000125.)  I also added "with that being said, I will do all I can to help my campus understand these changes."

There is nothing in this e-mail which constitutes misconduct that satisfies the definition of cause in the HR Manual and which warrants immediate termination.  The fact that senior leadership of CSCU, including Alice Pritchard, David Levinson, Andrew Kripp, and Jane Gates, all received my e-mail in January 2021 and none of them attempted to discipline me for this e-mail at the time refutes CSCU's current claim, made for the first time after I filed my lawsuit, that this e-mail constitutes misconduct and provides a basis to terminate my employment for cause.

CSCU's claim that my January 26, 2021 e-mail included as Exhibit G constitutes a basis to terminate my employment for cause is absurd.  I wrote my January 26, 2021 e-mail in response to Alison Buckley's e-mail which indicated that Ms. Buckley was sharing a draft of the communication for review and Ms. Buckley specifically expressed that she welcomed my feedback on all aspects of the draft communication.  (CSCU 10/26/21 Position 000125-000126.)  In reviewing the e-mail, I noticed a statement that I believed was not factually accurate and I

expressed my own personal view that the statement was not factually correct.  Yet, I did so in a way that was still respectful, including by phrasing my comments as "my humble opinion" and making clear that I was only speaking for myself.  Also, importantly, despite my concerns with the factual accuracy relating to that statement, I still made clear that I would do all I can to help my campus understand these changes - - which I did.

CSCU's contention in this paragraph that I was not "forthcoming with suggestions or solutions in moving the process forward" is also not supported by Exhibit G.  In the January 26, 2021 e-mail included as Exhibit G, I specifically wrote that we "offered our input/feedback about it after it was drafted by the CT State Community College leadership" and made clear that I would do all that I could to help my campus understand the changes.  I have consistently communicated a desire to be able to participate in the development of plans for the structure of the future consolidated Connecticut Community College.  One example of this is an e-mail that I sent to David Levinson expressing a desire for the CEO's to be able to contribute more to the Students First planning.  (Email correspondence with David Levinson attached as **Exhibit 12**.)

8.      CSCU Relies on July 2020 E-mail Opposing Discrimination As Basis to Terminate

In the following paragraph of the Position Statement, CSCU cites the e-mails included as **Exhibit H**, which include CSCU 10/26/21 Position 000128 – 000141, as reasons why I should be terminated for cause.  (Esposito Discipline Position Statement 2.)  CSCU included in Exhibit H, and identified as part of its reason for why I should be terminated for cause, my e-mail to Alice Pritchard on July 18, 2020 in which I expressed objections to sexism by Rob Steinmetz and complained that Rob Steinmetz was treating me differently than other male CEO's who reported to him.  (CSCU 10/26/21 Position 000136 – 000139.)  In that July 18, 2020 e-mail, I complained that Rob Steinmetz was acting in ways that belittled and undermined me and that Rob Steinmetz criticized my "tone" and my "delivery" and that my "delivery is very off-putting."  I explained that I took issue with his conduct "as a professional woman."  I also expressed concern with Rob Steinmetz's opposition to hiring a strong, brilliant, Muslim woman who had a strong commitment to diversity in part because he was concerned that she "talked quite a bit and was concerned that she might not be able to pick up on context clues."  (CSCU 10/26/21 Position 000137.)  Combined with his repeated comments criticizing my "tone" and my "delivery" and his opposition to hiring a brilliant qualified woman in part because he felt that she talked too much during her interview, I felt that he was being sexist and I pointed out in my e-mail that Rob Steinmetz was not treating Steve Minkler or Duncan Harris that way - - two male CEOs who reported to Rob Steinmetz.  (CSCU 10/26/21 Position 000138.)  Complaining about different treatment compared to other male CEOs who report to Rob Steinmetz is also a complaint opposing sex discrimination.  Amazingly, CSCU included my July 18, 2020 e-mail to Alice Pritchard opposing sex discrimination by Rob Steinmetz as one of the reasons why it is seeking to terminate my employment for cause.  (CSCU 10/26/21 Position 000136 – 000139.)  This confirms that CSCU attempting to terminate me for retaliatory reasons, and not because I engaged in misconduct which warrants termination for cause.

All of the e-mails included in Exhibit H were sent to either Rob Steinmetz or Alice Pritchard in June 2020 or July 2020 - - more than a year ago.  CSCU never claimed at the time that any of my communications included as Exhibit H constituted a basis for terminating my employment for cause at the time that I sent them.  CSCU's current claim that I should be terminated for cause because of my July 18, 2020 e-mail to Alice Pritchard is also directly contrary to how Alice Pritchard responded to my e-mail at the time.  (CSCU 10/26/21 Position 000140 – 000141.)  CSCU did not identify these communications as a reason why it was seeking to terminate my employment for cause until after I filed my federal court lawsuit and after I filed complaints of discrimination and retaliation with the CHRO and EEOC.

CSCU's characterization of the issue regarding the office space at MCC in its Position Statement is also a distortion, and it is not supported by the e-mails cited in Exhibit H.  For additional context and understanding, I am sharing some additional information regarding this issue.  After I sent my initial e-mail to Rob Steinmetz in June 2020 regarding the issue, he indicated that we would discuss the issue at a later date, which we did.   We engaged in a discussion about what his needs/wants were for office space. Based on his requests, my Dean of Administration and I felt that we had a suite that would accommodate all of his requests and would require much less moving for other staff (there were two other people that were housed in the Presidents Suite at the time and technology that would have needed to be moved etc…). Given pending retirements, campus location, and use of office space, we asked Rob if he and his team would like to use the suite dedicated to finance. He toured the suite and did not express any concern about the space. We had it refreshed, repainted, carpets cleaned, signage update was requested etc…  We provided him with a parking space and keys for every member of his regional team as well. The suite was beautifully updated and Rob never expressed concern about this new space. We did all of this during the global pandemic and while folks were off campus. This was not easy, especially since many people were still teleworking. However, we still accommodated Rob Steinmetz.  This history shows that CSCU's current claim that I should be terminated for cause relating to this issue is simply ridiculous, and obviously retaliatory.

9.     I Was Not Insubordinate Relating to Reply All E-mail

In their Position Statement, CSCU claims that I should be terminated for cause because I was allegedly "insubordinate" more than a year ago in July 2020 relating to how to handle an e-mail communication.  (Esposito Discipline Position Statement 2-3.)  In support of this false claim, CSCU only provides a single e-mail communication from July 17, 2020, which it attached as **Exhibit I**.  (CSCU 10/26/21 Position 000142 – 000145.)  CSCU's attempt to terminate me for cause based on alleged "insubordination" demonstrated by the e-mail communication included as Exhibit I demonstrates a complete misunderstanding of the e-mail included as Exhibit I and a lack of understanding of what actually constitutes insubordination.  In the example identified by CSCU in Exhibit I, there was no insubordination because I did not intentionally refuse to obey a lawful and reasonable direct order from Robert Steinmetz.  This fact is evident from the July 17, 2020 e-mail from Robert Steinmetz that CSCU chose to include as part of Exhibit I.  (CSCU 10/26/21 Position 000143.)  In his July 17, 2020 e-mail to Alice Pritchard, Rob Steinmetz wrote "I asked Nicole to think about correcting people in private instead of correcting in an all-campus

e-mail as she did below."  (CSCU 10/26/21 Position 000143.)  If Rob Steinmetz "asked" me to "think about" handling an issue differently, and I did "think about" what he asked, but still maintained that my approach was correct, then there was no insubordination.  CSCU has not identified any example in which Rob Steinmetz issued me a lawful and reasonable direct order to handle an issue in a certain way and I intentionally and directly disobeyed his lawful and reasonable direct order.

I had valid reasons for maintaining that my original approach to the issue was correct.  There had been issues at MCC with people using reply all to send campus e-mails which sometimes resulted in conflict and negativity.  The head of IT at the time (Barry) sent repeated emails to remind folks to not "reply all" and if you needed help changing your email settings that he could assist.  As I explained in my July 18, 2020 e-mail to Alice Pritchard, I acted to reinforce the message from Barry and to avoid any repeated issues resulting from wide broadcast e-mails.  (CSCU 10/26/21 Position 000137 – 000138.)  One reason that I replied all was because I was attempting to reinforce the message to the entire MCC community, and I was not focused on correcting any individual employee.  The employee in question, Charlene Tappan, apologized and there was no further issue.  (CSCU 10/26/21 Position 000138.)

When Rob Steinmetz spoke to me again about the issue, he once again addressed my "tone" in a way that I felt was sexist and I spoke up regarding my concerns.  As I expressed to Alice Pritchard regarding that exchange with Rob Steinmetz in July 2020, "I will continue to remain professional and am happy to accept direction.  However, I am beginning to believe that is not what is happening here.  I am told that this is not happening to Steve Minkler or Duncan Harris.  Given Robs comment about my role as the CEO of MCC might not work out, I am now deeply concerned that he threatened my job.  It is true that I spoke up for myself yesterday and I was clearly offended by his comments.  This was not well received by Rob."  (CSCU 10/26/21 Position 000138.)  Accordingly, it appears that Rob Steinmetz sent the July 17, 2020 e-mail to Alice Pritchard that CSCU identified as Exhibit I and claimed was proof of "insubordination" directly in response to me openly and directly challenging Rob Steinmetz regarding his sexist comments criticizing my "tone" without any basis.  This is just more proof of retaliation and sexism.

In addition, contrary to CSCU's contention in their Position Statement that I "categorically rejected the guidance" that Rob Steinmetz provided to me, the July 18, 2020 e-mail that I sent to Alice Pritchard actually includes one example where I followed Rob Steinmetz's direction and guidance regarding a personnel decision.  In that e-mail to Alice Pritchard, I wrote "I understand that he feels strongly about being involved in decisions for MCC.  I respected his wishes and have accepted his guidance in the process.  For example, when I brought up the possibility of having Angelo Simoni serve in the role to help me clean up SA, Rob expressed his concerns stating that he has 'concerns about Angelo because Angelo has a reputation for being too harsh with employees and he doesn't think that he would be a good fit.'  I know Rob has more experience with Angelo so I listened and took his guidance."  (CSCU 10/26/21 Position 000137.)

There is simply no factual basis to the charge that I engaged in insubordination. The claims made by CSCU in support of that claim are without any factual support, and also shows an obvious misunderstanding of what actually constitutes insubordination. CSCU has not demonstrated that I engaged in any misconduct which warrants the immediate termination of my employment for cause under the HR Manual. Neither Rob Steinmetz nor Alice Pritchard attempted to terminate my employment for cause in July 2020 when the incident now relied upon by CSCU occurred. Instead, CSCU is only seeking to terminate my employment for cause based on this issue more than a year later after I filed my federal court lawsuit and filed complaints of discrimination and retaliation with the CHRO and EEOC. It is obvious that this example does not meet the high standard for a termination for cause under the HR Manual.

10.     Leadership Coach Does Not Demonstrate Cause for Termination

In their Position Statement, CSCU asserts that I and other CEOs were provided with an independent leadership coach but that my performance "continued to be unacceptable despite this additional coaching support." (Esposito Discipline Position Statement 3.) In support of that claim, CSCU cites to **Exhibit J**. (CSCU 10/26/21 Position 000146 – 000151.) However, the e-mails provided as part of Exhibit J do not contain any evidence that my performance was unacceptable. This issue does not provide any support for the conclusion that I engaged in any conduct which satisfies the definition of a termination for cause under the HR Manual.

However, since CSCU invoked the leadership coach, you should have some knowledge regarding what the leadership coach retained by CSCU actually communicated to me regarding Rob Steinmetz during our coaching sessions. The coach at Giombetti Associates with whom I met made strongly negative statements to me about Rob Steinmetz. The coach from Giombetti Associates acknowledged that I was clearly being bullied and that Rob Steinmetz needed to reflect on his own behavior but that he lacks the ability to do so. The coach from Giombetti Associates also shared with me that Rob Steinmetz requested to have his own personality assessment completed. However, when the coach attempted to review the assessment with Rob Steinmetz, he realized that he would not get anywhere with Rob so he asked his consulting partner to work with Rob instead. In my last session with the coach from Giombetti Associates, he indicated that he would be willing to give me a recommendation for a position at another institution. There is absolutely nothing about my discussions with the coach from Giombetti Associates which supports the conclusion that I engaged in any misconduct which would support a decision to terminate my employment for cause under the HR Manual.

11.     CSCU Retaliation Because I Communicated Concerns and Raised Questions
         Regarding Legality of Federal Financial Aid Issues

CSCU is also retaliating against me in violation of federal and state law by seeking to terminate my employment because I communicated reasonable concerns, and raised questions, regarding whether CSCU was doing something illegal relating to federal financial aid issues. (Esposito Discipline Position Statement 3-4.)

Federal law, including 41 U.S.C. 4712, prohibits recipients of federal funds, such as CSCU and the Board of Regents, from discriminating or retaliating against me because I

disclosed information that I reasonably believe is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant" to "a management official or other employee of the contractor, subcontractor, grantee, or subgrantee who has the responsibility to investigate, discover, or address misconduct." The Office of the Inspector General for the U.S. Department of Education confirms that the protections of 41 U.S.C. 4712 apply to recipients of federal funds from the Department of Education. https://www2.ed.gov/about/offices/list/oig/hotlinewbnonfed.html

Connecticut law, including Section 4-61dd, makes it illegal for CSCU to retaliate against me because I raise concerns relating to various issues, including compliance with laws, unethical practices, abuse of authority, and mismanagement. That Connecticut law empowers me to provide information to the Auditors of Public Accounts, and also prohibits state officers and employees from retaliating against me because I have disclosed any information covered by the law to any employee of the state agency where I am employed. Connecticut statute 31-51m also prohibits CSCU from retaliating against me because I have reported a violation or a suspected violation of law to a public body, which includes CSCU.

Through their Position Statement and the e-mails included as part of **Exhibit L** that CSCU referenced in their Position Statement (CSCU 10/26/21 Position 000198 – 000245), CSCU confirms that it is seeking to terminate my employment for cause because I raised serious questions and/or concerns regarding whether CSCU was properly managing issues relating to federal financial aid and whether CSCU was acting legally with respect to federal financial aid. I raised these questions and concerns in the e-mails provided by CSCU in Exhibit L which CSCU is relying upon as one of the reasons for its decision to seek the termination of my employment. I also raised these questions and concerns verbally. By seeking to terminate my employment because I raised these important questions regarding mismanagement and compliance with legal rules regarding federal financial aid, CSCU is not offering proof that I engaged in misconduct that warrants terminating my employment for cause. Rather, CSCU is confirming that it is retaliating against me in violation of federal and state law.

While CSCU has provided additional evidence that it is retaliating against me in violation of federal and state law, CSCU has not provided any evidence in its Position Statement or in the e-mails contained in Exhibit L to support its statements that I somehow engaged in misconduct which meets the definition for termination for cause because I did not sign the federal financial aid forms until after some unspecified deadline. It is my recollection that I received the federal financial aid forms on April 1, 2021, and CSCU has not provided any evidence that I received the federal financial aid forms before April 1st. On the morning of April 1, 2021, the same day that I believe I first received the federal financial aid documents, I expressed serious concerns about the federal financial aid documents and requested that Rob Steinmetz and Jennifer Gray provide me direction regarding my concerns. (CSCU 10/26/21 Position 000200 – 000201.) Rob Steinmetz did not respond to me until April 6, 2021, five days later. (CSCU 10/26/21 Position 000204 – 000205.) Notably, in his April 6th response, Rob Steinmetz did not give me an order or

a directive to sign the documents.  Instead, Rob Steinmetz suggested that we have a meeting if my concerns continued.  (CSCU 10/26/21 Position 205.)  Later on that same day, April 6, 2021, I responded to Rob Steinmetz and provided additional information regarding my concerns regarding mismanagement and legal compliance with federal financial aid rules.  Regarding Rob Steinmetz's suggestion for a meeting, CSCU falsely states in its Position Statement that "He then set up a meeting with financial aid leaders to address her concerns and she stated that she would not attend the meeting because she expected that additional CEOs should be invited." (Esposito Discipline Position Statement 3.)  I never stated that I would not attend a meeting with financial aid leaders that Rob Steinmetz set up and CSCU has not provided any evidence to support that accusation.  When Rob Steinmetz suggested that we have a meeting if I still had concerns, I suggested that the meeting should be open to all CEOs who had similar questions because I knew that other CEOs had similar concerns during this same time period – but I never stated that I would not attend a meeting that Rob Steinmetz had set up regarding this issue.  (CSCU 10/26/21 Position 000208.)  To illustrate that other CEOs had similar concerns at the same time, Campus CEO Lisa Dresdner wrote to James Lombella expressing some of the same concerns that I was expressing.  I have attached an e-mail from CEO Lisa Dresdner on April 8, 2021 as **Exhibit 13**.  I was simply suggesting that if we were going to have a meeting, it should be open to all CEOs who had similar concerns so that everyone's concerns could be addressed at the same time.

Also on April 6, 2021, I wrote to Ernestine Weaver to get some assistance regarding my concerns regarding the legal issues relating to federal financial aid.  CSCU failed to disclose my April 6, 2021 e-mail to Ernestine Weaver, but I have included it here as **Exhibit 14**.  I do not believe that Ernestine Weaver ever responded to my e-mail to provide me with guidance or assistance regarding the issues that I expressed.  Ernestine Weaver's failure to respond to my April 6, 2021 e-mail and her failure to provide legal assurances regarding this issue could have potentially facilitated a faster resolution of my concerns.  This further undermines the credibility of CSCU's accusations against me regarding the execution of the federal financial aid documents.

On April 8, 2021, I received an invite for a meeting on April 15, 2021.  On that date, I reiterated clearly to Rob Steinmetz in two separate e-mails that I would sign the federal financial aid forms if he issued me a directive requiring me to do so.  (CSCU 10/26/21 Position 000228 – 000229.)  However, Rob Steinmetz never provided me with any such directive and Ernestine Weaver never provided me with an answer to my questions regarding legal compliance regarding federal financial aid.  Thus, on the afternoon of April 8, 2021, I wrote again to convey some of my concerns regarding the legality of what was occurring relating to federal financial aid dollars and compliance with federal Title IV federal financial aid regulations.  One of the concerns that I expressed to Rob Steinmetz in my April 8, 2021 e-mail was that the accredited community colleges were being asked to use our individual federal financial aid numbers (OPE ID) to admit students into the CT Community College in October 2022 at a time when the CT Community College will not yet be accredited and will not yet be eligible for Title IV funding.  I expressed concern about whether the System Office's plan to utilize MCC's federal financial aid dollars for students attending the CT Community College at a time when it is not yet accredited and not yet able to receive Title IV funding on its own was legally sound.  I tried to make clear that I was not

being an obstructionist, but that I just wanted to "ensure this has all been vetted federally and I am following both the intent and spirit of the law here . . . and ultimately, I do not want to jeopardize MCC's ability to receive Title IV funding." (CSCU 10/26/21 Position 000228.)  Rob Steinmetz shared my April 8, 2021 e-mail communication with Alison Buckley, David Levinson, Alice Pritchard, and Andrew Kripp.  (CSCU 10/26/21 Position 000236.)

In approximately early April 2021, I also reached out to the U.S. Department of Education and asked the federal Department of Education whether there were any concerns regarding what CSCU was planning regarding the federal financial aid dollars.  In response, the Department of Education representative told me that it seemed as though CSCU was cutting corners.  This response that I received from the U.S. Department of Education was one of the reasons why, in the absence of a directive from Rob Steinmetz to sign the federal financial aid documents and in the absence of a response from Ernestine Weaver to my April 6, 2021 e-mail, I continued trying to get my questions answered regarding the legality and limitations of what CSCU was proposing to do with federal financial aid.

On April 8, 2021, I received an invitation to a meeting for April 15, 2021 to further discuss the federal financial aid documents.  I attended the meeting on April 15, 2021 and my recollection is that I signed the federal financial aid documents shortly after that meeting.

This sequence of events belies any contention that I engaged in misconduct warranting termination for cause by not signing the federal financial aid documents before April 15, 2021.  On April 1, 2021, I communicated my concerns on the same day that I received the forms.  Rob Steinmetz did not respond to my concerns until April 6, 2021, and I wrote back to Rob Steinmetz regarding my concerns on April 6, 2021 and April 8, 2021.  I expressed to Rob Steinmetz on multiple occasions that I would sign the forms if he issued me a directive to sign them, but he never issued me such a directive.  I also wrote to Ernestine Weaver on April 6, 2021 regarding some of my legal concerns, but she never responded to me to address my legal concerns.  On April 8, 2021, Rob Steinmetz scheduled a meeting with financial aid leaders, but he did not schedule the meeting until a week later, on April 15, 2021.  I signed the federal financial aid forms shortly after the meeting on April 15, 2021.

CSCU's contentions regarding the SLAs suffer from many of the same deficiencies. (Esposito Discipline Position Statement 3.)  The communications regarding the SLA took place in April and May 2021 and I signed the SLA Forms on May 11, 2021.  During that period of time leading up to my signature on May 11, 2021, I was trying to get resolution to a number of serious questions that were shared by other CEOs as well.  There is no evidence of any insubordination.  Rob Steinmetz never provided me with a directive to sign the SLA forms that I refused.  I signed the SLA contracts on May 11, 2021, but the SLA contracts could have been signed even earlier if CSCU had been more responsive.  On Monday, May 3, 2021, I noticed that the language of the SLA contracts had not been updated to address all of the concerns that the CEOs had previously raised.  (CSCU 10/26/21 Position 000162.)  Rob Steinmetz provided a response which indicated that he was "hopeful that outstanding questions will be resolved soon" and asked that, "if questions continue, please provide specific information and we can set up a time to discuss."  (CSCU 10/26/21 Position 000162.)  Therefore, in his May 3, 2021 e-mail, Rob

Steinmetz did not issue me a written directive to sign the SLA contracts in their current form - - he asked me to provide more specific information if I continued to have questions so that we could set up a time to discuss.  Two days later, on May 5, 2021, I provided Rob Steinmetz with the more specific information that he requested regarding the questions that I still had and I proposed some solutions.  (CSCU 10/26/21 Position 000166 – 000167.)  Rob Steinmetz shared my e-mail with Alison Buckley, Alice Pritchard, and David Levinson (CSCU 10/26/21 Position 000166) but I never received a substantive response from CSCU to my concerns or my proposed solutions.  On May 11, 2021, after almost a week of waiting for a response to my May 5, 2021 e-mail which never came, I decided to sign the SLA documents in the absence of a response.  (CSCU 10/26/21 Position 000168.)  After I submitted the signed SLA contracts, Rob Steinmetz thanked me for providing the signed documents.  (CSCU 10/26/21 Position 000168.)

Similar to the federal financial aid forms, there was no insubordination with respect to the execution of the SLA contracts.  I never refused a directive to sign the SLA contracts from my supervisor.  If Rob Steinmetz had issued me a directive before May 11, 2021 to sign the SLA contracts in their current form and made clear that CSCU would not entertain any further modifications of the forms, then I would have signed the forms upon receiving that directive.  While I never received any such directive, I was told on May 3, 2021 to provide specific information if I still had continuing questions, which I did on May 5, 2021.  CSCU never responded to my May 5, 2021 e-mail and proposed solutions, but I signed the SLA contracts on May 11, 2021 instead of continuing to wait for a response.

Also, like almost every issue that CSCU is now using to seek my termination for cause, CSCU never claimed at the time that I was being insubordinate or attempted to discipline me at the time when these events actually transpired.  Instead, CSCU offered me continued employment for at least another year in June 2021 and August 2021 after the issues with the SLA contracts occurred.  CSCU only claimed that my actions relating to the SLA contracts provided a basis to terminate my employment for cause for the first time after I filed my federal court lawsuit.  CSCU's current effort to terminate my employment for cause based on this issue is additional evidence of retaliation, not evidence of insubordination or a proper basis to terminate my employment for cause.

### 12    Other Alleged Punctuality Issues Do Not Constitute Evidence of Cause

Next, CSCU's Position Statement claims that I have "often failed to meet established deadlines on other occasions" and identifies issues in bullet format dating from September 2020 through March 2021.  (Esposito Discipline Position Statement 4.)  Without providing any further explanation, CSCU's Position Statement simply refers to e-mails included as part of **Exhibit M** (CSCU 10/26/21 Position 000246 – 000290).  However, none of those e-mails include any evidence of me engaging in any misconduct which satisfies the definition of a termination for cause in the CSCU HR Manual.  Since the issues that CSCU is raising for this claim relate to events which occurred between September 2020 and March 2021, how CSCU addressed these issues at the time that they occurred is important. Like the other issues already discussed, CSCU never claimed that I should be terminated for cause at the time that any of these issues occurred. CSCU never claimed that I should be terminated for cause at any time before I filed my federal

court lawsuit.  In fact, in June 2021 and August 2021, after these alleged punctuality issues occurred, CSCU offered me continued employment for at least another year - - which is inconsistent with me engaging in conduct which warranted an immediate termination for cause.

With respect to identifying space for the Regional Office, as I have already explained above, we worked appropriately to identify a space at MCC for Rob Steinmetz and his team and Rob did not express any concern about the space. We had it refreshed, repainted, carpets cleaned, signage update was requested etc…  We provided him with a parking space and keys for every member of his regional team as well. The suite was beautifully updated and Rob never expressed concern about this new space. We did all of this during the global pandemic and while folks were off campus. This was not easy, especially since many people were still teleworking. Furthermore, as I explained in the January 2021 e-mail included as part of Exhibit M, some additional time was required due to issues involving moving existing employees out of the office spaces at issue, including one employee who had a CHRO case and an approved ADA accommodation request.  (CSCU 10/26/21 Position 000260.)  Rob Steinmetz never moved to discipline me at the time for this issue.  In fact, Rob Steinmetz responded on January 13, 2021 to express his appreciation for the update that I provided and explained that he would set a time for the beginning of the next month to review the space and begin settling in.  In that e-mail, Rob Steinmetz also expressed that he was glad to hear about the resolution of the CHRO case and even stated that "we can continue to be patient with his office if more time is needed."  (CSCU 10/26/21 Position 000650.)  At the time, Rob Steinmetz explained that he would continue to work primarily remotely, but that it would be good to begin thinking about the use of the space since we will likely begin more in-person activities by the fall.  (CSCU 10/26/21 Position 000650.)  CSCU only attempted to terminate me for cause based on this issue much later, and after I filed my federal court lawsuit.

With respect to the Diversity and Equity Plan, there is no evidence in the documents provided by CSCU as part of Exhibit M that I engaged in any misconduct warranting a termination for cause.  In fact, to the contrary, Exhibit M shows that I sent an e-mail to Rob Steinmetz and Alice Pritchard on November 18, 2020 regarding the plan and my work on it. (CSCU 10/26/21 Position 000257.)  Alice Pritchard responded that same day and expressed appreciation for what I had shared and told me to "Go ahead and finish with your team and forward the final document when ready.  Appreciate your hard work on this!"  (CSCU 10/26/21 Position 000257.)  On November 30, 2020, Rob Steinmetz requested an update and I explained to him that "The ATD team still has not been able to meet with me due to their conflicting schedules.  However, we can submit this as is for now and I will continue to evolve the plan (which I assume is the expectation).  This plan does outline the things we captured during our Capacity Café meeting and does serve as a 'plan for our plan' as you described."  (CSCU 10/26/21 Position 000256.)

The Diversity and Equity plan was submitted after all the ATD Data Café data was collected and organized. All of the CEO's in our region continued to seek clarification from Rob Steinmetz regarding what, exactly, the system was looking for us to provide.  I provided the information that Rob Steinmetz had explained should be provided.  Again, this was completed

after we held our ATD Data Café and the ATD Coaches and IR director was able to provide the data to support our general plan. I was not aware that any of my actions relating to the Diversity and Equity Plan were problematic in any way because Rob Steinmetz never communicated to me that I had done anything wrong relating to this issue. In fact, I even collaborated with a few other CEO's to see what folks were doing across the regions. I even took extra measures to deepen the discussions about DEI work on campus. CSCU is trying to terminate me for cause because of an issue that occurred a year ago, and which CSCU never treated at the time as something which warranted discipline. CSCU is only attempting to terminate me for cause based on this issue now, after I filed my federal court lawsuit.

With respect to the September 2020 enrollment update issue raised by CSCU in their Position Statement, the documents provided by CSCU in Exhibit M do not demonstrate that I engaged in any misconduct which warrants immediate termination for cause. From the e-mails, it appears that I provided the information to Rob Steinmetz on September 4, 2020 at 9:48 a.m., when Rob Steinmetz indicated in his e-mail on September 4, 2020 that the enrollment update was due the day before. (CSCU 10/26/21 Position 000248 – 00249.) I also provided the information to Rob Steinmetz on the same day that I received it. That is not evidence of misconduct warranting immediate termination for cause, as demonstrated by the fact that Rob Steinmetz never attempted to discipline me for this issue at the time.

The e-mails provided as part of Exhibit M relating to HEERF Technology Needs and the Use of Stimulus Funds in March 2021 also do not demonstrate a basis to terminate my employment for cause. Regarding the use of stimulus funds, Exhibit M shows that Rob Steinmetz shared an e-mail on Friday March 5, 2021 (although it does not indicate who it was sent to) in which he apologized for the short turnaround and requested an answer regarding technology needs at the campus by Tuesday March 9, 2021. (CSCU 10/26/21 Position 000277.) I wrote to Rob Steinmetz on March 9, 2021 and explained that Jenn Gray, the Regional CFO who reports directly to Rob, was working with the campus Dean of Administration and Director of Finance to discuss the technology needs of the campus and shared information regarding what Jenn Gray had communicated to the Dean of Administration and Director of Finance regarding the issue. In that communication on March 9, 2021, I also communicated to Rob Steinmetz regarding other technology needs and indicated that it would be helpful to know about any restrictions regarding the usage of the funds. (CSCU 10/26/21 Position 000276.) The following day, March 10, I shared additional information regarding technology needs promptly after I received the information from someone at MCC. (CSCU 10/26/21 Position 000280 – 000281.) On April 1, 2021, I was included on another e-mail relating to this issue and I responded on that same day. (CSCU 10/26/21 Position 000282 – 000283.) Since I did nothing to warrant discipline for cause relating to this issue, I was never disciplined at the time. CSCU is only attempting to terminate my employment for cause because of this now, months later and after I filed my federal court lawsuit.

13.     Absence of Details Provided Regarding "Openly Insubordinate"

Next, CSCU's Position Statement charges that I have been "openly insubordinate in meetings and directly with Dr. Steinmetz in one-on-one meetings, through email, and during

phone conversations" and identifies behaviors such as rolling eyes and shrugging shoulders. The Position Statement also claims that I "continually dismissed and ignored Dr. Steinmetz's advice, feedback, and directives." (Esposito Discipline Position Statement 4.) CSCU's Position Statement does not identify important details, such as which meetings and when the meetings occurred, or which e-mails and which phone conversations. CSCU also does not identify any direct orders or directives that Rob Steinmetz issued to me which I refused. CSCU also does not identify what specific advice, feedback, and directives from Dr. Steinmetz that I allegedly "continually dismissed and ignored." Without being provided the factual details to support these broad and general allegations, it is difficult for me to share a detailed response. For instance, I previously identified an example when I followed Dr. Steinmetz's guidance relating to his suggestion in July 2020 to not hire Angelo Simoni as the dual Dean of Student Affairs and Academic Affairs. If CSCU provides additional details regarding these allegations, then I would request an opportunity to respond further after I receive that additional information. However, for now I will respond generally that I have never been engaged in insubordination towards Dr. Steinmetz. Despite providing a lengthy position statement and more than 600 pages worth of exhibits, CSCU has not identified any specific example when Robert Steinmetz issued me a directive to take some action and I openly refused to comply with his order. In the entire time that I reported to Dr. Steinmetz, he never once told me that I was being insubordinate and he never attempted to discipline me for being insubordinate. CSCU's current effort to terminate me for cause, after I filed my lawsuit, in the absence of any actual insubordination, is retaliation. It is also clear to me that CSCU's Position Statement attempting to terminate me for cause for various alleged issues includes many examples in which CSCU is treating me differently than other employees, and trying to apply standards to me that it has not applied to other employees. CSCU cannot apply one set of rules for me, and a different set of rules for other employees who have not filed federal court lawsuits against CSCU, Robert Steinmetz, Alice Pritchard, and Andrew Kripp.

14.   <u>No Refusals to Speak with Dr. Steinmetz</u>

In their Position Statement, CSCU includes the following paragraph:

Dr. Esposito would often refuse to speak with Dr. Steinmetz about significant decisions and would seek guidance and approval from others, despite Dr. Steinmetz being her immediate supervisor and, therefore, the individual that she should have gone to for guidance and approval. For example, Dr. Esposito created a reorganization plan and provided Dr. Steinmetz with no details before sending an email to five other administrators asking for their feedback at the same time as his. Dr. Esposito also continuously included other system leaders on emails that should have only been sent to her direct supervisor. Dr. Esposito also added others who were not on original correspondence that Dr. Steinmetz had sent. In addition, Dr. Esposito emailed others in the system without copying Dr. Steinmetz when he, as her supervisor, should have been copied. This behavior is yet another indication of her inability and/or unwillingness to accept the organization structures, process and supervisory role Dr. Steinmetz had explained to Dr. Esposito in her first week of employment. See, **Exhibit N** and **Exhibit 0**.

(Esposito Discipline Position Statement 4.)  **Exhibit N** includes pages CSCU 10/26/21 Position 000292 – 000356.  **Exhibit O** includes pages CSCU 10/26/21 Position 000358 – 000377.

CSCU has not provided any specific examples when I supposedly often refused to speak with Dr. Steinmetz about significant decisions, and this claim is contrary to the fact that I had regularly scheduled bi-weekly phone calls with Dr. Steinmetz that he scheduled.  The e-mails included in Exhibit N and Exhibit O do not include any evidence of misconduct which warrants my immediate termination for cause under the HR Manual.  The fact that CSCU is arguing that I should be terminated for cause because of the e-mails that are included as part of Exhibit N and Exhibit O only provides more proof that CSCU is not trying to terminate me because I have actually engaged in misconduct, but that CSCU is retaliating against me because I have filed claims.

Exhibit N includes an e-mail that I sent on July 21, 2020 to Alice Pritchard and Rob Steinmetz regarding an updated organizational chart for MCC.  I explained in that e-mail that I was sharing the information with both Alice and Rob because I thought it would be helpful as we work together on issues relating to possibilities regarding the budget and reductions in force and expressed that I would be sure to collaborate with both of them on such issues.  (CSCU 10/26/1 Position 000294.)  It seems absurd that CSCU is attempting to terminate me for cause, more than a year later, because I sent that e-mail to both Rob and Alice.  At no time after July 21, 2020 did Alice Pritchard or Rob Steinmetz notify me that I had done something wrong by sending that e-mail to both of them.  In fact, to the contrary, Rob Steinmetz responded to me on that same date to thank me for providing them with those updates.  (CSCU 10/26/21 Position 000320.)  More than a year passed between when I sent that July 21, 2020 e-mail and when I filed my federal court lawsuit, and CSCU never attempted to terminate my employment for cause based on that e-mail until after I filed my federal court lawsuit.

Exhibit N also includes an e-mail that I sent on August 5, 2020 regarding appointments on campus (CSCU 10/26/21 Position 000322) and e-mails that I sent on August 11, 2020 regarding draft organizational chart for student affairs at MCC (CSCU 10/26/21 Position 000324 – 000325).  These e-mails do not reflect any misconduct by me which warrant a termination for cause under the CSCU HR Manual.  I was never informed that I had done anything wrong by sending these e-mails.  More than a year passed between when I sent those e-mails and when I filed my federal court lawsuit, and CSCU never attempted to terminate my employment for cause based on those e-mails until after I filed my federal court lawsuit.

On September 2, 2020, I sent an e-mail to Alison Buckley (and included Rob Steinmetz and others) in order to provide some clarification regarding the organizational structure I was trying to put in place at MCC.  (CSCU 10/26/21 Position 000328 – 000329.)  I sent that e-mail to provide clarification to Alison because I had shared my plans with Rob Steinmetz a number of times and, although Rob Steinmetz appeared supportive directly to me, he informed me that Alison had some questions about what I was trying to achieve.  I was never informed that I had done anything wrong by sending that e-mail.  For more than a year after I sent that e-mail, CSCU never attempted to terminate my employment for cause.  CSCU is only attempting to terminate my employment for cause because of that e-mail now, after I filed my federal court lawsuit.

**ESPOSITO - 11/10/21 RESPONSE - 000025**

On September 2, 2020, I sent an e-mail to Rob Steinmetz, Jennifer Gray, and Alice Pritchard to ask a question about hiring faculty and conducting a search process for the following semester in the spring. (CSCU 10/26/21 Position 000352.) In that September 2, 2020 e-mail, I explained how we would have room in the budget to hire for the positions, and indicated that I was inquiring very early well in advance of the anticipating searches for the positions in the spring semester. I was never informed that I had done anything wrong by sending that e-mail. For more than a year after I sent that e-mail, CSCU never attempted to terminate my employment for cause.

On September 8, 2020, I sent an e-mail to Rob Steinmetz and others explaining that I was brainstorming solutions to an issue but did not want to move forward until I knew what I could and could not do. (CSCU 10/26/21 Position 000354.) I asked for someone to let me know the answer to two questions relating to a potential solution. I was never informed that I had done anything wrong by sending that e-mail. For more than a year after I sent that e-mail, CSCU never attempted to terminate my employment for cause.

The final document included in Exhibit N is an e-mail that I sent on October 27, 2020 to Rob Steinmetz, Alice Pritchard, and Alison Buckley sharing that I was happy to announce that we were able to implement a new opt-in scheduling process. (CSCU 10/26/21 Position 000356). I was never informed that I had done anything wrong by sending that e-mail. For more than a year after I sent that e-mail, CSCU never attempted to terminate my employment for cause.

Exhibit O (CSCU 10/26/21 Position 000358 - 000376) also includes several e-mails from August 2020, and one e-mail from October 2020, that do not provide any cause to terminate my employment under the CSCU HR Manual. In the first e-mail in Exhibit O (CSCU 10/26/21 Position 000360), I wrote to Alice Pritchard on August 3, 2020 regarding the possibility of keeping Angelo Simoni available to me through the remainder of August 2020. I explained to Alice that I wanted to keep her in the loop, and that I had mentioned the possibility to Rob a while back. (CSCU 10/26/21 Position 000360 – 000361.) Alice Pritchard responded that same day to thank me for looping her in, and also provided some supportive feedback and guidance. (CSCU 10/26/21 Position 000360.) The remaining documents in Exhibit O are other e-mails from August 2020 and October 2020 which also do not provide any cause to terminate my employment. I was never informed that I had done anything wrong by sending the e-mails included in Exhibit O. Before I filed my federal court lawsuit, CSCU never attempted to terminate my employment for cause based on any of the e-mails included in Exhibit O that were sent in August 2020 or October 2020.

CSCU is only attempting to terminate my employment for cause because of those e-mails now, after I filed my federal court lawsuit, in order to retaliate against me.

15.    I Did Not Refuse to Provide Calendar Access

In their Position Statement, CSCU claimed that I expressed concern about sharing calendar access, then agreed to provide calendar access after discussion, but never provided calendar access despite agreeing to do so in November 2020. (Esposito Discipline Position Statement 5.) In support of their claims, CSCU only refers to the e-mails included as **Exhibit P**.

(CSCU 10/26/21 Position 000378 – 000385.)  The statements made by CSCU in their position statement regarding this issue are not proven by the e-mails included in Exhibit P, and I have not engaged in any misconduct relating to this issue which supports terminating me for cause under the CSCU HR Manual.

The e-mails provided by CSCU in Exhibit P actually show that it was Mary Ellen Jukoski who initially expressed concerns about the request to share calendar access after Rob Steinmetz's request, and that it was Steve Minkler who then agreed with Mary Ellen.  (CSCU 10/26/21 Position 000383 – 000384.)  After Rob Steinmetz commented that he found the responses from Mary Ellen and Steven interesting and would discuss them during the next one-on-one meetings, I shared that I also agreed with Steve and Mary Ellen but that I was happy to discuss the issue in my next one-on-one with Rob Steinmetz or as a group if he thought that would be more productive.  (CSCU 10/26/21 Position 000382.)  After discussion with Rob Steinmetz, I agreed to provide the calendar access requested in November 2020.  (CSCU 10/26/21 Position 000380 – 000381.)  I believed that I had provided the calendar access requested and the e-mails provided by CSCU as part of Exhibit P do not prove that I did not provide the calendar access that was requested.  CSCU never took any action to terminate my employment for cause based on this issue before I filed my federal court lawsuit, nor is CSCU attempting to terminate the employment of Mary Ellen Jukoski or Steve Minkler for cause because of the statements that they made in the e-mails contained in Exhibit P.  I did not engage in any misconduct that provides a reason to terminate my employment for cause.

16.     No Reason to Terminate For Cause Relating to On-Ground Courses

In their Position Statement, CSCU argued that my employment should be terminated for cause because of issues relating to the percentage of classes that were taught at MCC on ground vs. hybrid or fully remote.  (Esposito Discipline Position Statement 5.)  In support of this claim, CSCU referred to e-mails included as **Exhibit Q** (CSCU 10/26/21 Position 000386 – 000413).  Once again, CSCU has not provided proof that I engaged in any misconduct to terminate my employment for cause based on the standards in the CSCU HR Manual.

The Academic Deans at MCC did try to develop a schedule for up to 50% on ground courses for the Fall of 2021. However, we took the approach of letting the students choose the course modality that they wanted and then we would drop the under-enrolled section that was not filling. Therefore, the percentages would fluctuate from week to week as students enrolled. We took this approach because the colleges were being asked to accomplish competing goals: (1) Get as much on ground as possible; (2) increase enrollment; (3) cut the budget; and (4) maintain social distancing.  These conflicting goals presented problems.  If I put everything on ground, and had to social distance, then that would reduce the number of students in each class (reduce enrollment) OR I would have to split the class into two sections, meaning I would need to hire another adjunct to teach (would increase PTL budget). Therefore, we took the approach of essentially running some parallel sections, letting the students register for the modality they wanted, and then dropped the section that was under enrolled. This was actually a creative way to meet all the demands of the system, while still serving the needs of the students, keeping the budget under control, and allowing us to maintain social distancing, but it also meant that our

percentages would fluctuate as students made their modality selection. Each college campus is also very different in terms of the buildings.  So, for example, a college that only runs 100 courses a year could easily have 50% on ground.  For larger colleges, like MCC, that run many more courses and sections a year, it is harder to reach that 50% because that is MANY more classes, and many more people on the campus, making it harder to social distance and/or comply with orders regarding how many people could be indoors etc.

I did not misrepresent any facts relating to this issue, and CSCU has not provided any proof that I misrepresented any facts.  The documents included by CSCU as part of Exhibit Q do not contain any evidence regarding the claim of 46% of classes being fully on ground or hybrid, or the context or timing of any such statements.  The documents included as part of Exhibit Q appear to indicate a projection as of May 3, 2021 of 37% of combined on ground or hybrid courses.  That figure of 37% was an accurate projection when it was made on May 3, 2021.  The fact that a different number materialized by June 20, 2021 shows that the figures can change over time based on the circumstances that I explained above.  Also, on May 3, 2021, when the Fall 2021 reopening plan was shared indicating a projection of 37% fully on-ground or hybrid, Rob Steinmetz did not respond with alarm or with any concern which would be consistent with terminating my employment for cause based on this issue.  (CSCU 10/26/21 Position 000408.) The documents included as part of Exhibit Q also reflect the importance placed on overall enrollment numbers for the Fall 2021 semester.  During the course of my tenure as Campus CEO at MCC, we put a lot of emphasis on actions intended to help increase enrollment.  Although I have not been able to personally verify this due to my suspension, it has been reported to me that MCC's enrollment numbers for Fall 2021 were more stable than sister institutions.

17.     Diversity, Equity, and Inclusion

CSCU has also failed to prove that I should be terminated for cause because I have supposedly "shown deficiencies in managing areas related to diversity, equity, and inclusion, as well as formal investigations."  (Esposito Discipline Position Statement 5.)  CSCU refers to documents included as **Exhibit R**, but none of those documents actually prove this claim or show that I have engaged in any misconduct that supports terminating my employment for cause under the CSCU HR Manual.  (CSCU 10/26/21 Position 000414 – 000461.)

CSCU completely distorts the e-mail that I sent on June 30, 2021 in order to make a misleading claim regarding the message that I conveyed and its context.  CSCU claims that my June 30, 2021 e-mail "failed to acknowledge that we all have responsibility in improving the climate and culture on the campus and attributed the issues to past leadership."  (Esposito Discipline Position Statement 5.)  A copy of my June 30, 2021 e-mail is included as part of Exhibit R at pages CSCU 10/26/21 Position 000460 – 000461.  By way of context, I sent the e-mail on June 30, 2021 because stories had run in the media based on the findings of an EEO investigation relating to MCC.  What I stated in the e-mail is accurate - - the investigation finding did relate to the racial and equity climate on the MCC campus over the past two decades, and issued findings relating to events that occurred under previous MCC leadership suggesting that over the past 20 years MCC has experienced challenges related to diversity and specifically in regard to race and gender.  Even though that was an accurate characterization relating to the

finding of the report on that issue, I made absolutely clear that the responsibility to make improvements regarding issues of diversity, equity, and inclusion is a responsibility that everyone, including me and my leadership team, share.  For instance, I indicated that "I am writing to assure you that the college, and my current leadership team, are dedicated to finding and continuously pursuing opportunities to improve our climate of equity and inclusion, including issues relating to race and gender."  I also explained that "as part of our continuing efforts to address these important issues, after full discussions with the leadership team, I intend to move forward with engaging outside consultants to address concerns relating to the racial climate at MCC, and will also coordinate an independent racial climate survey for MCC - - both of which were recommendations in the recent report.  These measures are consistent with our objective of enhancing our learning and working environments for all at MCC."  (CSCU 10/26/21 Position 000460.)  In order to further emphasize the importance that I placed on Diversity, Equity, and Inclusion issues at MCC, I went on to identify various actions that we had taken to try and positively impact the climate at the college and make it a welcoming environment for all.  The statement in the CSCU Position Statement that my June 30, 2021 e-mail failed to acknowledge that we all have responsibility to improve the climate and culture on the campus is a deliberate distortion of the e-mail that I sent.  Consistent with almost every other issue raised by CSCU, Rob Steinmetz and CSCU never told me that they had any problems with anything that I said in my June 30, 2021 e-mail at the time.

As already explained above, I made a deliberate attempt to make improvements on issues related to diversity, equity, and inclusion as Campus CEO.  Another example of that is the July 27, 2020 e-mail communications included as part of Exhibit R, at pages CSCU 10/26/21 Position 000424 – 000425.

It is also telling that the only EEO Investigation provided by CSCU as part of Exhibit R is an investigation which includes a finding that "There is no evidence to suggest that CEO Esposito engaged in behaviors that contributed to the culture/climate issues at MCC since her return as CEO in July 2020."  (CSCU 10/26/21 Position 000419.)

In their Position Statement, CSCU also mischaracterizes the June 10, 2021 exchange with Rob Steinmetz.  I shared with him that I was receiving complaints from other diverse groups on campus that felt they were also not included and I felt strongly about creating a culture on the campus where all individuals feel included, heard, recognized etc…. and that I wanted to bring all of these groups of people together to work toward a better outcome for all. He stated in that meeting that I needed to just focus on the people who were making official complaints. However, I tried to explain that I wanted to move toward a truly inclusive campus for all under-represented groups across race, gender, ethnicity, ability etc….Including Hispanic and LatinX individuals as well. He then told me to put out another climate survey focusing on race. I told him it is a great idea to put out another climate survey focusing on race, ethnicity, gender etc…to really gather data about their experience on our campus. I then shared that we needed a better, more inclusive, survey that can help us gather this information.  In that context, I expressed that many of the surveys we use seem to be outdated and/or are based upon outdated understandings relating to diversity, equity, and inclusion. I also shared that we should focus on more than just

black and white because we needed to capture as much information as we could.  I believed that
we also needed to broadly examine issues of diversity, equity, and inclusion in all of their
complexity to identify how various issues of race, gender, ethnicity, color, sexuality, religion,
socioeconomic status, etc., all intersect and influence how people experience life at MCC so that
we can make the campus a positive and welcoming place for all.  I was attempting to explain that
the human experience is more complex than just categorizing someone for a simple survey so
that we can just "check the box" that we have done the work. I wanted to collect meaningful data
that we could actually use to impact change. We then engaged in a discussion about some survey
he used in Oregon. I told him it sounded like a great survey for me to take a look at and, perhaps,
we could use at MCC. I then asked him to reach out to his former colleagues to see if we can use
the same resource (since he advocated for it). He said he would do so, however, he never
followed through with this and I never received any information about that survey.

18.     I Did Not Diagnose Anyone

In another effort by CSCU to distort and mischaracterize, CSCU claims that I acted
improperly to diagnose an employee with a mental health condition.  (Esposito Discipline
Position Statement 5-6.)  The e-mail exchange in question is included as part of **Exhibit S**, pages
CSCU 10/26/21 Position 000464 – 000465.  I sent that e-mail in March 2021 because I was
scared for my security and safety from someone who had demonstrated a pattern of harassment
against me.  I did not provide any diagnosis in that e-mail.  Furthermore, when I expressed those
concerns, I was speaking confidentially in my capacity as an employee concerned for my own
safety and security based on a documented pattern of harassment from the employee in question.
I did not engage in any misconduct in that e-mail in March 2021 which provides any basis for
terminating my employment for cause under the standard contained in the CSCU HR Manual.

CSCU did not attempt to terminate my employment for cause at the time because of that
e-mail.  Nor did CSCU attempt to terminate my employment for cause at any point in the six
months which followed my sending of that e-mail.  CSCU only attempted to terminate my
employment for cause after I filed my federal court lawsuit.  It is attempting to reach back in
time to try and manufacture bogus issues to retaliate against me, not because I engaged in any
misconduct which warrants the termination of my employment for cause.

19.     No Termination for Cause Based on FOIA Issues

In their Position Statement, CSCU also argues that I should be terminated for cause
because I supposedly have "also been found to be uncooperative and failed to meet the
requirements in providing information and data" in response to FOI requests.  (Esposito
Discipline Position Statement 6.)  CSCU refers to documents included as part of **Exhibit T**
(CSCU 10/26/21 Position 000467 – 000565) and **Exhibit U** (CSCU 10/26/21 Position 000566 –
000615), and CSCU identifies two examples:  a request on behalf of the 4C's union and AFT in
March 2021, and my own FOI request submitted by one of my attorneys.  I will address each in
turn.

Regarding the March 2021 request, the e-mails included as part of Exhibit T do not
provide any proof that I engaged in any misconduct that warrants my immediate termination for

cause.  I and other people at MCC worked to provide the information that we believed was being requested.  On March 23, 2021, Andy Kripp clarified that the request was seeking additional information and I worked to ensure that the additional information was obtained from the people at MCC who possessed it.  (CSCU 10/26/21 Position 000488 - 000501.)  On the following day, March 24, 2021, I sent an updated document to Andrew Kripp and explained that "Now that my staff understand what you are looking for, they have been able to put all of the high school teachers names into this document for you."  (CSCU 10/26/21 Position 000502.)  On the next day, March 25, 2021, I received an additional piece of information, notified Andrew Kripp, and added the additional information to the spreadsheet.  (CSCU 10/26/21 Position 000554 - 000555.)

There is no evidence of misconduct in the e-mails included as part of Exhibit T which warrant the termination of my employment for cause.  The documents offered do not show that I was uncooperative, or that I resisted complying with the request.  The initial request was not completely clear.  Once we received clarification on March 23, 2021, we promptly collected the additional information and provided an updated spreadsheet.  Although this issue occurred in March 2021, CSCU never moved to terminate my employment for cause at that time because of this issue.  After this issue occurred, CSCU offered me continued employment in June 2021 for at least another year addressing an important issue relating to student health.  Offering me continued employment for another year to address an important issue relating to student health is inconsistent with the conclusion that I had engaged in misconduct which met the criteria to terminate my employment for cause under the CSCU HR Manual.

The next FOIA issue raised by CSCU as a reason to terminate my employment is also blatant retaliation.  CSCU is claiming that I should be terminated for cause because of the way that I responded to my own FOI request that was submitted on my behalf by my attorneys and CSCU refers to documents included as **Exhibit U** (CSCU 10/26/21 Position 000566 – 000615).  (Esposito Discipline Position Statement 6.)  The purpose of the FOI request that my attorney submitted to CSCU on my behalf was for CSCU to provide documents to me, not so that I could provide documents to CSCU.  Since the FOI request at issue was submitted by my attorney on my behalf, I had a clear understanding of what documents that I was seeking through the FOI request.  CSCU's contention that I should be terminated for cause because I did not do a good enough job of responding to my own FOI request is ridiculous.

CSCU's decision to attempt to terminate me for cause because of the way that I responded to my own FOI request also shows a clear difference in treatment between how CSCU is acting towards me and how it is acting towards other people.  There are a number of examples of documents that were responsive to my FOI requests that my attorney submitted on my behalf that CSCU did not produce to my attorney in response to those FOIA requests.  Yet, I am not aware of CSCU moving to terminate the employment of the individuals who are responsible for CSCU failing to disclose those documents to my attorneys for cause.  CSCU is not only taking a ridiculous position regarding how I responded to my own FOI request, but in doing so, it is also applying a standard to me that it has not applied to other people who actually are responsible for failing to provide documents to me that were responsive to the FOI requests that my attorneys

submitted on my behalf.  Treating me differently than other people is additional proof that CSCU is retaliating against me, and that I have not committed any misconduct which warrants my immediate termination for cause.

20.  Extending a Conditional Offer of Employment to ████████ Does Not Warrant Termination for Cause

In their Position Statement, CSCU also argues that I should be terminated for cause because I extended an offer of employment to ████████, which was conditional on her successfully completing a background check.  (CSCU 10/26/21 Position 000628 - 000629.)  I did not engage in any misconduct to warrant my termination for cause relating to this employment offer.

By way of background, ████████ was the only candidate recommended to me for consideration by the hiring committee for this position.  I also received information from the committee which offered a glowing assessment of how ████████ performed during the interview process.  A copy of that assessment is included here as **Exhibit 15**.  As the assessment from the hiring committee reinforced, hiring ████████ for the position would also help to increase the diversity on campus (████████ is a Black female).  When I extended the offer of employment to ████████, I did not know all of the details regarding her previous employment at MCC.  However, it is my understanding that employees can be non-continued for a myriad of reasons, including many reasons which do not signify misconduct or poor performance.  Therefore, I do not believe that CSCU's position statement is accurate when it argues that a previous non-continuation, by itself, is evidence that someone has a history of unsuccessful work at the college.  Nevertheless, when I extended the offer of employment to ████████, it was contingent on a successful background check and a reference check.  In addition, it was my understanding that HR Recruitment and Talent helps to manage the process and had prior knowledge of the candidates and nobody from HR expressed any reservations before I extended the employment offer to ████████.  I did not engage in any misconduct warranting the termination of my employment for cause by extending the offer of employment to ████████, contingent on a successful background check and references.  This is just another effort by CSCU to manufacture a bogus issue.  It is not an example of misconduct by me.

21.  Exhibit W E-mails Do Not Support CSCU Claims or Termination for Cause

At the end of their Position Statement, CSCU claims that I am "an ineffective listener who is unable to hear new information that could lead to making more effective decisions," that I am "unable to communicate clearly; she creates confusion, and provides inconsistent information. Her performance indicates that despite efforts to support her growth, she does not understand what it takes to an executive, is unwilling to engage in or unable to understand risk analysis and is not a good team player. See above referenced exhibits and **Exhibit W**." (Esposito Discipline Position Statement 7.)  (Exhibit W is included as CSCU 10/26/21 Position 000640 – 000682.)

In this final paragraph of the Position Statement, CSCU also fails to prove that I have engaged in any misconduct that supports the immediate termination of my employment for cause

under the standard in the CSCU HR Manual. CSCU fails to provide specific information and examples for many of the general statements in this paragraph, such as specific examples when I exhibited these deficiencies and also fails to explain how my specific conduct in those examples supports the charges made in this paragraph against me. Without that specific information, it is difficult to provide a specific response to each issue. If CSCU provides additional specifics, I look forward to responding to that additional information in the future.

The e-mails included as part of Exhibit W also do not include any proof that I engaged in any misconduct that supports terminating my employment for cause under that standard. A review of the e-mails included as part of Exhibit W shows that the communications relate to issues between July 2020 and February 2021. CSCU never attempted to discipline me for cause or terminate my employment for cause at the time of any of those communications occurred. CSCU's decision to try and use these communications, which do not show any misconduct, to try and terminate me for cause more than a year after I sent some of the e-mails, and more than six months after I sent other e-mails, shows that these e-mails do not actually constitute proof that I have engaged in any misconduct satisfying the standard for termination for cause. Presumably, if I had engaged in any such misconduct in writing and in e-mails, then CSCU would have acted to terminate my employment for cause at the time for any misconduct. CSCU's decision to offer me continued employment for at least another year in June 2021, after all of the e-mails included as part of Exhibit W, addressing an important issue relating to student health, is also contrary to the conclusion that I engaged in repeated acts of misconduct months earlier which warranted the termination of my employment for cause. It is clear that CSCU is simply acting to retaliate against me and is desperately trying to manufacture false and unsupported charges against me in order to harm me and retaliate against me after I filed my federal court lawsuit.


This document, and the documents referenced in this document, should make clear that CSCU has not demonstrated that I engaged in any misconduct that warrants the immediate termination of my employment for cause under the standards identified in the CSCU HR Manual. The decision to terminate an employee for cause is incredibly significant, and it can have life-altering consequences. Terminating my employment for cause has the potential to effectively end my career as an administrator in academia. Since I have not committed any offense which meets the high standard for a termination of employment for cause, CSCU should not impose that severe penalty against me.

Very truly yours,


Nicole Esposito, Ed.D.

Cc: Inez Diaz-Galloza
     Sarah Bold

# EXHIBIT 1

**Connecticut Community Colleges**
Expenditure Plan General & Operating Funds
FY22 Budget
All Colleges Consolidated

Attachment F

| Account Name | CSCC Consolidated | CSCC | Shared Services | System Office | Asnuntuck | Capital | Gateway | Housatonic | Manchester | Middlesex | Naugatuck | Norwalk | Northwestern | Quinebaug | Three Rivers | Tunxis |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue:** | | | | | | | | | | | | | | | | |
| Tuition (Gross) | 109,594,097 | - | - | - | 3,851,782 | 7,201,821 | 15,853,236 | 10,836,000 | 13,035,965 | 5,761,318 | 14,520,945 | 13,339,825 | 3,404,798 | 3,381,080 | 8,771,142 | 9,635,685 |
| Fees | 54,308,760 | - | - | - | 3,689,834 | 4,332,086 | 7,835,962 | 3,958,000 | 6,136,606 | 3,084,000 | 6,420,189 | 5,974,878 | 1,296,543 | 1,834,023 | 4,857,973 | 4,888,667 |
| State Appropriations | 148,863,171 | 5,590,356 | - | 3,428,505 | 7,401,889 | 10,435,552 | 18,515,066 | 13,495,057 | 15,424,363 | 7,622,294 | 18,170,465 | 14,220,712 | 6,275,839 | 6,146,464 | 10,866,230 | 11,270,379 |
| Addtl State Appropriation (Dev Edu and Outcom | 8,523,582 | 1,196,017 | - | - | 227,606 | 497,682 | 1,045,228 | 726,004 | 998,942 | 395,569 | 964,826 | 856,270 | 184,424 | 244,785 | 601,703 | 584,526 |
| GF Fringe Benefits Paid by State | 136,820,225 | 3,677,708 | - | 2,365,587 | 7,098,635 | 10,213,253 | 16,805,599 | 12,455,279 | 14,786,295 | 7,135,546 | 17,510,582 | 13,014,037 | 5,337,378 | 5,655,510 | 10,009,557 | 10,755,259 |
| OF Fringe Benefits Paid by State | 16,200,000 | - | - | - | 243,068 | 1,346,199 | 2,047,099 | 1,613,450 | 2,738,719 | 884,761 | 2,534,584 | 1,575,691 | 357,096 | 271,496 | 1,308,121 | 1,279,716 |
| Private Gifts, Grants and Contracts | 111,500 | - | - | - | - | - | - | - | - | - | - | - | 111,000 | - | - | 500 |
| Sales of Educational Activities | 569,049 | - | - | - | 15,000 | 30,000 | 11,000 | 135,000 | 5,000 | 7,000 | 111,049 | 155,000 | - | - | - | 100,000 |
| All Other Revenue | 2,942,359 | - | - | - | 131,252 | 111,700 | 661,389 | 265,000 | 191,971 | 201,835 | (70,500) | 262,609 | 25,810 | 458,161 | 520,000 | 183,332 |
| Less Contra Revenue | (18,707,736) | - | - | - | (922,857) | (3,248,483) | (2,551,347) | (1,706,362) | (2,208,171) | (798,453) | (2,025,372) | (1,213,387) | (289,788) | (1,109,540) | (979,131) | (1,654,845) |
| **Total Revenue** | 459,225,007 | 10,464,081 | - | 5,794,092 | 21,736,209 | 30,919,810 | 60,223,032 | 41,777,428 | 51,109,690 | 24,294,370 | 58,136,768 | 48,185,635 | 16,703,099 | 16,881,979 | 35,955,595 | 37,043,219 |
| | | | | | | | | | | | | | | | | |
| **Expenditures:** | | | | | | | | | | | | | | | | |
| **Personnel Services:** | | | | | | | | | | | | | | | | |
| Full Time (601000) | 176,112,133 | 5,590,356 | 27,777,845 | 3,428,505 | 6,862,172 | 12,164,683 | 17,417,491 | 13,449,527 | 15,760,175 | 7,696,067 | 18,116,078 | 15,403,951 | 5,396,940 | 5,809,489 | 9,841,959 | 11,396,897 |
| Continuing Part Time (601100) | 932,834 | - | - | - | - | - | 89,567 | 99,118 | 13,000 | 75,893 | 129,349 | 173,815 | - | 221,956 | - | 130,136 |
| Temporary Part Time (601200, 02, 03, 04, 60130 | 10,048,861 | - | - | - | 807,421 | 1,006,718 | 1,483,909 | 620,548 | 1,189,367 | 650,756 | 1,831,570 | 650,437 | 169,884 | 397,419 | 798,150 | 442,683 |
| Clinical EA (601201) | 6,329,846 | - | - | - | - | 1,695,810 | 1,206,408 | - | 106,285 | - | 1,299,760 | 840,000 | 270,827 | - | 559,612 | 351,144 |
| Contractual PTL (601302) | 41,924,088 | - | - | - | 1,541,505 | 2,188,941 | 7,147,102 | 3,710,955 | 5,200,000 | 2,313,843 | 5,172,799 | 4,233,672 | 1,382,715 | 1,391,903 | 3,969,445 | 3,671,208 |
| Contractual NCL (601300) | 3,760,427 | - | - | - | 299,942 | 338,795 | 428,779 | 301,798 | 200,000 | 214,725 | 320,000 | 575,674 | 40,599 | 143,511 | 387,459 | 509,145 |
| Contractual ECL (601301) | 7,690,746 | - | - | - | 520,110 | 639,721 | 1,212,052 | 451,596 | 1,150,000 | 448,149 | 775,610 | 880,142 | 138,503 | 112,911 | 636,273 | 725,678 |
| Student Labor (601400, 01, 02, 601406) | 1,663,437 | - | - | - | 80,060 | 88,536 | 237,853 | 228,000 | 100,000 | 190,356 | 73,096 | 332,000 | 11,444 | 14,885 | 205,000 | 102,207 |
| Overtime (601501, 601502) | 980,950 | - | - | - | 10,250 | 50,000 | 230,000 | 210,000 | 90,000 | 25,000 | 200,000 | 80,000 | 20,000 | 37,500 | 10,000 | 18,200 |
| All Other Personnel Services | 5,869,724 | - | - | - | 96,785 | 452,737 | 422,200 | 870,000 | 898,965 | 222,829 | 388,966 | 1,077,305 | 388,892 | 179,236 | 638,494 | 233,315 |
| Subtotal Personnel Services | 255,313,047 | 5,590,356 | 27,777,845 | 3,428,505 | 10,218,246 | 18,625,941 | 29,875,361 | 19,941,542 | 24,707,792 | 11,837,617 | 28,307,228 | 24,246,996 | 7,819,804 | 8,308,810 | 17,046,391 | 17,580,613 |
| Shared Services Personnel Services | - | - | (27,777,844) | - | 1,038,516 | 2,154,644 | 3,439,734 | 3,423,311 | 2,706,302 | 1,890,940 | 3,776,523 | 2,664,359 | 1,171,070 | 1,082,601 | 2,202,140 | 2,227,704 |
| **Total Personnel Services** | 255,313,047 | 5,590,356 | 0 | 3,428,505 | 11,256,763 | 20,780,585 | 33,315,095 | 23,364,853 | 27,414,094 | 13,728,557 | 32,083,751 | 26,911,355 | 8,990,874 | 9,391,411 | 19,248,531 | 19,808,317 |
| | | | | | | | | | | | | | | | | |
| Fringe Benefits | 187,869,154 | 3,576,009 | 23,090,583 | 2,365,587 | 7,860,744 | 13,676,112 | 21,510,260 | 14,756,741 | 19,379,557 | 7,566,199 | 22,585,917 | 14,902,107 | 6,066,604 | 6,361,334 | 11,221,453 | 12,949,947 |
| Shared Services Personnel Fringe Benefits | (0) | - | (23,090,583) | - | 865,003 | 1,796,823 | 2,836,628 | 2,887,768 | 2,234,981 | 1,586,314 | 3,130,481 | 2,197,689 | 987,027 | 902,859 | 1,824,328 | 1,840,683 |
| **Total P.S. & Fringe Benefits** | 443,182,200 | 9,166,365 | (0) | 5,794,092 | 19,982,509 | 36,253,520 | 57,661,983 | 41,009,362 | 49,028,632 | 22,881,070 | 57,800,149 | 44,011,151 | 16,044,505 | 16,655,604 | 32,294,312 | 34,598,947 |
| | | | | | | | | | | | | | | | | |
| **Other Expenses:** | | | | | | | | | | | | | | | | |
| Inst. Financial Aid/Match | 15,163,949 | - | - | - | 511,501 | 900,000 | 2,315,429 | 1,509,150 | 1,885,658 | 822,069 | 2,041,868 | 1,876,730 | 238,947 | 414,697 | 1,257,297 | 1,390,603 |
| Waivers | 3,530,404 | - | - | - | 149,898 | 170,000 | 216,312 | 775,000 | 214,910 | 200,000 | 578,992 | 544,291 | 256,219 | 51,782 | 208,000 | 165,000 |
| Utilities | 9,553,559 | - | - | - | 344,753 | 767,458 | 918,000 | 1,264,500 | 975,000 | 374,500 | 1,228,070 | 1,235,000 | 494,278 | 262,500 | 855,000 | 834,500 |
| All Other Expenses | 62,840,133 | 5,053,067 | 22,700,605 | 494,320 | 1,555,247 | 2,311,009 | 7,123,581 | 5,155,000 | 2,130,816 | 2,263,516 | 2,353,399 | 4,349,175 | 652,847 | 1,178,056 | 2,788,980 | 2,730,515 |
| **Total Other Expenses** | 91,088,046 | 5,053,067 | 22,700,605 | 494,320 | 2,561,399 | 4,148,467 | 10,573,322 | 8,703,650 | 5,206,384 | 3,660,085 | 6,202,329 | 8,005,196 | 1,642,291 | 1,907,035 | 5,109,277 | 5,120,618 |
| | | | | | | | | | | | | | | | | |
| **Total Expenditures** | 534,270,246 | 14,219,432 | 22,700,605 | 6,288,412 | 22,543,908 | 40,401,988 | 68,235,305 | 49,713,012 | 54,235,016 | 26,541,155 | 64,002,478 | 52,016,347 | 17,686,796 | 18,562,639 | 37,403,589 | 39,719,565 |
| | | | | | | | | | | | | | | | | |
| **Addition to (Use of) Funds Before Transfers** | (75,045,239) | (3,755,351) | (22,700,605) | (494,320) | (807,700) | (9,482,178) | (8,012,273) | (7,935,584) | (3,125,326) | (2,246,785) | (5,865,710) | (3,830,712) | (983,697) | (1,680,660) | (1,447,994) | (2,676,346) |
| | | | | | | | | | | | | | | | | |
| **Transfers, Additional Funds and Commitments** | | | | | | | | | | | | | | | | |
| Transfer in | 27,681,533 | 3,857,050 | 22,700,605 | 494,320 | - | - | - | - | 462,558 | - | - | - | - | - | - | 167,000 |
| Transfer out | (27,051,974) | - | - | - | (1,038,376) | (1,707,612) | (3,859,082) | (2,780,997) | (3,362,130) | (1,465,159) | (3,615,185) | (3,188,126) | (726,271) | (809,712) | (2,243,387) | (2,255,937) |
| HEERF Institutional | 48,888,855 | - | - | - | 1,926,540 | 6,039,131 | 6,160,272 | 4,755,494 | 7,536,041 | 2,350,178 | 6,183,182 | 4,791,991 | 552,770 | 1,259,760 | 2,539,134 | 4,794,361 |
| **Total Transfers, Additional Funds and Commitme** | 49,518,414 | 3,857,050 | 22,700,605 | 494,320 | 888,164 | 4,331,519 | 2,301,190 | 1,974,497 | 4,636,469 | 885,019 | 2,567,997 | 1,603,865 | (173,501) | 450,048 | 295,747 | 2,705,424 |
| | | | | | | | | | | | | | | | | |
| **Net Change Subtotal** | (25,526,825) | 101,699 | 0 | - | 80,464 | (5,150,659) | (5,711,082) | (5,961,087) | 1,511,144 | (1,361,766) | (3,297,713) | (2,226,847) | (1,157,198) | (1,230,612) | (1,152,247) | 29,078 |
| | | | | | | | | | | | | | | | | |
| Target savings (PS, FB and OE) | 5,000,000 | 132,987 | 689,785 | 58,812 | 193,039 | 340,903 | 579,470 | 405,916 | 463,600 | 215,705 | 532,917 | 441,010 | 145,232 | 155,038 | 312,159 | 333,427 |
| | | | | | | | | | | | | | | | | |
| **Net Change Subtotal** | (20,526,825) | 234,686 | 689,785 | 58,812 | 273,503 | (4,809,756) | (5,131,612) | (5,555,171) | 1,974,744 | (1,146,061) | (2,764,796) | (1,785,837) | (1,011,966) | (1,075,574) | (840,088) | 362,505 |

**Additional State Appropriations per 5/17 Committee ARP Allocations**

| | |
|---|---|
| State Appropriation | 700,000 |
| FB paid by State for SERS UAL CC | 21,332,962 |
| Higher Education - CSCU | 4,866,345 |
| **Net Change** | 6,372,482 |

**ESPOSITO - 11/10/21 RESPONSE - 000036**
CC Consolidated FY22 Budget

# EXHIBIT 2

**Manchester Community College**
**2019 College Employee Satisfaction Survey**
**\*\*\* DRAFT FOR INTERNAL USE AND DISCUSSION ONLY \*\*\***
**July 2019**

---

### Overview

The College Employee Satisfaction Survey (CESS) is designed to assess the campus environment for college and university employees (faculty, staff, and administration). The CESS has a set of core satisfaction items and respondents are asked to rate importance and satisfaction for each one. Results are benchmarked against a comparison group made up of over 60,000 responses from sixty-eight two-year colleges who completed the CESS within the past three years. MCC can also compare satisfaction ratings vs. our previous CESS participation in 2015.

The MCC Academic Senate requested that MCC participate in a college climate study of this type. MCC invited staff and faculty, including adjuncts, to participate in the 2019 CESS via a web link sent to MA-Allpoints. In May and June 2019 the survey received 115 responses from MCC employees.

The average satisfaction ratings from MCC employees were significantly lower than the comparison group on more than half the items, and generally lower than the MCC responses from 2015.

The survey instrument consists of 4 sections:
- Section 1: Campus culture and policies (30 standard items)
- Section 2: Institutional goals (9 standard items)
- Section 3: Involvement in planning and decision-making (8 standard items)
- Section 4: Work environment (21 standard items)

This report uses exhibits and text provided by the CESS.

---

### Section 1: Campus Culture and Policies

Respondents are presented with statements and asked to rate their importance to them as employees and then to rate their satisfaction. A five-point Likert rating scale is used for both importance and satisfaction. CESS has calculated gaps between the two means. Keep in mind there are always gaps between importance and satisfaction. Statistical significance markers are defined in notes at the end of this report.

Strengths – higher average importance ratings and higher average satisfaction ratings:

- Faculty take pride in their work
- Staff take pride in their work
- Administrators take pride in their work
- This institution is well-respected in the community
- This institution promotes excellent employee-student relationships

Opportunities – lower average satisfaction ratings, or a larger gap between importance and satisfaction ratings:

- This institution does a good job of meeting the needs of students
- The leadership of this institution has a clear sense of purpose
- There is a spirit of teamwork and cooperation at this institution
- The reputation of this institution continues to improve
- This institution makes sufficient budgetary resources available to achieve important objectives
- This institution consistently follows clear processes for orienting and training new employees
- There are effective lines of communication between departments
- This institution consistently follows clear processes for selecting new employees

ESPOSITO - 11/10/21 RESPONSE - 000038

**Manchester Community College**
**2019 College Employee Satisfaction Survey**
**\*\*\* DRAFT FOR INTERNAL USE AND DISCUSSION ONLY \*\*\***
**July 2019**

The largest changes vs. MCC's 2015 responses were decreases in satisfaction ratings for several items:

- The reputation of this institution continues to improve
- This institution involves its employees in planning for the future
- This institution is well-respected in the community
- Efforts to improve quality are paying off at this institution
- Employee suggestions are used to improve our institution
- This institution consistently follows clear processes for selecting new employees

| Section 1: Campus Culture and Policies | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **RATE IMPORTANCE**<br>**(1 = "Not Important at all" / 5 = "Very Important")**<br>**AND SATISFACTION**<br>**(1 = "Not satisfied at all" / 5 = "Very satisfied")** | **Manchester Community College 2019** | | | **Comparison group** | | | **IMP Sign diff** | **SAT Sign diff** |
| | **IMP Mean** | **SAT Mean** | **GAP** | **IMP Mean** | **SAT Mean** | **GAP** | | |
| 1 This institution promotes excellent employee-student relationships | 4.71 | 3.34 | 1.37 | 4.63 | 3.71 | 0.92 | NS | \*\*\* |
| 2 This institution treats students as its top priority | 4.82 | 3.25 | 1.57 | 4.71 | 3.64 | 1.08 | \* | \*\*\* |
| 3 This institution does a good job of meeting the needs of students | 4.75 | 3.14 | 1.61 | 4.69 | 3.57 | 1.12 | NS | \*\*\* |
| 4 The mission, purpose, and values of this institution are well understood by most employees | 4.53 | 3.07 | 1.46 | 4.35 | 3.52 | 0.83 | \* | \*\*\* |
| 5 Most employees are generally supportive of the mission, purpose, and values of this institution | 4.48 | 3.32 | 1.16 | 4.39 | 3.60 | 0.79 | NS | \*\* |
| 6 The goals and objectives of this institution are consistent with its mission and values | 4.61 | 2.96 | 1.64 | 4.44 | 3.59 | 0.85 | \* | \*\*\* |
| 7 This institution involves its employees in planning for the future | 4.46 | 2.44 | 2.02 | 4.43 | 3.10 | 1.33 | NS | \*\*\* |
| 8 This institution plans carefully | 4.50 | 2.61 | 1.90 | 4.51 | 3.13 | 1.39 | NS | \*\*\* |
| 9 The leadership of this institution has a clear sense of purpose | 4.64 | 2.71 | 1.94 | 4.59 | 3.33 | 1.26 | NS | \*\*\* |
| 10 This institution does a good job of meeting the needs of its faculty | 4.42 | 2.78 | 1.64 | 4.42 | 3.25 | 1.17 | NS | \*\*\* |
| 11 This institution does a good job of meeting the needs of staff | 4.46 | 2.65 | 1.81 | 4.43 | 3.14 | 1.29 | NS | \*\*\* |
| 12 This institution does a good job of meeting the needs of administrators | 4.14 | 3.27 | 0.87 | 4.21 | 3.68 | 0.53 | NS | \*\*\* |
| 13 This institution makes sufficient budgetary resources available to achieve important objectives | 4.59 | 2.41 | 2.17 | 4.48 | 3.17 | 1.31 | NS | \*\*\* |
| 14 This institution makes sufficient staff resources available to achieve important objectives | 4.57 | 2.45 | 2.12 | 4.41 | 3.10 | 1.30 | \* | \*\*\* |
| 15 There are effective lines of communication between departments | 4.58 | 2.28 | 2.30 | 4.48 | 2.79 | 1.69 | NS | \*\*\* |
| 16 Administrators share information regularly with faculty and staff | 4.58 | 2.56 | 2.02 | 4.49 | 3.11 | 1.37 | NS | \*\*\* |
| 17 There is good communication between the faculty and the administration at this institution | 4.55 | 2.59 | 1.96 | 4.47 | 3.08 | 1.39 | NS | \*\*\* |
| 18 There is good communication between staff and the administration at this institution | 4.50 | 2.62 | 1.88 | 4.44 | 3.07 | 1.38 | NS | \*\*\* |
| 19 Faculty take pride in their work | 4.75 | 3.94 | 0.81 | 4.65 | 3.90 | 0.75 | NS | NS |
| 20 Staff take pride in their work | 4.68 | 3.82 | 0.85 | 4.61 | 3.83 | 0.78 | NS | NS |
| 21 Administrators take pride in their work | 4.59 | 3.38 | 1.22 | 4.58 | 3.76 | 0.82 | NS | \*\*\* |
| 22 There is a spirit of teamwork and cooperation at this institution | 4.63 | 2.50 | 2.13 | 4.56 | 3.08 | 1.47 | NS | \*\*\* |
| 23 The reputation of this institution continues to improve | 4.56 | 2.40 | 2.16 | 4.57 | 3.40 | 1.17 | NS | \*\*\* |
| 24 This institution is well-respected in the community | 4.63 | 3.35 | 1.28 | 4.63 | 3.61 | 1.02 | NS | \*\* |
| 25 Efforts to improve quality are paying off at this institution | 4.52 | 2.51 | 2.00 | 4.49 | 3.35 | 1.14 | NS | \*\*\* |
| 26 Employee suggestions are used to improve our institution | 4.43 | 2.32 | 2.12 | 4.37 | 2.99 | 1.38 | NS | \*\*\* |
| 27 This institution consistently follows clear processes for selecting new employees | 4.60 | 2.28 | 2.32 | 4.41 | 3.16 | 1.25 | \*\* | \*\*\* |
| 28 This institution consistently follows clear processes for orienting and training new employees | 4.51 | 2.22 | 2.29 | 4.43 | 3.08 | 1.35 | NS | \*\*\* |
| 29 This institution consistently follows clear processes for recognizing employee achievements | 4.35 | 2.60 | 1.76 | 4.25 | 3.14 | 1.11 | NS | \*\*\* |
| 30 This institution has written procedures that clearly define who is responsible for each operation and service | 4.35 | 2.42 | 1.93 | 4.34 | 3.11 | 1.24 | NS | \*\*\* |

\* Statistical significance is defined in notes at the end of this report.

ESPOSITO - 11/10/21 RESPONSE - 000039

**Manchester Community College**
**2019 College Employee Satisfaction Survey**
**\*\*\* DRAFT FOR INTERNAL USE AND DISCUSSION ONLY \*\*\***
**July 2019**

This *Campus Culture and Policies* section of the survey included an open-end question that read: "Please provide any additional feedback about the campus culture and policies at Manchester Community College." Seventy-eight comments included the following representative examples, presented in random order.

1. Morale is very low, leadership is unqualified, quality of service to students is deteriorating

2. The misery of a few constantly attempts to devour the joy and happiness of many. How sad this place has become. It is often dreadful to attend meetings and watch people with years-long vendettas against colleagues long gone still spew hatred around and incite paranoia in others who have no recollection of, or concern for imagined ancient history. Many of us would simply like to look forward to the future without the baggage of a past we were never part of, if it even existed.

3. The college consolidation is affecting the morale of staff and creates additional stress. However, overall, I feel that MCC is a very nice environment to work in and the majority of employees are positive and helpful.

4. Unfortunately, it is a very uncertain environment and culture at MCC. There is a growing lack of respect and professionalism among all layers from the top down which is becoming very toxic and am disheartened to see this decline and really want to see us get back to where we were.

5. Leadership starts at the top. There seems to be a culture of vindictiveness and negative pay back in the future. Rather, if the current CEO and academic dean were comfortable in their respective roles I don't think this would be the case. We as an academic community should be able to disagree respectfully and not worry about future retaliation. Everyone should be able to express their view. It is imperative that a national search be conducted when these two positions become permanent. Under no circumstances should the two individuals slide into these very important positions without a thorough search.

6. The campus culture has been on the decline for several years as a direct result of poor leadership that operates with virtually no faculty and staff participation and with little transparency. The leadership has been enforcing the BOR directives with campus input, imposing the BOR goals to replace the MCC goals that had been carefully developed under the guidance of the Strategic Planning Committee and endorsed by all stakeholders of the college.

7. Morale is at an all time low. No one is defending "back office" staff whose jobs are being eliminated in the coming years, even if the change is bad, gets rid of the best, most skilled employees. Money being spent on improving student technology that could improve student learning on innovative solutions are being diverted into projects that have no benefit for the student or won't be funded.

8. The leadership at MCC is exclusive, secretive, and vindictive. Those who openly disagree or challenge the ideas from leadership are retaliated against in direct and indirect ways. I am deeply concerned about the direction this college is taking. Staff and faculty morale is the lowest I have seen because of consolidation and because the vacuum this change has created in leadership. There are several Interim positions being held by people who seriously lack experience for their positions. I have no confidence in those who are currently in charge.

9. Policies and procedures have been very unclear and changing each time we have new interim administration in place. Communication of these changes in policies, procedures and staff/faculty responsibilities has been unclear. Current campus culture is much less about teamwork and much more competitive and vindictive in nature. I would say we have a very negative campus culture amongst the employees right now.

10. The mere suggestion that this survey take place shows how far off we are from the true mission of the institution. Our efforts could be best served actually focusing on students' satisfaction, but there is no demand for that survey.

The Ruffalo Noel Levitz Guide for Using Open-End Questions is included on the last page of this report.

**ESPOSITO - 11/10/21 RESPONSE - 000040**

**Manchester Community College**
**2019 College Employee Satisfaction Survey**
**\*\*\* DRAFT FOR INTERNAL USE AND DISCUSSION ONLY \*\*\***
**July 2019**

---

**Section 2: Institutional goals**

Respondents are presented with statements describing a set of institutional goals and asked to rate how important it is to them that the institution pursues each of the goals. A five-point Likert rating scale is used for importance. Respondents are then asked to choose three goals from the list that they believe should be the institution's top priorities and then indicate which of the three goals is their first priority goal, their second priority goal, and their third priority goal.

| Section 2: Institutional Goals | | | |
|---|---|---|---|
| **RATE: IMPORTANCE (1 = "Not important at all / 5 = "Very important")** | **Manchester Community College Mean** | **Comparison group Mean** | **Sign diff** |
| A) Increase the enrollment of new students | 4.50 | 4.46 | NS |
| B) Retain more of its current students to graduation | 4.62 | 4.71 | NS |
| C) Improve the academic ability of entering student classes | 4.29 | 4.37 | NS |
| D) Recruit students from new geographic markets | 3.67 | 3.74 | NS |
| E) Increase the diversity of racial and ethnic groups represented among the student body | 3.80 | 3.71 | NS |
| F) Develop new academic programs | 3.56 | 3.90 | \*\*\* |
| G) Improve the quality of existing academic programs | 4.39 | 4.53 | \* |
| H) Improve the appearance of campus buildings and grounds | 3.34 | 3.82 | \*\*\* |
| I) Improve employee morale | 4.70 | 4.58 | NS |

| Section 2: Institutional Goals | | | | |
|---|---|---|---|---|
| **TOTAL "VOTES" FOR EACH GOAL** | **Manchester Community College TOTAL** | **Manchester Community College Percent** | **Comparison group TOTAL** | **Comparison group PERCENT** |
| A) Increase the enrollment of new students | 52 | 17% | 13,948 | 22% |
| B) Retain more of its current students to graduation | 81 | 27% | 16,721 | 26% |
| C) Improve the academic ability of entering student classes | 40 | 13% | 5,692 | 9% |
| D) Recruit students from new geographic markets | 9 | 3% | 1,448 | 2% |
| E) Increase the diversity of racial and ethnic groups represented among the student body | 7 | 2% | 1,353 | 2% |
| F) Develop new academic programs | 8 | 3% | 4,375 | 7% |
| G) Improve the quality of existing academic programs | 35 | 12% | 9,931 | 15% |
| H) Improve the appearance of campus buildings and grounds | 2 | 1% | 1,803 | 3% |
| I) Improve employee morale | 64 | 21% | 9,397 | 15% |
| All responses | 298 | 100% | 64,668 | 100% |

\* Statistical significance is defined in notes at the end of this report.

**ESPOSITO - 11/10/21 RESPONSE - 000041**

**Manchester Community College**
**2019 College Employee Satisfaction Survey**
**\*\*\* DRAFT FOR INTERNAL USE AND DISCUSSION ONLY \*\*\***
**July 2019**

*Section 2: Institutional Goals* included two open-end questions. The first reads: "What other institutional goals do you think are important?" Fifty-one comments included the following representative examples, presented in random order.

1. Hire permanent campus leadership! Not having this leads to greater instability and the inability to pursue all the goals identified above.
2. Transparency and communication between the leadership and faculty/staff
3. Employees are being asked to continually do more (more tasks) with fewer resources most importantly sufficient numbers of employees and money for our programs in order to keep our academic standards high. If employees don't feel that their concerns about being "heard" and how difficult it currently is to maintain their sanity, their will be fewer people volunteering for "extra duties and tasks". Let the administrators pick up the slack-after all they are compensated much better than the rest of the employees.
4. Manchester Community College is first and foremost an academic institution. Our primary goal should be a commitment to academic excellence. Our second goal should be to support students so that they are able to complete their academic programs. Our third goal should be to improve employee morale, and one of the best ways to achieve this goal is by strengthening the institution's commitment to shared governance.
5. I do believe the college should make efforts towards improving climate culture but that is not their job. It is up to the college community as a whole to do that. And there are individuals unwilling to do this.
6. Recruit qualified and experienced educators in to leadership positions at the college.
7. Reduce anxieties of employees through the process of consolidation with support and clear communication
8. Pay equity and promotional opportunities for adjuncts
9. Assessment is a complete waste of time. You can do all the assessment you want, but without good faculty, the teaching will still be bad. Conversely, a good instructor does not need "assessment" to make them a good instructor.
10. Balance state higher edu budgets by closing down 1-3 underperforming CC's. We must revamp and re-double efforts to marketing our college's programings, offerings, and success stories to the greater community. We have a fantastic product, but there is so much competition clamoring for our students and their tuition dollars. We must increase advertising to improve community awareness!

A second open-end question in this section reads: "Please provide any additional feedback about Manchester Community College's goals." Thirty-six comments included the following representative examples, presented in random order.

1. I feel that retention is the key for MCC to show their success as a college.
2. I am not sure that I fully understand what the real goals of the college are today. Of course maintaining student numbers, staff and funding are always a goal. But I would like to be informed about the challenges that administration is facing, in detail, and be trusted enough to try to be a part of the solution.
3. There is still time to overhaul the strategic planning process to make it more relevant to the day-to-day work of the college, and just not a list that is reviewed once or twice a year. It should be a living document.
4. Create an environment of stability so employees are engaged and invested. Administration must be more visible on campus! Simply popping into an office to say hello would increase feelings of caring and connectedness.
5. The new goals instituted at the college do not include Academic Excellence. Instead, the focus is on meeting IPEDS indicators for success. This is troublesome since student success is a result of many things including strong teaching. This is not reflected in the new goals and is very troubling.

The Ruffalo Noel Levitz Guide for Using Open-End Questions is included on the last page of this report.

**ESPOSITO - 11/10/21 RESPONSE - 000042**

Manchester Community College
2019 College Employee Satisfaction Survey
\*\*\* DRAFT FOR INTERNAL USE AND DISCUSSION ONLY \*\*\*
July 2019

## Section 3: Involvement in planning and decision-making

Respondents are presented with a list of types of individuals (faculty, staff, deans, trustees, alumni, etc.) and asked to rate how much involvement each type of individual has in the planning and decision- making process at the institution. A five-point Likert rating scale is used for involvement.

The average ratings suggest staff, students and faculty do not have enough involvement in planning and decision making; and senior administrators have too much involvement.

| Section 3: Involvement in planning and decision-making | | | |
|---|---|---|---|
| **RATE: INVOLVEMENT**<br>**(1 = "Not enough involvement" /**<br>**3 = "Just the right involvement" /**<br>**5 = "Too much involvement")** | **Manchester Community College Mean** | **Comparison group Mean** | **Sign diff** |
| How involved are: Faculty | 2.51 | 2.67 | NS |
| How involved are: Staff | 1.99 | 2.35 | \*\*\* |
| How involved are: Deans or directors of administrative units | 3.61 | 3.36 | \*\* |
| How involved are: Deans or chairs of academic units | 3.41 | 3.30 | NS |
| How involved are: Senior administrators<br>(VP, Provost level or above) | 3.97 | 3.76 | \* |
| How involved are: Students | 2.14 | 2.32 | \* |
| How involved are: Trustees | 3.33 | 3.24 | NS |
| How involved are: Alumni | 2.43 | 2.50 | NS |

\* Statistical significance is defined in notes at the end of this report.

## Section 4 Work environment

Respondents are presented with statements and asked to rate their importance to them as employees and then to rate their satisfaction. A five-point Likert rating scale is used for both importance and satisfaction.

Strengths – higher average importance ratings and higher average satisfaction ratings:

- The type of work I do on most days is personally rewarding
- I am proud to work at this institution
- The work I do is valuable to the institution
- I have the information I need to do my job well
- The employee benefits available to me are valuable

Opportunities – lower average satisfaction ratings, or a larger gap between importance and satisfaction ratings:

- It is easy for me to get information at this institution
- My department has the budget needed to do its job well
- My department has the staff needed to do its job well

**ESPOSITO - 11/10/21 RESPONSE - 000043**

**Manchester Community College**
**2019 College Employee Satisfaction Survey**
**\*\*\* DRAFT FOR INTERNAL USE AND DISCUSSION ONLY \*\*\***
**July 2019**

Largest differences vs. MCC's 2015 results include:

- Increased importance of "My department or work unit has written, up-to-date objectives" and "My department meets as a team to plan and coordinate work".
- Increased importance and satisfaction with "I am comfortable answering student questions about institutional policies and procedures"
- Decreased satisfaction with several items:
  - ➢ My supervisor pays attention to what I have to say
  - ➢ My department has the budget needed to do its job well
  - ➢ My department has the staff needed to do its job well
  - ➢ I have adequate opportunities for advancement
  - ➢ The work I do is appreciated by my supervisor
  - ➢ The work I do is valuable to the institution

| Section 4: Work environment | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **RATE IMPORTANCE**<br>(1 = "Not important at all" / 5 = "Very important")<br>**AND SATISFACTION**<br>(1 = "Not satisfied at all" / 5 = "Very satisfied") | **Manchester Community College 2019** | | | **Comparison group** | | | **IMP** | **SAT** |
| | **IMP Mean** | **SAT Mean** | **GAP** | **IMP Mean** | **SAT Mean** | **GAP** | **Sign Diff** | **Sign diff** |
| It is easy for me to get information at this institution | 4.57 | 2.88 | 1.69 | 4.49 | 3.27 | 1.22 | NS | *** |
| I learn about important campus events in a timely manner | 4.20 | 3.21 | 0.99 | 4.22 | 3.51 | 0.71 | NS | ** |
| I am empowered to resolve problems quickly | 4.52 | 3.08 | 1.44 | 4.43 | 3.38 | 1.05 | NS | ** |
| I am comfortable answering student questions about institutional policies and procedures | 4.34 | 3.38 | 0.96 | 4.24 | 3.52 | 0.72 | NS | NS |
| I have the information I need to do my job well | 4.68 | 3.44 | 1.24 | 4.61 | 3.66 | 0.95 | NS | * |
| My job responsibilities are communicated clearly to me | 4.56 | 3.46 | 1.10 | 4.57 | 3.72 | 0.85 | NS | * |
| My supervisor pays attention to what I have to say | 4.58 | 3.41 | 1.16 | 4.60 | 3.91 | 0.68 | NS | *** |
| My supervisor helps me improve my job performance | 4.47 | 3.23 | 1.25 | 4.47 | 3.76 | 0.70 | NS | *** |
| My department or work unit has written, up-to-date objectives | 4.37 | 3.25 | 1.12 | 4.26 | 3.58 | 0.68 | NS | ** |
| My department meets as a team to plan and coordinate work | 4.42 | 3.46 | 0.97 | 4.36 | 3.68 | 0.68 | NS | NS |
| My department has the budget needed to do its job well | 4.57 | 2.59 | 1.98 | 4.52 | 3.08 | 1.43 | NS | *** |
| My department has the staff needed to do its job well | 4.62 | 2.40 | 2.22 | 4.57 | 3.04 | 1.52 | NS | *** |
| I am paid fairly for the work I do | 4.54 | 3.30 | 1.24 | 4.56 | 3.12 | 1.44 | NS | NS |
| The employee benefits available to me are valuable | 4.53 | 3.87 | 0.66 | 4.58 | 3.86 | 0.73 | NS | NS |
| I have adequate opportunities for advancement | 4.34 | 2.82 | 1.52 | 4.25 | 3.02 | 1.23 | NS | NS |
| I have adequate opportunities for training to improve my skills | 4.40 | 3.23 | 1.17 | 4.40 | 3.40 | 1.00 | NS | NS |
| I have adequate opportunities for professional development | 4.37 | 3.27 | 1.10 | 4.37 | 3.44 | 0.93 | NS | NS |
| The type of work I do on most days is personally rewarding | 4.65 | 4.11 | 0.55 | 4.58 | 4.10 | 0.48 | NS | NS |
| The work I do is appreciated by my supervisor | 4.46 | 3.46 | 1.00 | 4.46 | 3.90 | 0.56 | NS | *** |
| The work I do is valuable to the institution | 4.63 | 3.66 | 0.97 | 4.56 | 3.96 | 0.60 | NS | ** |
| I am proud to work at this institution | 4.65 | 3.81 | 0.85 | 4.56 | 4.09 | 0.47 | NS | ** |

\* Statistical significance is defined in notes at the end of this report.

**ESPOSITO - 11/10/21 RESPONSE - 000044**

**Manchester Community College**
**2019 College Employee Satisfaction Survey**
**\*\*\* DRAFT FOR INTERNAL USE AND DISCUSSION ONLY \*\*\***
**July 2019**

*Section 4: Work Environment* includes an open-end question reading: "Please provide any additional feedback about the work environment at Manchester Community College." Fifty comments included the following representative examples, presented in random order.

1. Having worked on other teams that did not function well, I am appreciative that I work with a group of people who support each other and are rowing in the same direction, while holding each other accountable. I know that other offices that function as well, and I feel badly that some of my colleagues, while working at the same institution, work in dysfunctional environments.

2. The work environment has changed drastically in the last few years and it has only gotten worse and worse. I don't have the support from my supervisor, my union, or any administration. There is no communication, direction or even understanding of where we are going now that the implementation of the students first plan has moved forward. People are scared for their jobs and uncertain about the future of MCC.

3. I used to be happy to work here. The job was rewarding, new things could be done. I had the ability to do what I needed to do the job. I used the skills I gained well and gained new skills frequently. The environment in higher education was worth not making as much as one could in the private sector. That is no longer the case. Coming to work every day is now depressing and difficult. As the consolidation continues, it gets worse. We are not treated well by the CSCU system down to the level of threats if not being on board with the vision.

4. Faculty and staff morale is very low and satisfaction with the college administration and leadership is very low. Most faculty try to focus on their students as much as possible because there is no satisfaction elsewhere.

5. Overall is a positive environment with the exception of disgruntled racially insensitive individuals.

6. The cultural demise brought on by consolidation makes working here painful, frustrating and stressful. What a massive difference from before this poorly conceived and executed disaster was instigated.

7. The specter of consolidation is destroying this institution. What was once a great college is now a shell. There is a culture of disrepect among faculty and staff, and it is undeniably being felt by prosepetive and current students. The quality of our programs has deteriorated, and there is no innovation. The wrong people are in key positions, and they are keeping us from moving forward. The CEO is doing the best she can with what she has to work with, but there needs to be a major shake-up in all areas of the college. Most importantly, employees need to be held accountable for their areas, with defined goals and objectives.

8. Not enough invitations/opportunity to be involved in strategic initiatives, departmental planning and updates

9. Morale at the college is very low. I work very hard with little support or recognition from leadership. If one is not part of the inner circle, one does not get attention or support. There is a clear relationship between proximity to power and access to resources and supports.

10. We have an outstanding institution. Let's keep it that way. It is a shame what took so long to build is being dismantled quickly and in an uncaring fashion. I genuinely care about MCC and its reputation. Leadership at the top needs to change. A more qualified person should be in the CEO position.

The Ruffalo Noel Levitz Guide for Using Open-End Questions is included on the last page of this report.

**Manchester Community College**
**2019 College Employee Satisfaction Survey**
**\*\*\* DRAFT FOR INTERNAL USE AND DISCUSSION ONLY \*\*\***
**July 2019**

---

**Global satisfaction**

In addition to these sections the survey includes a global satisfaction item ("Rate your overall satisfaction with your employment here so far") using the same 5-point Likert satisfaction scale noted above.

In 2015 the average overall satisfaction rating was 3.84 vs. a comparison group mean of 3.90.

| Overall satisfaction | Manchester Community College Mean | Comparison group Mean | Sign diff |
|---|---|---|---|
| Rate your overall satisfaction with your employment here so far: | 3.50 | 3.85 | *** |

---

**Demographics**

The MCC employees responding to the survey described themselves as shown below.

| Section 5: Demographics | | | | |
|---|---|---|---|---|
| How long have you worked at this institution? | Manchester Community College Count | Manchester Community College Percent | Comparison group Count | Comparison group Percent |
| Less than 1 year | 1 | 1% | 1,938 | 9% |
| 1 to 5 years | 21 | 18% | 6,795 | 30% |
| 6 to 10 years | 24 | 21% | 5,173 | 23% |
| 11 to 20 years | 43 | 37% | 5,931 | 26% |
| More than 20 years | 26 | 23% | 2,695 | 12% |
| All responses | 115 | 100% | 22,532 | 100% |
| Is your position: | Manchester Community College Count | Manchester Community College Percent | Comparison group Count | Comparison group Percent |
| Faculty | 62 | 55% | 9,905 | 45% |
| Staff | 44 | 39% | 10,379 | 47% |
| Administrator | 7 | 6% | 1,920 | 9% |
| All responses | 113 | 100% | 22,204 | 100% |
| Is your position: | Manchester Community College Count | Manchester Community College Percent | Comparison group Count | Comparison group Percent |
| Full-time | 84 | 76% | 18,260 | 83% |
| Part-time | 27 | 24% | 3,833 | 17% |
| All responses | 111 | 100% | 22,093 | 100% |

**ESPOSITO - 11/10/21 RESPONSE - 000046**

**Manchester Community College**
**2019 College Employee Satisfaction Survey**
**\*\*\* DRAFT FOR INTERNAL USE AND DISCUSSION ONLY \*\*\***
**July 2019**

Notes on Significance Testing

Significance Definitions and Levels

The significance level for Importance is a result of comparing your institution's average importance score to the comparison group's average importance score. Likewise for the Satisfaction score. The result is obtained by running an ANOVA (analysis of variance) on the two scores. The result you see is showing you the level of significance, or the p-value.

NS = no significant difference exists between the groups.

One asterisk = a p-value of .05, meaning that the two scores are significantly different, and such a difference would only be due to chance 5% of the time.

Two asterisks = a p-value of .01, meaning that the two scores are significantly different, and such a difference would only be due to chance 1% of the time.

Finally, three asterisks = a p-value of .001, meaning that the two scores are significantly different, and such a difference would only be due to chance 0.1% of the time.

C

Notes on Open Ends



Guide for Using Open-end Questions

- Use the quantitative results (numeric) as the only source for key findings and strategies. Once those key findings are known, in particular strengths and challenges/opportunities for change (high importance/low satisfaction OR highest gaps), read through the open- ends and pull only those that might have some relation to the quantitative as potential suggestions, but do not treat any open-end as being anything but one person's opinion.

- The open-ends are qualitative (similar to a focus group) and not everyone provides answers; they are not statistically sound.  Do not share them publicly. Most campuses only allow review by a trusted executive team and/or Human Resources.

- The open-ends allow employees to vent pent up frustration so do not be surprised if some are controversial.

- The open-ends can provide helpful suggestions of quick "just do it" fixes and other longer-term ideas that might require more resources and planning.

- The open-ends can provide insight into problem areas that need further investigation (additional interviews or a survey item for next time to test it more broadly.)

- It is important to highlight any suggestions that are implemented that came from employee input, to show that the survey results were used and helped.

**ESPOSITO - 11/10/21 RESPONSE - 000047**

# EXHIBIT 3

**Manchester Community College**
**Fall 2020 Campus Climate Survey**
**DRAFT RESULTS REPORT Dec-17, 2020**

MCC fielded a campus climate survey for faculty and staff during November 2020. The invitation to participate was sent via MA-Allpoints, and three reminders were sent over the next week. In total, the survey was open for about twelve days.

<u>**Respondents**</u>

There were 162 responses from faculty and staff. FT Faculty and FT Staff were the most common self-identified positions. There were a significant number of PT respondents as well.



| Is your primary MCC position: | Count | % |
|---|---|---|
| Faculty | 90 | 56% |
| Staff | 70 | 43% |
| (blank) | 2 | 1% |
| Grand Total | 162 | 100% |

| Which best describes your work location since the Fall 2020 semester began? | Count | % |
|---|---|---|
| Splitting time between working on-campus and from home | 51 | 31% |
| Working from home all or most of the time | 99 | 61% |
| Working on campus all or most of the time | 11 | 7% |
| (blank) | 1 | 1% |
| Grand Total | 162 | 100% |

| Is your primary MCC position:2 | Count | % |
|---|---|---|
| Full time | 113 | 70% |
| Part time | 45 | 28% |
| (blank) | 4 | 2% |
| Grand Total | 162 | 100% |

| How long have you worked at MCC? | Count | % |
|---|---|---|
| Less than one year | 3 | 2% |
| 1-5 years | 29 | 18% |
| 6-10 years | 39 | 24% |
| 11-20 years | 61 | 38% |
| 20 or more years | 26 | 16% |
| (blank) | 4 | 2% |
| Grand Total | 162 | 100% |

1

**ESPOSITO - 11/10/21 RESPONSE - 000049**

**Manchester Community College**
**Fall 2020 Campus Climate Survey**
**DRAFT RESULTS REPORT Dec-17, 2020**

**Satisfaction and Feeling Connected**

Part time employees and those spending some time working on campus reported higher levels of overall satisfaction.



**Manchester Community College**
**Fall 2020 Campus Climate Survey**
**DRAFT RESULTS REPORT Dec-17, 2020**

Staff generally gave slightly higher ratings than faculty to questions about satisfaction with personal and department effectiveness and communication.



Most faculty and staff were reported that the culture of diversity and inclusion was about the same as six months ago. The average rating was 3.2 for both groups.



3

**Manchester Community College**
**Fall 2020 Campus Climate Survey**
**DRAFT RESULTS REPORT Dec-17, 2020**

Most faculty and staff reported there was no change in their job satisfaction vs. six months ago. The average rating for faculty was 2.6, and a slightly higher 2.9 for staff.



There were four open-ended questions on the survey.

What **resources** does your unit need to be more effective in the context of COVID precautions?

- Key themes were related to PPE, COVID policies, technology and training for faculty and students, communication, and leadership.

What could MCC do to help you or others feel more **connected** to the college and MCC community?

- Key themes were related to communication, events, and different types of communication

Looking forward over the next year, what **MCC-related issues** are you particularly concerned about?

- Key themes were related to consolidation, enrollment, budget and COVID. Faculty had more mentions of consolidation and enrollment concerns, staff had more mentions of staffing levels and leadership.

What could MCC do to **improve communication**?

- Key themes were related to more communication, events, transparency, clarity, and division meetings. Staff had more references to events and division/dept meetings. Faculty had more references to staffing changes and COVID information.

4

**Manchester Community College**
**Fall 2020 Campus Climate Survey**
**DRAFT RESULTS REPORT Dec-17, 2020**

## What resources does your unit need to be more effective in the context of COVID precautions?

1. Ability to hold on ground labs by providing proper PPE to students and faculty willing to take courses.
2. Access to campus!!!
3. Access to PPE; Regular cleaning of spaces; This may not fit the questions, but it a COVID induced resource..teaching remotely, I am going through reams of paper and ink on my home printer. While worked is posted and submitted in TEAMS, the volume to read on line is TOO much, thus the printing.
4. Access to the classroom to record lectures for students with the materials we have in person
5. Additional Face Shields
6. Additional resources to meet the needs of remote learners if we continue to push for more remote classes.
7. Advertising to increase enrollment in program
8. All employees to work remotely.
9. As far as material resources we have been very fortunate to have appropriate Ppe to continue with "hands on"academic learning objectives.. However, the expansive time it takes to facilitate these student learning objectives extends far beyond additional responsibilities or the expected time one would need to prep, teach and respond to students for a 3 credit class.
10. Better Laptops not tablets
11. Better, more progressive tools for communication to students by program (ability to use social media, etc.)   Better communication between student services departments and faculty - e.g. what is being communicated to students, what changes have been made (for example, faculty were not briefed on the new procedures for placement testing - this creates difficulties

when the information is not widely disseminated and faculty are interfacing with students).   Better tools for planning - hard to determine what class formats are ideal for students, what courses students need without alot of time and effort spent to try and manually collect information.
12. Bettwr communication and transparency
13. Cameras on computers on campus and audio. I have to use my iPhone for meetings when I am on campus. I have no audio coming out of my computer.. I know my supervisors have been asking for this equipment since July.
14. Clear and timely information about policy and practices. Updates to operations that acknowledge and accommodate employees who are working at least partially from home. Information about changes in reporting lines,  Ploy ease, structure changes, even if not COVID-related.
15. Clear direction from the administration about what technology resources are available to our student, like will financial aid cover the cost of a laptop sufficient to run game and Adobe software, student licenses for Adobe software, better on-ground IT support at the time it is needed in the classroom.
16. Clearer guidelines and policies. It seems that each case that comes up has slightly different procedures. I realize these are often changing, but through conversations, different faculty have received different directives from administration.
17. College-provided computer that has video conference capabilities. When we relying on faculty/staff using personal equipment and home internet, we get widely varying results.
18. Communication
19. Computers with video conferencing capability.

5

20. Continuous communication. Students are asking for more and more accommodations and extensions. Maybe some guidance how to balance that and keep course on track. Some faculty have full courses so they have more students and work load. It's ideal, as we want courses at full capacity. But maybe some understanding that some faculty have significant higher volume of students than others. So their ability to contribute to tasks such as NECHE involvement may be more limited.

21. Could use more in person training for Team, Webex etc.

22. Covid Vaccine

23. During these stressful times people need to know their job duties and do them, not pass them to someone else to do because they are not working on campus. If they are not working on campus at all they still should be able to do their job.

24. Easily accesible and frequently updated organizational charts for MCC and CSCU.

25. Effective, experienced leadership

26. Fewer email updates about the rising numbers and more updates on actions being taken to ensure the community will be safer in the near future.

27. For now, BB Collaborate is not as effective as Zoom is, and this affects the quality of teaching/learning.

28. full time instructors and academic advising for students

29. Full-Time Leadership

30. Funding for teachers and more students. I was not offered a class next semester so all I have figured out about connecting with students online will be lost unless/until I am rehired.

31. Generally adequate

32. HEPA filters and ability to open doors to the outside with some security measures in place.

33. Hot-line for everyone (MCC staff, faculty, and students) who need info related to COVID.

34. I am teaching remotely. I do not think open labs are realistic or fully available to students who don't have at home resources.

35. I believe that overall all ccs should be receiving same funds, support as CSUs regarding testing, contact tracing, funding for IT support for hybrid courses, a better understanding from administration of what is involved with delivery of vfa classroom techniques especially concerning hybrid models - they simply will not work without dedicated IT support & appropriate funding.

36. I don't give a flying fuck about covid and I wish I would stop getting 17 emails every day about it. People get sick. It happens. We can't prevent it all and we need to stop thinking we can. Get back to teaching our students as they deserve. As a "covid survivor" myself this overblown reaction is crippling our education system.

37. I feel disconnected, but it may be because I am part-time. I feel going in once a week is helpful so I can connect with a small number of co-workers.

38. I have taught on campus all semester and have felt very safe. Scanning IDs has been very effective and the students have been very respectful of each other and me.

39. I know the college is doing everything it can to increase and maintain contact with students. I would be open to finding new and creative ways to engage students but I am out of ideas. Specifically, I would love some strategies to help retain and reinvigorate students. I suspect any work that would help these students would also increase enrollment for the next semester.

40. I mainly work from home but when I do come to campus once each week, I feel that facilities and campus police are doing a

**Manchester Community College**
**Fall 2020 Campus Climate Survey**
**DRAFT RESULTS REPORT Dec-17, 2020**

great job in providing needed safeguards, signs, etc... Kudos to them!

41. I think my department has been given the resources it needs to protect the health and safety of the staff as well as the populations we serve. Information about requesting PPE, etc. was a little slow/lacking during July/August, but by the start of fall classes we had what we needed. I'm very pleased that safety and security on campus is being taken seriously. Requiring photo IDs is a great step forward.

42. I think my unit has been doing its best.

43. I think that the college adminsistration has been doing an excellent job navigating this challenging situation.

44. I think we need a better, safer COVID policy for on-campus classes. When a student is found to have COVID, the entire campus community should be immediately informed and that class should go online. I also would like to see more technology help for students.

45. I think we need to work from home completely without an expectation of being on campus at all.

46. I wish I knew. Resolution of some concerns is simply a factor of time, learning and mastering technology.

47. I wish that I could continue using Zoom because I'm very comfortable with it

48. I would welcome any automation of processes and procedures.

49. If forced to teach in person we would need CDC recommended PPE paid for by the college.

50. I'm pretty happy with my resources.

51. Information provided further in advance with clear descriptions and centralized place to gather the information; more support for students and more support for teachers in managing the needs of students; policy clarification and changes

related to grading policies and online teaching policies.

52. Instead of weekly reports, there should be real-time reports of COVID occurrences on campus.

53. Just been informed on cases that we have on campus. Hot zones areas to stay away if possible !

54. Laptops students borrow from MCC should be equipped with programs needed for their course; e.g. Lockdown Browser & Respondus for ALEKS courses.

55. Lately, there has been a lot of useful resources shared via email; therefore, I do not have any suggestions at this time.

56. Leadership

57. Limited hours of contact on campus.

58. Money - I want to be

59. More communication between lower level leadership.

60. More consistency and training relating to use of virtual meeting tools.

61. More direct communication with Administration. Yes, there are the policies that are given to us yet, they are not one size fits all. Each case should lead to a discussion and input from the department that has a case.

62. More disposable gowns

63. More effective and up-to-date technology in each classroom

64. More effective leadership that pays attention to the needs of all faculty, staff, and students

65. More effective? Precautions? Don't know. More effective? Students need computers and access to wifi and software for online courses. More effective? A version of the Help Desk for students who need help with basic computer skills. More effective? More faculty training - technology, strategies, options relating to online teaching. Precautions? On ground class rooms need to be cleaned between classes.

7

**Manchester Community College**
**Fall 2020 Campus Climate Survey**
**DRAFT RESULTS REPORT Dec-17, 2020**

Precautions? A designated place for students to eat on campus that is regularly cleaned.   What needs to continue? Access to on ground classrooms and facilities, so students have a choice.

66. More full time staff.

67. More help with online teaching.

68. more information to plan for the future, classes to offer, definitive information on which type of classes are preferred

69. More PPE supplies

70. More sharing of resources on how to teach online effectively

71. more specific message on exposed student. Some community colleges have a more definitive message. If exposed 14 day quarantine and negative test then allowed into lab and clinical

72. More staff

73. New computers in the classrooms

74. Nicole's coffee chats are great!

75. Not able too attend meetings or LRON classes on my work computer on the one day per week I am on campus. This is because there is not audio/camera. I was provided a laptop recently and I bring that to campus. Overall the transition to working from home has been good and I am productive working from both my home and work office.

76. one to one training Blackboard Collaborate evenings or weekends

77. Our area was adversely affected prior to the pandemic and then Covid also impacted our department incredibly hard. The current Administration seems to be working with us and I'm hopeful that as the virus is addressed and stopped the administration will meet with our department to fix the curricular impacts imposed by the past interim administration.

78. Our division needs a leader. It has been some time now since student affairs had a Dean driving the ship.

79. Our students need an intensive Commnet / Email / Blackboard introduction - this should be mandatory for all incoming students.  Bring in faculty to help design this.

80. Professional development opportunities for faculty and staff who are technologically deficient. Frankly, it's disturbing to see how technologically inept some of our colleagues are and then to think of them teaching online courses. One online course is a challenge, much less a full load.

81. Provide staff with wipes, and masks when possible.  COVID testing provided on campus.

82. Refill positions

83. Regular communication

84. remote desktops for entire dept

85. resources to address student's needs in technology, assistance with fees, software, supplies and textbooks

86. Right now, we are an online university but some units still function according to the old model.  Students need online student support--advising, financial aid, registrar, disability services--available 6 days. Students need email answered within 24 hours.  Faculty cannot address many of these needs and are triaging outside their areas to support students.  Clarify div coordinator position and be transparent in hiring for that position

87. Sanitation equipment

88. Sharing of ideas on teaching live classes

89. so far so good

90. Software, tools, technology platforms that allow for me to engage with my target audiences easier

91. Specific policies and procedures should have been in place at the beginning of the semester; while I understand the one on one case analysis that is required, having a plan in place would have been effective as cases started to be present on campus and

8

**Manchester Community College**
**Fall 2020 Campus Climate Survey**
**DRAFT RESULTS REPORT Dec-17, 2020**

faculty were making decisions as they interpreted to the situation

92. Staff

93. Staff willing to use phones more, as opposed to emails. With complex issues, email can be very inefficient and time consuming.

94. Structure guidelines

95. Support for faculty reflecting academic freedom and choices about how they want to teach.

96. Technology support

97. Technology support and hardware

98. Technology that works. When it does not work access to someone who can help ASAP. Please do not misunderstand this comment. The IT people have been fabulous! With that said it has been non stop with technical challenges. I could write a volume giving you all the challenges. I'm not sure in this given situation you can do anything to fix it. Some of it is my lack of knowledge and often a lack of time to educate myself or trouble shoot the problems and get them fixed. Sometimes it is an ongoing technology troubles. An upgrade happens and files are missing, projectors don't work, computers don't work. It has been very challenging. OK I feel better now. Sorry for the rant. If I think of a way to improve this besides adding staff, I'll let you konw.

99. Temps at entrance- restaurants do it.

100. The availability of laptops for students has been wonderful. I hope this continues. An updated ventilation system should be a must, but I understand this is very expensive endeavor.

101. The MCC Management Team is doing a great job with making sure that the Campus Community is safe. I commend our CEO Dr. Nicole Esposito, Dean Jim McDowell, Interim Dean Dr. Fatma Salman, Interim Dean Angelo Simoni and the entire MCC

Police Department (who is on the frontlines) for their continued and relentless efforts in keeping our Campus Community safe.

102. The unit members can benefit from a continued flexibility with work schedules for the purpose of safety. When able, additional support re: human capital.

103. true n-95 masks for our allied health students with fit testing Clearer guidelines as to what to do when a students calls asking for COVID guidance. Actual secretarial help help with purchasing

104. We need better response and assistance from IT staff on campus. It's often difficult to get simple answers to questions and very difficult to get their help on larger issues. Things often get thrown back and forth between campus and BOR IT, sometimes for several months, until help is provided.

105. We need more full time faculty and fewer part time faculty.

106. Working from home through flu season would be great. We really don't see students, so less going in / no going in till March would be ideal.

107. Zoom would, in my opinion, be a better and more user friendly conferencing/teaching tool than the WebEX, Teams, and Ultra.

9

**Manchester Community College**
**Fall 2020 Campus Climate Survey**
**DRAFT RESULTS REPORT Dec-17, 2020**

**What could MCC do to help you or others feel more connected to the college and MCC community?**

1. Zoom. More information about how IT resources will be handled now that consolidation is under way. How many IT staff are still on campus? What does the help desk look like? Do we still have local people to repair computers? Who manages custom images for custom classrooms?
2. Actually MCC is doing a respectable job of trying to keep us connected, it's just the nature of the situation that is isolating.
3. All classes that were on ground should be on ground. Students need to be on campus.
4. Ask us how we're doing. What could be done to support us. More regular newsletters that pertain to student, faculty, and staff updates. Transparency around plans for the upcoming semester and beyond. I am not receiving a lot of information from MCC. Or I am receiving a blast of emails that are hard to weed through.
5. Attending open meetings has helped me feel connected to the college and my colleagues.
6. Being more transparent and openly address the not so dormant issues around racism and classism's.
7. Better communication - less siloed approaches to how each campus component does business
8. Better communication with new positions - knowing who and what departments do...
9. Better communication within departments. I am sure some are better than others.
10. Bring more staff & faculty back on ground- schedule working days between on-campus and from home.
11. CEO Coffee Hour went really well, hosting more in an effort to get people to connect even virtually goes a long way.
12. Close the college's huge equity gaps

13. Communication
14. Communications has deteriorated dramatically in the past six months. Changes are being made at the college that are not being shared. It appears that administrators don't know who does what, and you're not paying particular attention to verbal or written information. Misinformation is being shared regularly, And there is a lack of consistency in what is being shared and with whom. This is what needs to be fixed.
15. Continue the CEO chats.   Regular updates about staffing changes/ reorganizations
16. Continue to mitigate bullying, harassment among staff members.
17. Continue update emails to Campus
18. Continue with "coffee chats" and Mary Lou's monthly meetings with coordinators
19. Continue with faculty virtual meetings
20. Department communication with adjuncts including virtual team meetings College wide programs (ie coffee hour/etc) offered after 4pm
21. Department Teams meetings on a regular basis just for a check-in when no one in the department is together on campus during this time.
22. Each department should have a skeleton crew through this pandemic all departments .... because if a few people get it or get exposed. wipes out your whole unit and then we can't offer services that should be offered to students are required to come here.. The call make an appointment does not work because people do not return calls or set it up , which I have witnessed, it's very frustrating for the students and when they're frustrated they look elsewhere for their education ! Looking forward to the new CEO on her Ideas to get this place back where it was 5 years ago !
23. Faster response to common questions.

10

**ESPOSITO - 11/10/21 RESPONSE - 000058**

24. Feeling connected and feeling listened to are different things; I would focus on MCC needs being heard and addressed by the system.

25. For the spring semester, we really need to attempt to have more on-campus activities. We have a vast campus with lots of outdoor space. Let's try to come up with creative ideas to safely connect with our students: In-person advising with social distancing/masks, etc. Some club meetings that are again, social distanced. Could use auditorium, GPA Community Commons, Village buildings. Four year colleges are trying to come up with creative ways to have more in-person events for spring. I think we should attempt to do the same. Our students are feeling isolated and depressed. Even though our campus is open, it feels shut down. Spring, especially later spring, should bring more activity to the campus (safely, of course).

26. Frequent communication; socialization events... maybe a call in "happy" hour where folks could just socialize with each other.

27. Get people on campus. Even before COVID the majority of faculty spent significantly less than their 35 hrs/week on campus. It honestly made me angry every time I heard people complain about lack of community and "school spirit" when they were only on campus less than 25 hrs/wk. You can't be connected and (re)build community if you are not here. Once people are here then really incentivizing activities like club sponsoships / activities. Or seminar programs with outside speakers. "Classic" movie screenings. Lunch-time music performances - in addition to MCC student groups invites groups from other local colleges have pot-luck like the holiday"stroll" in the middle of the semester not just at the holiday. I have

several other items I want to add but they would likely break anonymity

28. Given this virtual world, there are many opportunities provided, it is up to the individual to engage. Once again time and the number of hours to n the computer can be a barrier.

29. Hard during pandemic - I miss seeing the students.

30. Having regular, substantive updates from the college leadership would be a welcome change. I've been encouraged by the changes since July and hope it continues. Knowing the college's strategic objectives (both long and short-term) would help us to better focus/align our work and encourage a sense of shared connection and purpose.

31. Here are a few thoughts: -Assemble a pool of volunteers who would be interested in serving on problem solving committees and then enlist them to help as needed. Being part of a cross functional group tasked to problem solve is very rewarding and establishes connections outside of silos. - Bring back "lunch buddy's".

32. Here's a thought: Let's consider EVERYONE having a photo of themself to use when their camera is off. Not initials, not a muppet or a superhero or favorite animal but a photo of themself. (Even the one from the new badges/ID..) As for the ID's, that is an idea that was long overdue and kudos to whoever was responsible for that decision.

33. Hire more diverse faculty and staff, hire more experienced leadership team, acknowledge the college's weaknesses as well as its strengths

34. I am not sure--staff and faculty are working so hard it may be difficult to take extra time for community-building events AND everyone is experiencing online fatigue. It is difficult to solve a connection challenge if people's time is too constrained.

11

Manchester Community College
Fall 2020 Campus Climate Survey
DRAFT RESULTS REPORT Dec-17, 2020

35. I am very happy with the community meetings and the communications that have been going on this semester and which have been getting more informative. It is important to feel like employees are being kept informed and that keeping us safe is a priority. Thank you.

36. I appreciate the many chances to connect with faculty, staff, and leadership. I know the meeting platforms may be getting tiresome for folks but I feel recharged after these meetings. Perhaps there are other ways to do this as people become increasingly burnt out on these meetings. Maybe folks can share fun pictures or videos of COVID life at home, how people are coping, and being creative in our new normal. Silly and light-hearted might be a nice distraction and a new way to connect.

37. I believe MCC does a good job of helping people to feel connected, though in times of Covid we are mostly connected virtually.

38. I don't know that there is much the college can do at this point. Creating more meetings/gatherings/forums becomes self defeating because the work must be my priority. My work is to teach and help my students engage and excel.

39. I Feel more connected by having meetings, book meetings and by email.

40. I have plenty of information coming my way

41. I like the email communications where Nicole reports updates to us. Maybe more communication about the consolidation, since it will have such an impact. Any information is appreciated. Some campuses are having all campus meeting with Mike Rooke. Because so many MCC people are involved, we don't seem to get as much information. But many people at MCC do not have access to the information. Nicole does report out her information that is high level. Maybe more information about the academics and discipline

departments and how that will work in the future.

42. I really believe that MCC has done so much to enhance communication as we try to navigate around the challenges that are present at this time.

43. I really don't know, although I realize the need is there. I think students in particular feel very disconnected. I hope we are polling students - that's who we really need to hear from. What do they want?

44. I recently received a laptop from MCC, and this made a huge difference for remote teaching.

45. I still feel connected to my colleagues

46. I think a good amount of work is already being done... can't think of anything in particular to make me feel more connected.

47. I think I'm "meeting"ed out!!! I believe colleagues (including administrator colleagues) are working hard for the betterment of college and its everyday dealings;  MCC website needs to be continuously improved not wait for a whole semester to pass to make it more user-friendly for both students and staff.

48. I think MCC is doing the best it can to keep connection happening, but the COVID precautions have really eliminated the daily interaction in our community.

49. I think the college needs to break down its silos and work more collaboratively.  There are communications being sent to faculty that would be beneficial for staff to know as well.

50. I would like to see MCC and the entire CT Community College system  address the lack of awareness among its faculty and staff concerning working class cultural values; these values cut across all races and genders.  We have a major cultural-mismatch problem.

51. I would love to see CFT step up and lead more regular  professional development

opportunities. I would enjoy MCC faculty and staff remote social events, virtual happy hours, etc. Mostly just more opportunities to talk about teaching with my work pals I miss so much.

52. improved communication

53. In the midst of COVID, it is challenging to feel fully connected. A goal of consistent honest and communication would be helpful.

54. In this challenging time for students, I feel that we shouldn't rush to centralize our services - students need to feel more of a personal touch now more than ever. Directing them to someone specific on campus is essential. Also having each department aware of other department's processes is important for giving info to students that may call. For instance, knowing which Advisor to send them to, or knowing first steps, etc.

55. Initiate a group virtual meeting

56. It is really challenging to be connected when you do not see many other students or faculty. It feels like a ghost town on campus. I think the students that are new to college and have not had in person classes are really missing out on the experience.

57. It may be a good idea to arrange regular open mini lunch meetings to create a sense community until we are back on campus

58. It's difficult with the Covid virus. Perhaps conduct some Zoom meetings.

59. It's hard to say given the current times we are in, the majority of meetings are all virtual. So, it can be difficult to feel connected and navigate when no everyone is working on campus.

60. It's really hard with covid and not being able to see my colleagues, students and others each day. But, continue offering things like the CEO Coffee Hour for people to connect and have conversations. Also, with changes,

not always sure who is doing what, and don't really know the new hires. Would be great to have short bio's/info sent by email maybe included in the ICYMI email that Mike Jordan puts out with a photo and brief info to let us know a little about that person, what they do on campus, etc...

61. Job promotion from within, team working better. Highlighting staff or tres and their accomplishments or what they do well.

62. Keep doing what you are doing. Personally, I would have liked to participate in more meetings, but there are so many hours at the computer I can take every day.

63. Laptops and iPads for Remote work and IT has been very helpful.

64. Less "bullying" of "minority" opinions when it comes to political stances in meetings, in hallways, in public documents. NOT everyone at MCC wants to vote for Biden/Harris! Does a "liberal" education mean INtolerance towards "conservative" thoughts/opinions, or does it mean "our way or the highway." Conservatives are very often tolerant of liberals; why isn't the opposite true?

65. LOVED the CEO Coffee Hour-- continue that practice

66. Maybe highlight faculty, staff and current students on the web page with brief interviews and photos?

67. Maybe some Zoom meetings in smaller groups by discipline for adjuncts.

68. More CEO coffee hours would be beneficial. Additionally, my opinion is that there should be regular department meetings (virtual) to include all staff (including part-time adjuncts). Personally, I would welcome the opportunity to be in the loop, be more involved, and assist the department.

69. More collaborative projects between Student Affairs, Continuing Education and

13

Manchester Community College
Fall 2020 Campus Climate Survey
DRAFT RESULTS REPORT Dec-17, 2020

Academic Affairs. I do think we are too siloed.

70. More communication about what's happening at the system office, and what kind of problems the college is facing with the budget. If there's a possibility that budget cuts need to happen that might affect my job, I would hope that I'm made aware of that risk well ahead of time.

71. More consistent CFT events.

72. More diverse faculty and leadership team

73. More phone/Teams communication on a "casual" basis (vs. scheduled meetings) to discuss rather than doing everything by email.

74. More racial and ethnic diverse members of the faculty, academic affairs, student affairs, and finance.

75. More regular and open communication about the consolidation

76. More working sessions rather than large group meetings; more "unscheduled" problem-solving convetsatuons—try to come closer to walking into people's offices

77. No favoritism?

78. Not much with the pandemic we are experiencing

79. Not sure. Difficult situation we are in. Maybe consider using video so there is more of a connection.

80. online courses should require video chat a few times during the semester.

81. Open communication and honesty

82. opportunity for more input from adjuncts

83. perhaps be more demanding in obtaining as much support as the CSUs are receiving but I am not sure if that is possible given the current BOR climate of not supporting the CC & this is extremely defeating when trying to teach a difficult subject during a difficult time.

84. PreCovid (and hopefully post Covid), I would have a meeting or gathering with everyone (including adjuncts) at least once

a semester. These give people an opportunity to see each other and speak informally.

85. probably out of their hands

86. Provide a video of the new employees and administrators as was done on campus with the "meet and greet."

87. Regular communication

88. Regular communication from college administration such as a weekly or monthly email, reassuring emails during this challenging time, etc. Communication is few and far between and not warm at all.

89. Regular update email, weekly? about changes at MCC

90. Reissue this survey at a later date. It is far too early in this new administration's tenure to have any valuable feedback.

91. Responsiveness from mid-level administrators to faculty in a timely, respectful, and clear manner.

92. share information about re-organizations that are occurring, and implement clear communication lines (who to go for what), for example, the recent sharing of the new HR info was helpful, but limited, titles don't really tell you what individuals are in charge of, which doesn't tell us where to go for what issues, we need this information in general across the college, for us and our students

93. Share updates on great work being done by various units under unprecedented Covid challenges. To value and appreciate every employee.

94. Since I'm working from home full-time, let's implement more 'open/visual' meetings for cross-department communication(s). I have weekly Teams meetings with my immediate colleagues, but it would be nice to see fellow professionals from across campus.

95. Staff working together for the benefit of students

14

Manchester Community College
Fall 2020 Campus Climate Survey
DRAFT RESULTS REPORT Dec-17, 2020

96. Stop pandering to every political issue or social movement. Hold professors accountable for proper teaching and students accountable for their requirements.

97. Teams is not the answer. You don't really get to see anyone.

98. The benefits of 4c members should not be limited to other union members.

99. The cafe with CEO Dr. Esposito was wonderful and I hope those will continue.

100. The coffee chat was popular.

101. the coffee hour discussions have been very helpful, happy to see another one planned at the two week point from the first one and with a different to capture other parties as well.

102. The communication from the MCC Management Team has improved tremendously since Dr. Nicole Esposito took over as our CEO in the first week of July 2020.

103. This is a difficult question. I do think that everyone is doing the best that they can. What I think is very challenging is all the work for the one college / merger/alignment/consolidaiton of resources continues to move ahead without a pause of anything else that is happening around us. I completely support the curriculum alignment and all the work being done to help our students with this initiative. I also do think it is great that it is moving ahead. What is incredibly difficult is to manage and balance all the changes with the pandemic and the college. I would like to slow some things down so we can take in a process the communication and have time. A perfect example is this survey. I am only now getting a chance to respond. I really appreciated the reminders and encouragement to complete this survey. If I had not gotten reminders, I'm not sure I

would have given it attention because it would have gotten lost with other priorities.

104. This is tough during this time. I do like the coffee hour idea, but I also think people are "zoomed out". Too much of this will not necessarily more effective. One social piece per month might be nice. In addition, many are balancing homeschooling/child care with their job responsibilities. Many are just not available to engage much more than they already are doing.

105. Train moderators that are leading meetings to be better prepared with the technology.

106. Transparency. Everything seems so secret.

107. Video messages from MCC leaders to faculty and staff for a portion of communication. We get so many emails. Would be nice if some emails contained a video message so that we feel more connected to MCC leadership. We can see faces and not just names.

108. visual tours of classrooms maybe? Posting recordings of past events?

109. We need faster responses from higher up IT staff. It is just ridiculous how they ignore deans, supervisors and staff for months! Occasional meetings with a theme. Have people put their camera on at least for the beginning and ending of a meeting, just to say hi and bye. I don't even know what some of the staff members I am working with look like.

110. Welcome everyone and support diversity

111. When a student has tested positive for Covid 19, immediate notification would be appreciated so the students and I can be tested immediately so we do not pass the virus to our families . More open communication.

**Manchester Community College**
**Fall 2020 Campus Climate Survey**
**DRAFT RESULTS REPORT Dec-17, 2020**

112.    With everyone working remotely, I do not feel very connected to the MCC community. Is there one still?

113.    Work with state legislature to make community college free for qualified students and increase enrollment. It would make sense to make students pay for classes they repeat. This would get media coverage and make students feel that we value them and work for their benefit.

16

**Manchester Community College**
**Fall 2020 Campus Climate Survey**
**DRAFT RESULTS REPORT Dec-17, 2020**

## Looking forward over the next year, what MCC-related issues are you particularly concerned about?

1. #1 Faculty's (lack of) knowledge of technology skills to deliver engaging coursework. #2 The non-consistent experience students' have in their on-line courses. There are no academic protocols in place (ex. grading homework within 5 days, etc.) and at least 3 different delivery tools being used (WebEx, MS Teams, Bb Collaborate).#3 Lack of morale and community with faculty and staff.

2. 4Cs contract, layoffs, consolidation might not go well

3. Access to GPA for 'on ground' classes for summer 2021

4. Accreditation - this is not on the radar the way it needs to be. Impact of consolidation efforts and a lack of a unified MCC response to consolidation.

5. As a single parent I'm concerned about losing my job due to the financial impact covid has had on our college and the CSCU system. Also having enough staff to do the work and do it well. If we do not make it easy for students to enroll and register and get to the resources they need, they will not return. I think we are making progress in these areas but having permanent positions rather than interims and people helping a few hours here or there will help. It's hard when you are working for someone who has commitments to other institutions and is not fully invested at MCC, or the person in the position keeps changing.   I'm also concerned about staying connected to students and other colleagues since most work remotely all or part of the time. We lose some of that personal connection. I realize we have to social distance but after awhile, get tired of being in virtual meetings all day :) . I don't have any ideas on how we can better this at the moment (sorry) other

than would we consider a drive through event of some type.   Boosting enrollment and being able to collaborate effectively across campus to do the work we need to do for student success. Being asked to use our strength areas to take on new roles and projects to help MCC and our students.

6. Being around staff who may have tested positive for COVID and not being told especially if I have been in close proximity due to having a weak immunity system it is worrisome.

7. budget one college model

8. Budget cuts Not being able to replace staff who retire

9. Budget cuts, jobs becoming number driven, not enough support. Morale, following what's popular in media or culture vs what might make us unique or what's makes us work well as a college.

10. Budget issues, layoffs

11. Bullying, harassment.

12. Changes to my course, the course offering, and how many credit hours I will get paid for.

13. Concerned that the equity gap will continue to grow wider and wider

14. consolidation

15. consolidation with loss of control of curriculum and loss of access to important HR, IT and purchasing staff

16. Consolidation, and lack of direct access on campus to knowledgeable staff to support students, faculty and other employees.

17. Consolidation, budget, enrollment, culture, MCC's Identity

18. Consolidation, hiring freeze, organizational charts not being clear, no Associate Dean of Students, leading to minimal advocacy and support for role and future of department. Too much emphasis from SO on Guided Pathways Advisors, not enough emphasis on other support services and their comprehensive interconnectedness.

17

**ESPOSITO - 11/10/21 RESPONSE - 000065**

19. Consolidation. The landscape is changing so quickly, it is hard to imagine we will be the same campus we were before we left. Who will be there, who won't, and how will we rebound in this new environment? It is stressful and going to campus makes me even more nervous (not so much about COVID but what it will be after COVID). I am also afraid the BOR is taking over too much, too soon in the name of COVID. I honestly don't trust them at all anymore. We really are reliant on our new leadership to protect us from them.

20. continued flexibility in work roles during the covid crisis. Support for different personal choices.

21. Continuing handling of the covid crisis. It is a challenge for everyone, students, faculty and staff.

22. Covid - requires the college to continue to do so much remotely/online. Concerned that this is far inferior to being on campus. Consolidation- lack of buy-in from faculty/staff, covid, changing leadership at our college and the system office... all are making the transition to one college a mess.

23. Covid and internships and the completion of clinical hours set forth by accreditation standards.

24. Covid and my safety

25. COVID-19

26. Covid's effect on job security for full-timers and stability for part-timers

27. Declining enrollment and funding issues. Students' mental health issues during these Covid times is also a concern.

28. Declining enrollment, the leadership's support of consolidation and the system office, and the lack of expertise and experience of the cabinet

29. Direction for the student affairs division; communication about the consolidation and what it means; many of us are being pulled in multiple directions and reporting

to multiple bosses who all have different wants and needs.

30. Doesn't a "liberal higher education" mean expression, teaching, and even some openness to other/all thoughts, not just what Democrats espouse? What are we really teaching our students. (If you ask them, and they happen to disagree w/ their teachers/administrators/union leaders about what's going on in culture/politics/state or nat'l gov't, they feel bullied, squelched, and uncomfortable to speak up. Doesn't seem like a very "open-minded" campus environment...)

31. Dropping degree programs, not hiring staff back. Lack of succession planning due to open hiring policies and interview panels not having subject specific qualified staff for decision making, budget problems, program cutbacks, lack of vested long term employees, lack of faculty leadership due to retirements and promotions

32. Enrollment

33. enrollment and keeping students engaged, reaching out to them when they are struggling and being able to offer real support and help

34. Enrollment and reaching out to students who are less easy to reach remotely.

35. Enrollment decline, budget issues, consolidation, lack of diversity, continuing to ignore achievement gaps in classes and the racism in staff and faculty, often displayed publicly

36. Enrollment declines, less staff working on campus, less services for students (such as tutoring service), and less IT support services.

37. Enrollment is down, hiring is frozen, we are in the midst of a pandemic. I am afraid to come to campus and afraid for my job and the jobs of my colleagues.

38. Enrollment, budget, and ability to make devious based on needs of our Campus

**ESPOSITO - 11/10/21 RESPONSE - 000066**

18

39. Enrollment, looming Budget Crisis, One College initiatives
40. Enrollment. Consolidation
41. Enrollment; finances; job security for junior faculty NECHE--little has happened since a meeting last May ATD and equity--little has happened in two years
42. Enrollments - this is a problem for community colleges nationally. Students need more structure then the have in the past. I think we have to more deliberate and involved in helping them complete degrees and obtain jobs or transfers. All degrees should be mapped to the next steps.
43. Equity issues
44. Feel welcome Feel include Feel that we are working together and leadership is about leader and support instead of personal attack
45. Feeling connected and knowing what others are doing - i.e. their hours, their services, etc.
46. Financial
47. Getting back into the classroom when it is safe.
48. Getting students back. !! we don't do enough out reach to high schools and advertisement through social media we do a disservice I believe to certain communities , it's such a beautiful place no one knows what we can offer !!! Admissions needs to get out into the community we need more people and recruitment in that department !!!
49. Hiring practices have been coercive in the past. Searches have been improperly conducted with "lost" applications. I have been concerned about appointments made in the past without proper searches being conducted. These practices need to be cleaned up and made transparent.
50. Hold standards with students and concentrating on education rather than

everything but. We've wasted too much time energy and resources on inclusion and covid and oversight and task forces and our students are getting inferior education because of it.
51. How classes will be taught
52. I am concerned about possible return to campus on a full time basis, considering the COVID upticks.
53. I am concerned about returning to campus with COVID still a risk. I am concerned about budget cuts and fewer students registering for classes. I am concerned that the quality of our online classes is not yet up-to-par (myself included).
54. I am concerned about the hiring freeze and the need for more advising staff at MCC. I hope we are able to keep the staff we have an add a new full-timer.
55. I am concerned about the lack of experience among the leadership team, and the loss of institutional knowledge. I believe that experience will make it hard for the system office to implement it's one college practices, and that MCC will suffer because of that because of a perception that we're not cooperating. I am concerned that decisions will be made without the proper context. I'm afraid that our academic programs will begin to suffer.
56. I am concerned about the lack of testing, reports of Covid numbers and declining enrollment. I am also afraid smaller programs will be cut.
57. I am incredibly concerned about the increased challenges to student success due to the pandemic, economic changes, the national climate and the impact of all of these on physical and mental health of students. I believe significant attention to our policies, support systems, etc. is required to mitigate the potential for dramatic decreases in student success overall and equity in student success. I am

**Manchester Community College**
**Fall 2020 Campus Climate Survey**
**DRAFT RESULTS REPORT Dec-17, 2020**

personally very concerned about the extra time demands and emotional stresses on staff and faculty members in light of student challenges caused by our current pandemic & online teaching context. This is happening even as all staff have increased personal demands in the pandemic, and is likely to get worse with hiring freezes, centralization of services, etc. I see barely any attention to how being squeezed like this is leading to burnout, job dissatisfaction, or other emotional and health costs. The time demands of meeting increased student needs also mean that staff/faculty often do not have time to participate in events that would address their own personal challenges in their jobs or might provide support. Unless the work load is changed, this structural barrier to providing support and assistance to staff/faculty remains, with the likelihood of getting worse as more is being requested in terms of work on system changes and other needs.    With services moving away from MCC, including human resources, it gets very difficult to even get answers to questions. Email response times can be very slow.    I am concerned about the potential for further increases in advising & teaching loads, and ongoing challenges related to system-level transformations.

58. I am most concerned about the effort towards consolidation into a single CT Community College. My concerns are the loss of MCC faculty control of curriculum, MCC shared governance and local control of purchasing, HR and IT departments. I am also concerned about the large amount of money spent on added administration for a college that doesn't yet exist and the loss of the individual identity of MCC.

59. I am particularly concerned about continued funding cuts and the impact on students, losing great colleagues to other

institutions, and the increase in the level of students presenting mental health-related issues with minimal staffing to address them.

60. I look forward to employee morale to be uplifted. There has been so many transitions overvthe last few years that there is a desperate need for stability and a leader with an inclusive vision.

61. I sense declining collaboration, brainstorming and interaction with colleagues that occurs when we occupy a shared space. It's also evident that the hiring of administrators for the yet to exist one-college while continual budget cuts to our current colleges is problematic for morale and for convincing anyone it's going to save money and put students first.

62. I'm concerned that many students are left to fend for themselves, as faculty members don't care enough about students who need more assistance and need documents or lectures in a more accessible format, or captions on their videos, or better ideas of what is expected of them, etc. So many students are unhappy with the quality of education they're receiving and I do not see it improving over the next year when so many faculty members themselves are still very inexperienced with online teaching, and they are not willing to take on the work needed to improve.

63. I'm mostly concerned about whether or not we will have enough staff to properly serve our students, as we are already under-staffed.

64. I'm very concerned that our students are not having great experiences with instructors who are unfit or not yet fit to teach online. I would advocate for mandatory online observations of all faculty, and to see faculty whose courses are not up to standard be made to take iTeach (or something similar) and be

observed again as a follow up. Teaching online requires a much different skillset, and not everyone is up to the task yet. My sense is we won't be fully on ground for quite some time.    I'd also like to see a higher standard of email responsiveness and professionalism. If we're going to keep this college afloat, students should get responses from all FT faculty and staff within 24 hours. Online learning takes place seven days a week, and I know we have students sending emails on a Friday afternoon and not hearing back until sometime Monday. This is unacceptable, and we can't expect to retain or pass students who aren't getting contacted in a timely fashion by full-time members of our community. Our work situation right now is pretty cushy, and it would be nice to see folks acknowledge by checking email over the weekend. Lots of fires can be avoided by fast response times.

65. In addition to the pandemic and transition to One College, burnout. I have never taught four classes online before and building my courses on line has taken tremendous effort which is affecting my ability to do additional responsibilities effectively. I am working many more hours. I also feel more like a technical assistant than a professor because many of my students struggles and concerns are about technology rather than the content of their courses. I hope next semester will be better. I imagine that this is also true for other faculty and staff.

66. Increase of student enrollment

67. Individuals having the same job title over 10 years. While others keep getting promoted.

68. It is still unclear of academic affair roles. These need to be clearly defined- Dean, Associate Dean and Academic Associates. I don't believe we have ever had a clear indication of who faculty actually report to.

I have also heard possibilities of Dept Chair and Program Coordinator roles changing. I am hoping that folks will be contacted and considered prior to these decisions being made. I don't think our current Dean and Associate Dean necessarily understand the responsibilities of each of these positions.

69. Job security

70. job security for part-timers, appropriate working technology at home, low enrollment, free community college still in operation?

71. Keeping students connected to MCC who do not wish to take remote courses.

72. Lab fees that are taken from students who do not have a lab to work in. I have asked where these fees go if there is no lab and I have gotten no response. That sets a terrible tone. Do not take money from students who are struggling regardless if MCC is struggling. And please respond to questions like that. It's not my job to explain that to students.  The mandate that we cannot use Zoom when it fully supports the technology in my class and is more stable than webex etc. Another thing that the administration has been unwilling to discuss. The United Nations uses Zoom. Educate people on how to use it or bake in the password control. Other institutions I teach at use it and it's fine. I currently use it in my class. I have a deaf student who did not received help from the Disability office. I bought a subtitling service through Zoom to help them. Other programs do not support that. And I expect not to be reimbursed or to get push back over that. I feel like I have to needlessly fight for my students at MCC.  Lastly the online training for Blackboard is shortsighted. I find that the platforms available to us do not support teaching a multimedia class. So that puts me in a position of having to use outside resources which we are told not to use but I

21

Manchester Community College
Fall 2020 Campus Climate Survey
DRAFT RESULTS REPORT Dec-17, 2020

would be able to teach online without them.

73. Lack of direct HR support

74. Lack of employees doing their share of work.

75. Lack of funding for replacement faculty, advisors and counselors. Engulfment by the ONE college and loss of institutional identity and originality

76. Lack of personal contact on campus.

77. Lack of qualified students in our program. They're just not prepared.

78. Lack of resources. Lack of control over our specific environment and resources.

79. Layoffs, changes to job duties

80. Looking forward, I am very concerned about the welfare of my Colleagues keeping in mind the Consolidation Efforts by the BOR and there in not much of a communication from the BOR to the Campus Community.

81. MCC needs to do a better job of communicating various processes to prospective and current students. Overhaul the website to make pertinent information easier to find.

82. Mildly wondering what direct leadership from BOR means for my department

83. mixed messages

84. Money/Budget   Creating a student focused culture of CAN. Too many departments don't talk to each other. They approach their jobs and others in the school with NO We CANT as the default position rather than looking for how can we make it happen.

85. More communication on the movement of student first and how it is impacting MCC

86. My concern is for students who have trouble with the online class format.

87. My health and safety

88. Number of students in the lab. Students are getting half the time learning in lab. Adjuncts should be given extra credits and be allowed to teach lab for all students per

week instead of half of them. It is hard to give the students the proper time in lab instead of 16 lab classes cut down to 8 lab classes. Students are very stressed that they will not be prepared for internship in January.   During this time I am doing the best I can we assigning YouTube videos to watch as well to online extra assignments. I love teaching at MCC  and my overall goal is for our students to succeed.   MCC is doing a great job with safety.

89. Obviously, Covid and transitioning to online learning.

90. Of course, the health and safety of everyone is my main concern.

91. One College Alignment

92. Ongoing efforts to consolidate - gen ed, standardized degree programs, cuts to staffing and services etc.

93. on-ground classes and virus contact.

94. Opening campus full time.  enrollment and marketing  Staffing and support

95. Openness, fairness, inclusion, honesty. I truly hope we actually start marketing the college. We've become invisible because we no longer promote this great school! The biggest thing we lost in the last five years was our connection to each other. I miss that.

96. opportunity for more input from adjuncts

97. Our budget is a big concern.  I see large amounts of funds being poured into consolidation during the pandemic and little being put into academics and our students. The consolidation is not making MCC a better school and it is likely MCC will not recover its stature for many years if ever.

98. Retaining those students who are seeking only online classes.

99. returning to campus due to my high risk of COVID

100.     Safety related to Covid, and  a class environment that could reflect the current political polarization in the country.

22

**ESPOSITO - 11/10/21 RESPONSE - 000070**

101. Sexism, racism and lack of support in those areas by the union in which I am mandated to pay dues to.

102. Structural organization, reporting, follow through.

103. Student enrollment numbers effecting need for adjuncts and opportunities for hiring full time staff

104. Students' prolonged lack of in-person education and its consequences. Enrollment, consolidation, and the decreased of the college's budget. The amount of work seems to increase from year to year. There is more work and less faculty to do it.

105. Sustainability!

106. Technology! Appropriate and useful electronics. I am very concerned about the IT department. They have always been slow with responses over the last 2 1/2 years but it has gotten much worse. Not people at the helpdesk but higher up IT staff that usually need to fix major issues that we are facing or we need their permission.

107. The (in) ability of the College to function as a College (rather than just a campus). I am also gravely concerned about the structure of the hierarachy and dismembering of this college, with each function and service that goes to the BOR/SO. I am GREATLY encouraged with the leadership and vision of our new CEO and am hopeful the CEO will be able to help us all navigate through these very trying times.

108. the ability to continue to teach without any technology support pertinent to the discipline I'm teaching.

109. The administrations lack of experience and willingness to learn about different areas in the college.

110. The continual staffing changes and reorganization. I will say we are heading in the right direction of getting people in

permanent positions. I do want to applaud the previous interim administration and the current permanent administration. None of this is easy and I'm grateful for the help and support I received.

111. The decline in enrollment

112. The dire financial situation. Maybe truly evaluate course releases and their necessity. I do not think division coordinator position is necessary. Running meeting are expected. Also, and I don't know details of this, but maybe reevaluate Art 6 credit for 3 credit pay scale. It isn't this way across system and courses transfer over as 3 credits. Difficult situation but under these conditions, maybe it's time to revisit this.

113. The enrollment crisis. We need more people dedicated to this effort. We really need to reach out to more adult populations and pipelines.

114. The issue of wasted efforts looking ahead toward consolidation. For example, Governance Review; Is there not going to be a common governance in a couple of years? It feels as if we are trying to remodel the house and in a couple of years break it down to the foundation and rebuild!

115. The new gen ed guidelines where aestetic dimensions is no longer considered essential to a well rounded general education. I am extremely disappointed that this has happened because it will have a negative impact on VFA enrollment numbers but most importantly it sends a message to our students that reinforces the idea that the arts are not vital to a well rounded education.

116. The number of unfilled positions is truly alarming and one of our biggest threats. It's almost as if the BOR is setting the campuses up for failure in order to prove the consolidation is justified.

23

**Manchester Community College**
**Fall 2020 Campus Climate Survey**
**DRAFT RESULTS REPORT Dec-17, 2020**

117.  The self-study is critical to MCC's future, and yet the focus on that is diffused by the "out of the blue" and haphazard reports on the "one college" that come from unknown people at the system office.

118.  The state of the union.

119.  The transition back to on-campus work concerns me as I've become incredibly efficient working from home. I've also saved thousands of dollars in commuting costs, and have two extra hours to spend with my family each day. Transitioning back to a full-time, on-campus work week concerns me.

120.  The use of high school GPA (especially self-reported) to place students into ENG/MAT courses is concerning. This measure is not an accurate predictor for all students. As a result, in the last enrollment cycle, many students were misplaced. Now they're struggling and failing their courses, which also jeopardizes their financial aid.

121.  What the process will be for on ground classes once a vaccine is available

122.  Whether we'll stay physically open during semesters, and why should we stay open over winter break with all classes virtual?

123.  With IT support transitioning to the BOR, I am concerned about lack of IT Support on campus and timely support.

124.  Would like to see improvements on how our website function. Focus on clear and easy pathways to information for students and staff. Also, the website should be more interactive and include embedded videos so that students can see faces and get to know us better.

24

## What could MCC do to improve communication?

1. Implement a call support center
2. Continue with updates on weekly basis about the status of the college
3. Overhaul the MCC website. Instead of thinking of it as a marketing resource (no one visits the website to sit and watch banner adds) treat is a reference source. Survey staff and students about what information they need the most and place that front and center. It is too hard to find a list of programs, a list of faculty, hours for different services, etc. Students and advisors are very frustrated. Maybe we need someone new for a fresh perspective. On the other hand, overhauling the website may be a waste of time if the consolidation take over all of the individual college websites. 2) Email an organization chart to all faculty and staff at the start of each semester.
4. A dashboard of Communication Items and Meetings Minutes, etc. Everything via All-Points is a bit much.
5. Answer emails from students within 24 hours Provide consistent messaging--some of the covid emails are sent through numerous iterations Forward emails from CSCU level with context Provide more updates about the CSCU level Be transparent for postings such as div coordinator
6. Answer questions with real solutions that actually work.
7. Be honest and up front. Be more transparent. Be willing to lean about different areas, more specifically student affairs.
8. Be more specific about who is affected by the virus.
9. Being transparent Being proactive about communicating and not just from the top down but also between

departments/offices etc. Need to think about how decisions & changes impact others and let them know about before it becomes a problem. As much as possible make the communications "targeted." All points emails while necessary are really easy to ignore or just skim. Shorter messages to specific recipients carry more weight.
10. Better communication from student services offices - this has been an on-going issue for faculty. I would assume the opposite is also true. Better website with more information - MxCC and NVCC are two great examples - information is well-organized, expansive and easy to access
11. Better leadership
12. Centralized place to store updates/information, rather than only rely on email. Build on what is being done in terms of CEO updates and forums. Listening is crucial for all levels of leadership. Allowing people to share and truly listening to them is vital, rather than focusing on presenting explanations or demands. Communication with students and preparation of new students still needs some significant improvement--this would require some brainstorming and conversation building on past conversations. Acknowledging people's needs and people's hard work under difficult circumstances might help boost morale--this survey is a good start too.
13. CEO attend Dept meetings once a semester (We understand the huge responsibility with Covid so this may not be possible)
14. Communicaiton is OK.
15. Communication has been a dominant issue at MCC for years. A streamlining of communication to the college community would be helpful; too many varying communication regarding same topic and not necessarily accurate.

25

16. Communication has been good. I appreciate the email notifications.

17. Communication has improved in my opinion. Transparency and following protocols are a must.

18. Consistent communication. Be clear on direction and don't back pedal. Once a decision is made its done.

19. Continue the open dialogs. The leadership change has been more responsive and communication is better.

20. continue updates

21. Continue with the current modes

22. Continue with your alerts and general info messages.

23. Control the flood of emails, I get so many that it is difficult to keep up and process. The reply all situation is better but still ridiculous.

24. Covid updates have been great, but I would like more about what else is going on, any changes being made to responsibilities on campus, need to communicate to us a little bit more like we're students, we're missing the background to understand decisions being made due to not being on campus

25. Deans should attend Division meetings. Many faculty are not Dept. Chairs so they have no contact with a supervisor. I am worried that many faculty feel that no one cares what they are doing.

26. Department heads should communicate more across departments so people can be informed on different processes, dates, that can impact the way we serve students.

27. Department meetings as well as individual supervisory time spent with adjuncts

28. Each manager/director should be holding regular meetings with staff to touch base and inform them of what they've learned from bigger meetings with college administration. Information seems to fall short in the middle somewhere--middle management needs to be more transparent

about what they've learned from their administrative meetings.

29. Everyone needs to slow down and listen to what colleagues are saying, and read emails and other communications carefully. We need to be more thoughtful about who we are writing to and what we are saying. With so many people working at least partially remotely, it's more important than ever that we overshare rather than undershare.

30. Find leaders and faculty who care more about the success of students and the institution than themselves and their comfort.

31. For every person, communication can be defined differently. A good strategy would be to continue with weekly updates from management and across all factions of the college community SA to AA and vice versa. Daily communication when it is urgent information that all need to be aware of to perform work more effectively. Create a Communications Team comprised of SA/AA to work on myriad communication tools and develop a Communication Plan.

32. get actual leaders

33. Given the present covid climate maybe send an email once in a while to on ground instructors or even take a walk on campus through the areas that are running on ground courses so that we don't always feel totally isolated & you get a sense of how we are teaching our subjects. Also if group meet & greets or campus events are set up please consider that studio courses run for three hours so our available times are limited - I am often unable to attend events/meeting because of this but don't know if this is possible to change

34. Have a person answer the school phone instead of a machine. Or at least have that as an option.

35. Have more transparency and share what's going on behind the scenes. Too many

**ESPOSITO - 11/10/21 RESPONSE - 000074**

people feeling in the dark, not having a clue as to the future of their positions/departments and overall job security.

36. Have someone available to answer the HELP line in person, not a message, provide us with written outlines of who all the new people are and what their roles are.

37. I am satisfied with the communication I have developed with my colleagues through email and Teams.

38. I believe openness and honesty is the best way to a more open and improved communication. Silence and siloed management breeds distrust and conjecture.

39. I enjoy weekly communications from management

40. I feel communication is excellent

41. I just do not have an answer to this.

42. I learned a lot from the CEO event.

43. I think communication has been really good while a new administration settles in and the new remote nature of our work. I am sure a few things slip through the cracks - because we miss an email or a detail - but, all in all, it has been pretty good.

44. I think MCC is doing a good job with communication particularly concerning COVID. That said, there were recently conflicting emails coming from the Associate Dean of Faculty regarding several issues.

45. I think MCC leadership is doing a great job communicating by sending out campus wide emails to keep us informed and holding open forums so we can be heard. My immediate boss's communication skills; not so good. MCC could improve communication by improving the skills of others by providing mandatory leadership/management and communication skills training for anyone who moves into a director, assoc dean, etc. position.

46. I think NIcole and leadership are doing a good job. But maybe more information on consolidation and upcoming changes. Do not assume we already know things, because we really aren't hearing a lot. Emails from leadership or even set up a page for updated information.

47. I think that communication has been improving. The open forums feel more "open" than the prior administration. At those forums, it felt like the administration listened without really hearing or understanding diverse concerns. I don't know if that's true but it's how it felt.

48. I think there needs to be intervention with communication in dysfunctional departments. Many things are left unattended to.

49. I would have more departmental meetings to introduce staff to one another who work for the same cause. The meetings would be very beneficial as long as an agenda is created ahead of time to keep everyone on track.

50. I would love to see more transparency with personnel moves, reassignments, and so on. I'm still not sure about what happened with ▇▇▇▇▇▇▇▇, but I know I've spoken with colleagues who were shocked by it. These kinds of closed-door changes were a major part of the problem in the past at MCC, and I'd hate to see that continue.

51. If you can slow things down that would help. :). I do think all that is currently happening. The continued out reach via emails and town hall is really great.

52. I'm not sure this is possible since the system makes these decisions, but I'd like to see rapid announcements about COVID positive cases on campus. I'd like to see outreach to students, but I'm not sure what that would look like: I'd love to hear from students. Last year's student feedback about SP2020 was eye opening & disheartening, but we

needed to hear it. After a summer of preparation, did we improve? If not, we have to work harder. Can we poll students? Now? So that we can improve for spring?

53. Improve direct communication about the Covid cases on campus and what the goals are for the spring semester. The information provided is not clear and is often wishy washy.

54. In terms of externally/outside of MCC, much more effective P.R. needs to be pushed outside of our 4 walls. Why are there so few news stories about MCC's students, accomplishments, faculties, and programs across many platforms, channels, stations?

55. In the past faculty were able to rely on Division Directors to disseminate information and keep everyone informed. Bring back the Division Directors.

56. Internally, I appreciate the emails from Nicole and from the CSCU. I wouldn't mind seeing something in my email inbox each week (or monthly if that's asking too much), or maybe a Teams channel just for MCC employees for brief news updates. Similar to how the CSCU sends out those weekly emails, but just for MCC. Maybe a brief news update from each department. We often hear about the bigger issues (covid, consolidation), but not things like we hired a new faculty and info about them, or culinary has been running 8 week classes successfully, or credit free is offering a new workforce development program and here's what it is. I feel like info like that is not shared to all as we are all focused on the bigger issues.   Externally, I think it's rallying faculty, staff, alumni, students and our community to promoting the great value and education at MCC and flooding our service area with info on the opportunities and value of going to MCC, and returning to MCC. Use multiple

communication platforms. And, also encouraging our community to support what we do and our students.    What's the latest on the Achieving the Dream Capacity Cafe? There was a lot of great feedback shared. I feel like we haven't heard much about that lately and if any of those great ideas are being implemented.

57. It would be helpful to have some way of reaching students who don't use their student email and prefer their personal email.  I would personally like to collaborate with colleagues more easily or at least check in with them to see how things are going.

58. It would help to finally have fewer interim positions and hire more permanent ones.

59. Jabber, MS Teams, WebEx and email have been more than sufficient in keeping lines of connection open. I feel very connected to my "team" with these tools.

60. Keep having the coffee hour with the CEO.

61. Keep sharing candidly with the campus, especially matters regarding consolidation and it's real impact to the college.

62. Keep those open forums going!

63. Leadership needs to stop rushing to get emailed information out as soon as they get it from the system office. Take a breath and think about the audience. If this was done, then the ceo and deans would not have to always send follow-up after follow-up to clarify. More emails do not mean effective communication. It just makes the leadership team look silly and confused. They also look like they are system office puppets and not leaders of their college. Bring back the previous ceo, she knew how to write and speak clearly to everyone and she seemed to be fighting for what was right at MCC.

64. Maybe a Dean shout out from each department ... this is what Has been going on in our department and these are things

28

**Manchester Community College**
**Fall 2020 Campus Climate Survey**
**DRAFT RESULTS REPORT Dec-17, 2020**

you might want to know. 1 per semester or staggered throughout the year.

65. Maybe have a useful newsletter instead of relying on letters from administrators

66. MCC leadership could be more open and transparent about everything. I still find out about important things well after they have already happened, or in some cases, I only find out from somebody who was in an important meeting and it's never formally announced by the CEO.

67. MCC leadership should strive to be as transparent about on-campus issues as they have been about COVID-19.

68. MCC works at communicating, but there are times faculty or a specific group receives info that ACL's do not receive the information. Example: withdrawing non-participating students after 2 weeks.

69. Meetings without agendas, per se. The CEO's tea was brilliant, as evidenced by the length of the mtg. People clearly are hungry to just connect. Everyone is working so hard just to keep afloat..no one had two hours to 'give up' and yet..the opportunity to be heard and to share was a profoundly enticing reality.

70. -Monthly CEO coffee hour that staff & faculty can exchange conversations, discuss on-going issues,... -Provide training sessions- computer skill

71. Monthly college meetings with the CEO instead of one every semester would be helpful.  Things change constantly, and I think if we had "town halls" with the CEO each month on a set day/time, we would have more informational updates.

72. More CEO Coffee hours, otherwise, doing more communication than previous administrations.

73. More informal online sessions with administration and faculty

74. Not sure, with all the changes which occur weekly.

75. On our website create Covid flowcharts for students and staff/faculty to use..... reporting, symptoms, quarantining, testing, etc. More specific.

76. Once a semester meeting at the department level that specifically includes adjuncts (or even just in the fall).

77. Only send valid, researched, articulate, pertinent information via All points

78. opportunity for more input from adjuncts

79. Overall, I think this administration has been more transparent and more communicative than in the past. Continuing with this is helpful. Continuing to clarify new and changing roles on campus is very helpful as well (ie Division Coordinators, Student Affair changes etc)

80. Please do not resend the same message by different people. It becomes overwhelming as everyone is e mailing these days and you need to plow thru hundreds of e mails in one day.  I liked the President's coffee hour, but I am reaching my zoom limit

81. Please think about having more of an attitude of graciousness. This is hard for everyone. People will rally and work together if they feel more openness and support. That come from just setting a tone of gratitude. I do not hear that from MCC. Which honestly affects my connection with college and my general support of the college.

82. Reduce the unnecessary communication. The flurry of emails every day does nothing but clog up my inbox.

83. Regular and more forward communication

84. Regular, positive communication from leaders.  Forwarding emails from the system office without context is not helpful and often times terrifying.

85. See above regarding phone work.

86. Send a list to faculty giving names, emails (and possibly phone numbers )of who to

29

contact when attempting to resolve certain issues or obtain certain information

87. So far not much, the department heads have been in contact when it was important.

88. start

89. Stop emailing us about every little, unimportant detail. Work on balancing what is pertinent and timely versus emailing kudos that seem self-serving and brown-nosing just to be liked and forwarding emails we have already received from other sources.

90. Technology support, encourage informal work interactions

91. The increased frequency of emails and community meetings is very helpful. Perhaps a weekly newsletter keeping us informed and connected would be a help.

92. The MCC Management Team should communicate more often with the Campus Community although the communication has greatly improved since July 2020. Kudos to the MCC Management Team.

93. There should be more meetings with Departments and brainstorming tactics with individuals that I've been here that worked in many years ...  the old saying old school homework this place was a thriving community college with old school tactics that worked.  Now it's a dying breed it seems with technology for some reason !  Hopefully the new CEO visions that or sees it !  The air is stagnant people walk around with there head down they don't go the extra mile for students some do some don't we need the whole college community to be on the same page !!! Public relations and IT departments are a ghost town they should be brainstorming with the admissions office and with the new CEO how do I improve the communication to the public !  Again like I stated before looking forward to the new CEO on her

ideas to get this campus back where it should be !

94. This area is well handled

95. To listen, without bias and filters.

96. To verify validity and trustworthiness of the messages coming from the System Office and not just become a vessel for transfer of information. Our administrators need to show some level of independence; not asking for display of resistance but to ask for useful and relevant information regarding our campus.

97. Too many Ccsu updates.  CEO updates are timely and transparent.

98. Transparency and attempting to make all members of the community feeling valued. We have a culture....and yes, Academia as a whole, where faculty believes they are the are the be all and end all. We are all here to serve the students. Period!

99. Transparency and honesty.

100. Transparency is at the top of the list. Next, is to write well-crafted emails that can inspire the receivers and communicate empathy at times. If links to articles are shared, include why it is important for us to visit them (Ex. here's why I am writing). Also respect our time and avoid "over" communicating (sometimes we get the same subject emails from 3 or 4 different leaders or are delivered the same information in multiple meetings).

101. Treating other union members the same as 4cs. The school only communicates to 4cs and its shame as we are one community.

102. Update and publish (and update as changes occur) an organizational chart

103. Video messages from MCC leaders to faculty and staff for a portion of communication. We get so many emails. Would be nice if some emails contained a video message so that we feel more

**Manchester Community College**
**Fall 2020 Campus Climate Survey**
**DRAFT RESULTS REPORT Dec-17, 2020**

connected to MCC leadership. We can see
faces and not just names.

104.     We should have more of a partnership,
team to communicate so that everyone has
a part and needs to be informed when
addressing COVID Cases. We are aware of
patient privacy, yet when this has a
potential  to  impact our health and the
health of other students departments need
more communication.

105.     Weekly updates. Could even be on a
rotating basis by Dean/Division. And some
positive news occasionally would be great.

106.     When a student has tested positive,
immediate notification to instructors and
classmates so we all can get tested so we
do not spread the virus to our families.

107.     while the frequency of communication
has improved, it must continue at this rate
and between semesters as well, as the
dynamics of the state rate of infection
changes so rapidly

108.     Zero tolerance policies on
unprofessional behavior and conduct.

31

# EXHIBIT 4

# The Connecticut General Assembly

**FOR IMMEDIATE RELEASE**

**June 22, 2021**

**Contact: Giovanni Pinto**

**(860) 240-8575**

## MANCHESTER REP. LUXENBERG STATEMENT OF SUPPORT FOR MCC CEO NICOLE ESPOSITO

*Luxenberg Questions BOR Decision to Non-Renew "Dynamic Leader"*

(MANCHESTER, CT) – Today, **State Representative Geoff Luxenberg (12th District Manchester)** released a prepared statement regarding the news of the non-renewal of MCC CEO Dr. Nicole Esposito's contract to continue to lead Manchester Community College by the Board of Regents.

"Nicole Esposito is a dynamic leader and Manchester Community College, its students, faculty, staff and the community at large have flourished under her leadership of the College. Her tenure has even included a budget that included a surplus during the COVID-19 crisis – and MCC being named the top Community College in Connecticut. To learn, now, that her contract to lead this institution will not be renewed, and to not be given any information as to why, raises a red flag of suspicion around the Board of Regents decision making process and lack of transparency," said **Rep. Luxenberg**.

**ESPOSITO - 11/10/21 RESPONSE - 000082**

"I have been impressed by the outpouring of support for Dr. Esposito from the community, the petitions, the calls and emails. Everyone who has worked with her has described her work performance as professional, effective, thoughtful and collaborative. To remove a beloved leader from a public, state-funded position like this, in secrecy, without an explanation to community stakeholders, is a concern. Many of my constituents work at MCC, go to MCC, or are deeply connected to the College as the crown jewel institution of our community. We are hoping to get an explanation from the BOR as to why they would head in this unexpected direction," **Rep. Luxenberg** said.

"My worst fear is that Dr. Esposito has fallen victim to what happens, all too often, to highly educated, effective, professional women of integrity in leadership positions of authority in institutions that have been traditionally and are currently dominated by men. We know that often there is a price to pay for being smart, being effective, being vocal and being a woman in power all at the same time – and I hope that isn't the reason that she is being shown the door now. With the absence of any other information, it is hard not to jump to that possible and unfortunate conclusion," continued **Rep. Luxenberg**.

Dr. Esposito earned a Doctor of Educational Psychology (Ed.D.) degree from American International College, as well as a Master of Science degree in Forensic Psychology and a certificate of advanced graduate studies in adjustment counseling from that institution. She holds a Bachelor of Science degree in Psychology and a minor in Criminal Justice from Springfield College.

She brings a wealth of teaching and curriculum design experience to the role, having served as program coordinator/program head and associate professor in the Disability Specialist degree program, Speech-Language Pathology Assistant option, at MCC. In addition, she served on the college's Threat Assessment and Behavioral Intervention team, the Title IX Task Force, was co-chair of the Women's Caucus, a faculty mentor for the Minority Fellowship program and held other committee and advisory roles.

She was elected to serve as the MCC representative for the Transfer and Articulation Policy committee and a member of the Framework and Implementation Review Committee. This work involved collaboratively developing and implementing new transfer degrees and working to help review and modify state-wide learning outcomes and core competencies for the general education curriculum, while helping determine best practices for reporting assessment efforts across the Connecticut State Colleges and Universities system. Dr. Esposito was also elected to serve as the MCC representative for the state-wide Faculty Advisory Committee to the Connecticut Board of Regents for Higher Education.

Up until 2019 she was also the owner of a successful psychotherapy and consultation practice, which she initiated and launched from concept to completion. She moved from her faculty position at MCC to become Assistant Dean of Liberal Arts and Professional Studies at Springfield Technical Community College in Springfield, Mass., the position she held before returning to lead MCC as CEO.

Dr. Esposito is dedicated to the role of community colleges in today's higher education landscape, committed to the idea that an accessible, affordable and equitable opportunity to achieve is vital to economic prosperity and social justice for everyone.

**Rep. Luxenberg** serves as Majority Caucus Chair and Deputy Majority Leader in the House of Representatives and is proudly serving in his 4th term in the Legislature.

**Giovanni Pinto**

*He/Him*

[(860) 240-8575](tel:8602408575)

**Press Aide – HDO**

*Representatives:*

*Aimee Berger-Girvalo*

*Mike D'Agostino*

*Michael DiGiovancarlo*

*Pat Dillon*

*Josh Elliott*

*Geoff Luxenberg*

*Cristin McCarthy Vahey*

*Geraldo Reyes*

*Caroline Simmons*

*Stephanie Thomas*

*Toni Walker*

# EXHIBIT 5

August 19, 2021

Dear President Cheng,

I have been teaching political science and economics at Manchester Community College (M.C.C) since 1986 and I currently serve as the Chairperson of the M.C.C. Academic Senate. I am writing to you to express my concerns regarding the BOR's decision to not re-appoint Dr. Nicole Esposito as Chief Executive Officer of Manchester Community College.

Dr. Esposito was appointed to this position in the spring of 2020 by Mr. Mark Ojakian, our former president. During the year that she has served as CEO, Dr. Esposito has demonstrated great skill in guiding our institution through the challenges posed by a global pandemic. She has organizationally and financially stabilized M.C.C., to the point that we have a $2 million budget surplus. Dr. Esposito is seriously committed to shared governance, and has acted to include students, faculty, and staff in decision-making processes. Her actions have significantly improved morale at the College. She has developed close relationships with state legislators who represent towns in our service area, and she works hard to promote the visibility of M.C.C. in local communities.

Last June, when we learned that the Board of Regents was going to remove Dr. Esposito from her position, over eighty members of the Manchester Community College faculty and staff signed a petition opposing the BOR's decision. I am including a copy of this petition with the list of signatories in this email. Then, as now, many members of the M.C.C. community were appalled that the Chief Executive Officer of one of Connecticut's largest community colleges could be removed from her position without even an evaluation of her performance as CEO. Our experiences of working with Dr. Esposito on a daily basis have led us to conclude that she is doing a good job as CEO. In what ways is she not fulfilling the BOR's expectations?

Over my 35 years at M.C.C., I have worked with five Presidents/CEOs, and I may honestly say that Dr. Esposito is one of the best that I have worked with. How can the BOR decide to remove Dr. Esposito without providing an explanation for this action? A large bureaucratic organization such as the consolidated Connecticut State Community College should have an objective procedure in place to ensure

that all administrators, faculty, and staff are fairly evaluated. How can we claim to be a "social justice institution" if we don't treat our employees fairly? Fair evaluations conducted by impartial judges are a minimum necessary requirement to establish a workplace in which all persons feel that they are being treated with dignity and respect.

The process of establishing a one consolidated Connecticut State Community College will not be easy. In order to succeed in this endeavor, we will have to ask difficult questions regarding the organizational structure of this institution. If we discourage people from asking difficult questions, we may well make poor decisions that diminish our institution and disadvantage our students.

Removing Dr. Esposito from her position as CEO of Manchester Community College and replacing her with some one who does not share her deep commitment to the welfare of our students will not make M.C.C. a better institution.

I urge you to reconsider this decision.

Sincerely,
Angelo A. Messore
Professor, Political Science and Economics
Manchester Community College

7/12/2021

**Opinion: MCC CEO Dr. Nicole Esposito's stance on inclusion efforts at MCC through the lens of an Immigrant Professor.**

My name is Burcin Calafiore. I am an assistant professor at Manchester Community College Business Department, and I have been a full-time faculty at MCC since 2015.  When you saw my first name, *Burcin*, did you try to guess my gender, nationality, or ethnicity?  I am not Italian as my last name suggests; I am a Turkish woman married to an Italian man.  Does this even matter?  Why am I even sharing the information about the origin of my name?  It turns out it matters.  It also turns out that speaking English with a foreign accent, albeit a subtle one, also matters.  I feel obligated to share my own experiences of diversity and inclusion-related issues on our campus to offer you an additional perspective as you try to understand the role of our current CEO, Dr. Nicole Esposito, on these issues.

For many years I have been at MCC, I have had a few colleagues who never tried to pronounce my name correctly. Moreover, some faculty I sat with within the same meetings for many years would make loud comments like *"who?"* if they heard my name, Burcin, being nominated for a position.  Others would pass me by in the hallways, not pretending to see me or hear my greeting.  I even once got a written comment from a student saying, "speak English!"  Every time I sense that a colleague is dismissive or a student is disrespectful towards me, I wonder whether their prejudicial attitudes might be impacting their behavior.  When my accomplishments do not get the same visibility or praise as my American-born colleagues' accomplishments, I cannot help but compare my experiences to theirs.  I am not a person of color, but I nonetheless get my share of discriminatory behaviors. Am I sensitive, or am I wrong attributing certain behaviors to prejudicial attitudes when the reason might be something else?  Perhaps.  Nonetheless, how I feel deserves validation.

Because of my own experiences due to being part of a minority group, I get very concerned when I sense my colleagues and students from other minority groups get treated unfairly or poorly.  People who act guided primarily by their stereotypical attitudes often do not discriminate differently against different minority groups.  Unfortunately, I guess they are almost equally discriminatory against people of color, immigrants, or members of the LGBTQ community.

To this day, one of the most pleasant memories I have had about MCC is the lengthy, heartwarming conversation I had with Dr. Esposito in 2014 on my first time on campus after I was offered a full-time position. In the years following, whenever she saw me in the hallway, she always greeted me with a genuine smile and asked about my daughter. I admired her

assertiveness and strong character, which could be intimidating for some.  I thought she always spoke her mind candidly without a hidden agenda, a trait that I always felt would serve her well in a leadership position.  We did not work in the same committees when she was a faculty, but we both worked as mentors for the minority fellowship program at MCC.  I never felt being treated differently by her because of my accent or ethnicity.

When Dr. Esposito came back to MCC as a CEO, a close colleague of mine who is also an immigrant sent me a message saying Nicole is a person of impeccable integrity.  I do not see everything eye to eye with her; however, that is also my perception of Dr. Esposito's character. She is fair and consistent.

Reflecting on my own negative experiences and that of my other colleagues from other minority groups, our campus community has a lot of hard work ahead to foster a culture of inclusion. We need to collaborate to create a culture where no form of microaggression is tolerated, and each member of our college community feels respected and included.  Dr. Esposito is deeply committed to lead and support these efforts.  For example, during the Opening Day for Fall 2020, Dr. Esposito invited Steven Hernandez, Executive Director at the Connecticut Commission on Women, Children, Seniors, Equity & Opportunity, to discuss inclusion and diversity. In addition, during the Opening Day for Spring 2021, she planned the Dr. Martin Luther King Jr. celebrations. Also, last October, our campus held a Virtual Black Lives Matter event that featured prominent speakers in diversity work.  Mr. Jesse Ross, who has been a powerful voice for Black and African American citizens following George Floyd's death, was one of the event speakers. Another important initiative was to hold four CEO coffee hours in response to the campus community expressing a need for an open dialogue.

Dr. Esposito picked Dr. Fatma Salman, an MCC faculty who has been a strong advocate for Muslim students and women faculty, as MCC's Interim Dean of Academic and Student Affairs. I was born and raised by a secular family in a predominantly Muslim yet constitutionally secular state, Turkey.  The ban of headscarves in public institutions was one symbolic application of secularism. Twenty years ago, a woman with a headcover would not be allowed to work at a public institution or go to any public university in Turkey. Many secularists like my family feared lifting the strict ban on religion would move our country backward and away from the modern West.  It was not until Dr. Salman, an incredibly smart, talented, competent, and confident Muslim Woman with a headscarf, became our Dean, I started uncovering and reflecting on my own biases about women with headscarves.  I also wondered how many gifted Turkish women like Dr. Salman could not fulfill their potential because of the Turkish constitution.

To elect a Muslim woman wearing a headscarf as our Dean amid the heightened nationwide discrimination against various minority groups was an incredibly courageous move for our CEO, an American-born white woman. It needs to be applauded as a positive move towards creating a workplace that celebrates diversity in all its beautiful forms and extending our inclusion efforts to all marginalized groups. I hope you, too, would realize Dr. Nicole Esposito's commitment to creating a workplace culture where everyone feels respected, included, and tangible accomplishments speak louder than the salient characteristics that one cannot easily change.

Yours truly,

**Burcin Calafiore**
**Assistant Professor of Business**
bcalafiore@mcc.commnet.edu/ 860-512-2634
Manchester Community College
Great Path, MS #4
P.O. Box 1046
Manchester, CT 06045-1046

**P.S.** My opinion has not been solicited by anyone.

**Endorsed by:** K. Umesh Vig, Director of Student Affairs Operations (Past Chair of the MCC Minority Caucus)



**ESPOSITO - 11/10/21 RESPONSE - 000091**



**From:** McDowell, James M <JMcDowell@mcc.commnet.edu>
**Sent:** Wednesday, July 7, 2021 9:28:03 PM
**To:** Esposito, Nicole C <NEsposito@mcc.commnet.edu>
**Subject:** FW: Nicole Esposito

Hi Nicole,

I want to share my letter of support for you that I sent to Alice Pritchard.  I realize these are challenging times, but you have done an exceptional job as CEO for our college.  I felt it was important to let CSCU leadership know that.

Sincerely, Jim.

James McDowell
Dean of Administration
Manchester Community College
jmcdowell@mcc.commnet.edu
Telephone: 860-512-3602

---

**From:** McDowell, James M
**Sent:** Tuesday, June 22, 2021 1:02 PM
**To:** Pritchard, Alice M <APritchard@commnet.edu>
**Cc:** Levinson, David <DLevinson@commnet.edu>
**Subject:** Nicole Esposito

Hi Alice,

After careful consideration as the senior member of our MCC management team, I felt it was important to reach out to you directly regarding the decision not to re-appoint Dr. Nicole Esposito.  From my perspective, Nicole has provided outstanding leadership to the college during a

2

ESPOSITO - 11/10/21 RESPONSE - 000092

difficult time of significant challenges and structural changes.  From the impact of COVID-19 to the ongoing transition to a one college structure, Nicole continued to keep employee morale high, implement innovative initiatives to address strategic priorities, carefully and skillfully managed the operating budget, while always keeping the needs of our students and college as her highest priority.  Dr. Esposito is fair, honest, inclusive, and willing to ask the difficult questions that lead to successful outcomes.  She challenges me everyday to find new ways to improve my areas of responsibility.  From Budget to Covid Coordination to Facilities to Police.  We have always worked as a team and I appreciate her supportive management style.

On a personal note, I am approaching 33 years at MCC and will be retiring on 9/1/2021.  I have been so fortunate to work for Gena Glickman, Tanya Millner, and Nicole Esposito.  I do care deeply about MCC and our students.  I believe a change in leadership at this point in time would be a mistake.  I encourage you and the CSCU leadership team to reconsider this decision.

Sincerely,

Jim.


James McDowell
Dean of Administration
Manchester Community College
jmcdowell@mcc.commnet.edu

---

 Scanned by McAfee and confirmed virus-free.

**ESPOSITO - 11/10/21 RESPONSE - 000093**

**Weaver, Ernestine Y**

| | |
|---|---|
| **From:** | Lindo, Patricia O |
| **Sent:** | Monday, June 21, 2021 5:12 PM |
| **To:** | Carolina, Kimberly B; Mazza, Diane |
| **Subject:** | FW: Petition Opposing the Dismissal of CEO Nicole Esposito    June 21, 2021 |

**From:** Messore, Angelo A <AMessore@mcc.commnet.edu>
**Sent:** Monday, June 21, 2021 5:08 PM
**To:** MA-Allpoints <Allpoints@mcc.commnet.edu>
**Subject:** Petition Opposing the Dismissal of CEO Nicole Esposito June 21, 2021

Dear Members of the Manchester Community College community:

After a nationwide search in the spring of 2020, Dr. Nicole Esposito was appointed Chief Executive Officer of Manchester Community College by the Board of Regents of the Connecticut State Colleges and Universities. Over the past year, Dr. Esposito has shown great skill in guiding MCC through difficult times. She has repeatedly proven her deep concern for the welfare of our students, and for the academic success of our college. She has asked probing questions about the consolidation of the 12 community colleges in order to ensure that our students are well served by the new institution that is being constructed. Dr. Esposito has also demonstrated a strong commitment to the procedures of shared governance that have long defined Manchester Community College.

Last week, Dr. Rob Steinmetz, our Regional President, informed Dr. Nicole Esposito that she would not be re-appointed to the position of Chief Executive Officer of Manchester Community College for the coming academic year.

Without valid reasons and without an objective evaluation of her performance as CEO, Dr. Esposito is being denied re-appointment. What kind of a system are we moving towards if one person can derail the career of another without facts, without an objective evaluation, and without due process?

At its meeting on Thursday, June 24, 2021, the Board of Regents (BOR) will vote on the dismissal of CEO Esposito. As Chair of the MCC Academic Senate, I have started a petition to bring to the BOR this Thursday to demand that Regional President Rob Steinmetz, CSCC President David Levinson, Chief Operating Officer Alice Pritchard, and the members of the Board of Regents rescind this action against CEO Esposito.

1

**ESPOSITO - 11/10/21 RESPONSE - 000094**                    **ESPOSITO - FOIA 1 - 8/5/21 - 000188**

I urge you to join me in signing this petition demanding that the Board of Regents renew for the coming academic year Dr. Esposito's appointment as CEO of Manchester Community College.

**Please reply to me by Wednesday June 23ʳᵈ at 5pm to add your name to this petition.**

Sincerely,

Angelo Messore

Chair, Manchester Community College Academic Senate

Professor, Political Science and Economics

**Signatories:**

K. Umesh Vig, Director of Student Affairs Operations

Carl Stafford, Retired Professor of Culinary Arts and Hospitality Management

Patrick Sullivan, Professor of English

Christopher Paulin, Professor of History

Maura O'Connor, Professor of Graphic Design

Susan Classen-Sullivan, Professor of Fine Arts

Kevin Skee, Department of Information Technology

Meghan Finley, Associate Professor, Sociology

T.J. Barber, Director of Student Activities

Kimberly Hamilton Bobrow, Professor of English

Nicole Simmons, Academic Associate, STEM

2

## Weaver, Ernestine Y

| | |
|---|---|
| **From:** | Lindo, Patricia O |
| **Sent:** | Tuesday, June 22, 2021 8:27 AM |
| **To:** | Mazza, Diane; Carolina, Kimberly B |
| **Subject:** | RE: Petition Opposing the Dismissal of CEO Nicole Esposito    June 21, 2021 |

Diane, you're welcome!

Responses are coming back from faculty in support of adding their signature.
Patricia

**From:** Mazza, Diane <DMazza@commnet.edu>
**Sent:** Tuesday, June 22, 2021 7:44 AM
**To:** Lindo, Patricia O <PLindo@commnet.edu>; Carolina, Kimberly B <KCarolina@commnet.edu>
**Subject:** RE: Petition Opposing the Dismissal of CEO Nicole Esposito June 21, 2021

Thanks Patricia for forwarding this.

Diane

**From:** Lindo, Patricia O <PLindo@commnet.edu>
**Sent:** Monday, June 21, 2021 5:12 PM
**To:** Carolina, Kimberly B <KCarolina@commnet.edu>; Mazza, Diane <DMazza@commnet.edu>
**Subject:** FW: Petition Opposing the Dismissal of CEO Nicole Esposito June 21, 2021

**From:** Messore, Angelo A <AMessore@mcc.commnet.edu>
**Sent:** Monday, June 21, 2021 5:08 PM
**To:** MA-Allpoints <Allpoints@mcc.commnet.edu>
**Subject:** Petition Opposing the Dismissal of CEO Nicole Esposito June 21, 2021

Dear Members of the Manchester Community College community:

After a nationwide search in the spring of 2020, Dr. Nicole Esposito was appointed Chief Executive Officer of Manchester Community College by the Board of Regents of the Connecticut State Colleges and Universities. Over the past year, Dr. Esposito has shown great skill in guiding MCC through difficult times. She has repeatedly proven her deep concern for the welfare of our students, and for the academic success of our college. She has asked probing questions about the consolidation of the 12 community colleges in order to ensure that our students are well served by the new institution that is being constructed. Dr. Esposito has also demonstrated a strong commitment to the procedures of shared governance that have long defined Manchester Community College.

1

Last week, Dr. Rob Steinmetz, our Regional President, informed Dr. Nicole Esposito that she would not be re-appointed to the position of Chief Executive Officer of Manchester Community College for the coming academic year.

Without valid reasons and without an objective evaluation of her performance as CEO, Dr. Esposito is being denied re-appointment. What kind of a system are we moving towards if one person can derail the career of another without facts, without an objective evaluation, and without due process?

At its meeting on Thursday, June 24, 2021, the Board of Regents (BOR) will vote on the dismissal of CEO Esposito. As Chair of the MCC Academic Senate, I have started a petition to bring to the BOR this Thursday to demand that Regional President Rob Steinmetz, CSCC President David Levinson, Chief Operating Officer Alice Pritchard, and the members of the Board of Regents rescind this action against CEO Esposito.

I urge you to join me in signing this petition demanding that the Board of Regents renew for the coming academic year Dr. Esposito's appointment as CEO of Manchester Community College.

**Please reply to me by Wednesday June 23ʳᵈ at 5pm to add your name to this petition.**

Sincerely,

Angelo Messore

Chair, Manchester Community College Academic Senate

Professor, Political Science and Economics

**Signatories:**

K. Umesh Vig, Director of Student Affairs Operations

Carl Stafford, Retired Professor of Culinary Arts and Hospitality Management

Patrick Sullivan, Professor of English

Christopher Paulin, Professor of History

Maura O'Connor, Professor of Graphic Design

2

Susan Classen-Sullivan, Professor of Fine Arts

Kevin Skee, Department of Information Technology

Meghan Finley, Associate Professor, Sociology

T.J. Barber, Director of Student Activities

Kimberly Hamilton Bobrow, Professor of English

Nicole Simmons, Academic Associate, STEM

3

**Weaver, Ernestine Y**

| | |
|---|---|
| **From:** | Carolina, Kimberly B |
| **Sent:** | Tuesday, June 22, 2021 9:31 AM |
| **To:** | Mazza, Diane |
| **Cc:** | Lindo, Patricia O |
| **Subject:** | Fw: firing of MCC CEO Nicole Esposito |
| **Attachments:** | Petition BOR Esposito v5.docx (1).pdf |

Good Morning,

Please see below and attached. Here is an email from 4Cs president (CCC) re: CEO Esposito.

Kimberly Carolina
CSCU Regional HR Manager – Capital East Region
Kcarolina@commnet.edu; 860-343-5757

---

**From:** Leon, Frances <FLeon@commnet.edu>
**Sent:** Tuesday, June 22, 2021 9:25 AM
**To:** Carolina, Kimberly B <KCarolina@commnet.edu>
**Subject:** FW: firing of MCC CEO Nicole Esposito

FYI

**From:** Freeman, Seth R <SFreeman@ccc.commnet.edu>
**Sent:** Tuesday, June 22, 2021 9:06 AM
**To:** Freeman, Seth R <SFreeman@ccc.commnet.edu>
**Subject:** Fw: firing of MCC CEO Nicole Esposito

CCC Colleagues,

Hope everyone is well.

Please see the attached statement that calls out the CSCU administration for their incompetence and mismanagement exemplified by the recent firing of Manchester Community College CEO Nicole Esposito.

We need all of our college community to stand up and fight the BOR, CSCU and CSCC system administrators for their continued colonization of our colleges. We must simply stop their plan to centralize power and take all decision-making from our students, faculty, staff and local administration.

Please read through the statement and reply to me individually if you would like your name added.

thanks,

1

**Seth Freeman**
*Professor, Computer Information Systems*
Capital Community College
(860) 906 5249
*President*
4Cs, SEIU 1973
seth@the4cs.org

**From:** Doninger, Lauren <LDoninger@gwcc.commnet.edu>
**Sent:** Monday, June 21, 2021 10:03 PM
**To:** Creech, Paul G <PCreech@ccc.commnet.edu>; Messore, Angelo A <AMessore@mcc.commnet.edu>; Jones, Eva M <EJones2@mxcc.commnet.edu>; Aime, Lois D <LAime@ncc.commnet.edu>; Maisfehlt, Lillian D <LMaisfehlt@gwcc.commnet.edu>; Lewis, John <JLewis@qvcc.commnet.edu>; Army, William G <WArmy@qvcc.commnet.edu>; Sheirer, John M <JSheirer@acc.commnet.edu>; Rempfer, Christopher <CRempfer@nvcc.commnet.edu>; Holmberg, Tara J <THolmberg@nwcc.commnet.edu>; Sanders, Randy <RSanders@hcc.commnet.edu>; Selvaggio, Joseph <JSelvaggio@trcc.commnet.edu>; Coan, Francis M <FCoan@txcc.commnet.edu>
**Subject:** firing of MCC CEO Nicole Esposito

Dear Governance Leaders,

As you probably know, MCC CEO Nicole Esposito was fired last week. Please see the attached statement. If you are inclined, please circulate to your colleagues. Anyone willing to sign the statement should send me their name by 9 AM on Wednesday 6/23. It will be submitted for inclusion in the BOR minutes on Thursday.

Regards,
Lauren


Lauren Doninger, Ed.D., LPC, LADC
Professor of Psychology
Office Hours - Webex Room 645 079 468 (instructions)
Student Success Center Advising Appointments

*"Rather fail with honor than succeed by fraud."~ Sophocles*

2

ℴ

## Weaver, Ernestine Y

| | |
|---|---|
| **From:** | Mazza, Diane |
| **Sent:** | Tuesday, June 22, 2021 9:32 AM |
| **To:** | Kripp, Andrew; Pritchard, Alice M; Weaver, Ernestine Y |
| **Subject:** | FW: firing of MCC CEO Nicole Esposito |
| **Attachments:** | Petition BOR Esposito v5.docx (1).pdf |

**From:** Carolina, Kimberly B <KCarolina@commnet.edu>
**Sent:** Tuesday, June 22, 2021 9:31 AM
**To:** Mazza, Diane <DMazza@commnet.edu>
**Cc:** Lindo, Patricia O <PLindo@commnet.edu>
**Subject:** Fw: firing of MCC CEO Nicole Esposito

Good Morning,

Please see below and attached. Here is an email from 4Cs president (CCC) re: CEO Esposito.

Kimberly Carolina
CSCU Regional HR Manager – Capital East Region
Kcarolina@commnet.edu; 860-343-5757

**From:** Leon, Frances <FLeon@commnet.edu>
**Sent:** Tuesday, June 22, 2021 9:25 AM
**To:** Carolina, Kimberly B <KCarolina@commnet.edu>
**Subject:** FW: firing of MCC CEO Nicole Esposito

FYI

**From:** Freeman, Seth R <SFreeman@ccc.commnet.edu>
**Sent:** Tuesday, June 22, 2021 9:06 AM
**To:** Freeman, Seth R <SFreeman@ccc.commnet.edu>
**Subject:** Fw: firing of MCC CEO Nicole Esposito

CCC Colleagues,

Hope everyone is well.

Please see the attached statement that calls out the CSCU administration for their incompetence and mismanagement exemplified by the recent firing of Manchester Community College CEO Nicole Esposito.

1

We need all of our college community to stand up and fight the BOR, CSCU and CSCC system administrators for their continued colonization of our colleges. We must simply stop their plan to centralize power and take all decision-making from our students, faculty, staff and local administration.

Please read through the statement and reply to me individually if you would like your name added.

thanks,

**Seth Freeman**
*Professor, Computer Information Systems*
Capital Community College
(860) 906 5249
*President*
4Cs, SEIU 1973
seth@the4cs.org

**From:** Doninger, Lauren <LDoninger@gwcc.commnet.edu>
**Sent:** Monday, June 21, 2021 10:03 PM
**To:** Creech, Paul G <PCreech@ccc.commnet.edu>; Messore, Angelo A <AMessore@mcc.commnet.edu>; Jones, Eva M <EJones2@mxcc.commnet.edu>; Aime, Lois D <LAime@ncc.commnet.edu>; Maisfehlt, Lillian D <LMaisfehlt@gwcc.commnet.edu>; Lewis, John <JLewis@gvcc.commnet.edu>; Army, William G <WArmy@qvcc.commnet.edu>; Sheirer, John M <JSheirer@acc.commnet.edu>; Rempfer, Christopher <CRempfer@nvcc.commnet.edu>; Holmberg, Tara J <THolmberg@nwcc.commnet.edu>; Sanders, Randy <RSanders@hcc.commnet.edu>; Selvaggio, Joseph <JSelvaggio@trcc.commnet.edu>; Coan, Francis M <FCoan@txcc.commnet.edu>
**Subject:** firing of MCC CEO Nicole Esposito

Dear Governance Leaders,

As you probably know, MCC CEO Nicole Esposito was fired last week. Please see the attached statement. If you are inclined, please circulate to your colleagues. Anyone willing to sign the statement should send me their name by 9 AM on Wednesday 6/23. It will be submitted for inclusion in the BOR minutes on Thursday.

Regards,
Lauren


Lauren Doninger, Ed.D., LPC, LADC
Professor of Psychology
Office Hours - Webex Room 645 079 468 (instructions)
Student Success Center Advising Appointments

*"Rather fail with honor than succeed by fraud."~ Sophocles*

**ESPOSITO - 11/10/21 RESPONSE - 000102**          **ESPOSITO - FOIA 1 - 8/5/21 - 000208**

**Weaver, Ernestine Y**

| | |
|---|---|
| **From:** | Pritchard, Alice M |
| **Sent:** | Tuesday, June 22, 2021 9:41 AM |
| **To:** | Steinmetz III, Robert R |
| **Subject:** | RE: firing of MCC CEO Nicole Esposito |

In receipt. Thanks

Alice Pritchard, Ph.D.
Chief of Staff
CT State Colleges and Universities (CSCU)
61 Woodland Street
Hartford, CT 06105
(860) 723-0016
pritcharda@ct.edu
www.ct.edu



**From:** Steinmetz III, Robert R <RSteinmetz@commnet.edu>
**Sent:** Tuesday, June 22, 2021 9:40 AM
**To:** Pritchard, Alice M <APritchard@commnet.edu>
**Subject:** Fwd: firing of MCC CEO Nicole Esposito

FYI.

Sent from my iPhone

Begin forwarded message:

> **From:** "Freeman, Seth R" <SFreeman@ccc.commnet.edu>
> **Date:** June 22, 2021 at 9:06:57 AM EDT
> **To:** "Freeman, Seth R" <SFreeman@ccc.commnet.edu>
> **Subject: Fw: firing of MCC CEO Nicole Esposito**
>
> CCC Colleagues,
>
> Hope everyone is well.
>
> Please see the attached statement that calls out the CSCU administration for their
> incompetence and mismanagement exemplified by the recent firing of Manchester Community
> College CEO Nicole Esposito.

1

We need all of our college community to stand up and fight the BOR, CSCU and CSCC system administrators for their continued colonization of our colleges. We must simply stop their plan to centralize power and take all decision-making from our students, faculty, staff and local administration.

Please read through the statement and reply to me individually if you would like your name added.

thanks,

**Seth Freeman**
*Professor, Computer Information Systems*
Capital Community College
(860) 906 5249
*President*
4Cs, SEIU 1973
seth@the4cs.org

---

**From:** Doninger, Lauren <LDoninger@gwcc.commnet.edu>
**Sent:** Monday, June 21, 2021 10:03 PM
**To:** Creech, Paul G <PCreech@ccc.commnet.edu>; Messore, Angelo A <AMessore@mcc.commnet.edu>; Jones, Eva M <EJones2@mxcc.commnet.edu>; Aime, Lois D <LAime@ncc.commnet.edu>; Maisfehlt, Lillian D <LMaisfehlt@gwcc.commnet.edu>; Lewis, John <JLewis@qvcc.commnet.edu>; Army, William G <WArmy@qvcc.commnet.edu>; Sheirer, John M <JSheirer@acc.commnet.edu>; Rempfer, Christopher <CRempfer@nvcc.commnet.edu>; Holmberg, Tara J <THolmberg@nwcc.commnet.edu>; Sanders, Randy <RSanders@hcc.commnet.edu>; Selvaggio, Joseph <JSelvaggio@trcc.commnet.edu>; Coan, Francis M <FCoan@txcc.commnet.edu>
**Subject:** firing of MCC CEO Nicole Esposito

Dear Governance Leaders,

As you probably know, MCC CEO Nicole Esposito was fired last week. Please see the attached statement. If you are inclined, please circulate to your colleagues. Anyone willing to sign the statement should send me their name by 9 AM on Wednesday 6/23. It will be submitted for inclusion in the BOR minutes on Thursday.

Regards,
Lauren

Lauren Doninger, Ed.D., LPC, LADC
Professor of Psychology
Office Hours - Webex Room 645 079 468 (instructions)
Student Success Center Advising Appointments

*"Rather fail with honor than succeed by fraud."~ Sophocles*

2

## Weaver, Ernestine Y

| | |
|---|---|
| **From:** | Gray, Jennifer L |
| **Sent:** | Tuesday, June 22, 2021 9:58 AM |
| **To:** | Steinmetz III, Robert R |
| **Subject:** | FW: firing of MCC CEO Nicole Esposito |
| **Attachments:** | Petition BOR Esposito v5.docx (1).pdf |

In case you haven't seen this...

**From:** Freeman, Seth R <SFreeman@ccc.commnet.edu>
**Sent:** Tuesday, June 22, 2021 9:06 AM
**To:** Freeman, Seth R <SFreeman@ccc.commnet.edu>
**Subject:** Fw: firing of MCC CEO Nicole Esposito

CCC Colleagues,

Hope everyone is well.

Please see the attached statement that calls out the CSCU administration for their incompetence and mismanagement exemplified by the recent firing of Manchester Community College CEO Nicole Esposito.

We need all of our college community to stand up and fight the BOR, CSCU and CSCC system administrators for their continued colonization of our colleges. We must simply stop their plan to centralize power and take all decision-making from our students, faculty, staff and local administration.

Please read through the statement and reply to me individually if you would like your name added.

thanks,


**Seth Freeman**
*Professor, Computer Information Systems*
Capital Community College
(860) 906 5249
*President*
4Cs, SEIU 1973
seth@the4cs.org

**From:** Doninger, Lauren <LDoninger@gwcc.commnet.edu>
**Sent:** Monday, June 21, 2021 10:03 PM
**To:** Creech, Paul G <PCreech@ccc.commnet.edu>; Messore, Angelo A <AMessore@mcc.commnet.edu>; Jones, Eva M <EJones2@mxcc.commnet.edu>; Aime, Lois D <LAime@ncc.commnet.edu>; Maisfehlt, Lillian D <LMaisfehlt@gwcc.commnet.edu>; Lewis, John <JLewis@qvcc.commnet.edu>; Army, William G <WArmy@qvcc.commnet.edu>; Sheirer, John M <JSheirer@acc.commnet.edu>; Rempfer, Christopher <CRempfer@nvcc.commnet.edu>; Holmberg, Tara J <THolmberg@nwcc.commnet.edu>; Sanders, Randy <RSanders@hcc.commnet.edu>; Selvaggio, Joseph <JSelvaggio@trcc.commnet.edu>; Coan, Francis M

1

**ESPOSITO - 11/10/21 RESPONSE - 000105**         **ESPOSITO - FOIA 1 - 8/5/21 - 000211**

<FCoan@txcc.commnet.edu>
**Subject:** firing of MCC CEO Nicole Esposito

Dear Governance Leaders,

As you probably know, MCC CEO Nicole Esposito was fired last week. Please see the attached statement. If you are inclined, please circulate to your colleagues. Anyone willing to sign the statement should send me their name by 9 AM on Wednesday 6/23. It will be submitted for inclusion in the BOR minutes on Thursday.

Regards,
Lauren


Lauren Doninger, Ed.D., LPC, LADC
Professor of Psychology
Office Hours - Webex Room 645 079 468 (instructions)
Student Success Center Advising Appointments

*"Rather fail with honor than succeed by fraud."~ Sophocles*

2

**Statement on the Firing of MCC CEO Nicole Esposito**

On Thursday June 17th 2021, Manchester Community College CEO Nicole Esposito was fired. CEO Esposito's dismissal is strategic silencing because of her advocacy for MCC, her critical questioning of consolidation costs and processes, and for bringing her concerns to NECHE. The dismissal of CEO Esposito is an explicit warning to any other CEO who might deign to ask any questions or attempt to advocate for the college they are, at least on paper, charged to lead.

Under the One College model, the twelve independently-accredited community colleges have no local autonomy and decision-making abilities. Currently, CEO/Presidents of independently accredited institutions are in the untenable position of being responsible for institutions over which they have insufficient authority.

The firing of CEO Esposito is further proof that local administrators who do not bow to the mandates of CSCC Regional and College administrators will be silenced and punished. Her termination is a clear demonstration of intimidation, bullying, coercion, retaliation, and demand for fealty, that characterizes this CSCU administration. It is reprehensible and inexcusable and the antithesis of what should be permitted in a system of higher learning.

**Signed**

Lois Aime, Norwalk Community College
Francis Coan, Tunxis Community College
Lauren Doninger, Gateway Community College
Seth Freeman, Capital Community College
Diba Khan-Bureau, Three Rivers Community College
Colena Sesanker, Gateway Community College

## Weaver, Ernestine Y

| From: | Bonilla, Sofia |
| --- | --- |
| Sent: | Tuesday, June 22, 2021 10:18 AM |
| To: | Kripp, Andrew; Delloiacono, Dean |
| Subject: | FW: Petition Opposing the Dismissal of CEO Nicole Esposito    June 21, 2021 |

Andy – this is the original email that went out before Congress sent out their own email – I forward that text to you.

*Sofia*

**From:** Messore, Angelo A <AMessore@mcc.commnet.edu>
**Sent:** Monday, June 21, 2021 5:08 PM
**To:** MA-Allpoints <Allpoints@mcc.commnet.edu>
**Subject:** Petition Opposing the Dismissal of CEO Nicole Esposito June 21, 2021

Dear Members of the Manchester Community College community:

After a nationwide search in the spring of 2020, Dr. Nicole Esposito was appointed Chief Executive Officer of Manchester Community College by the Board of Regents of the Connecticut State Colleges and Universities. Over the past year, Dr. Esposito has shown great skill in guiding MCC through difficult times. She has repeatedly proven her deep concern for the welfare of our students, and for the academic success of our college. She has asked probing questions about the consolidation of the 12 community colleges in order to ensure that our students are well served by the new institution that is being constructed. Dr. Esposito has also demonstrated a strong commitment to the procedures of shared governance that have long defined Manchester Community College.

Last week, Dr. Rob Steinmetz, our Regional President, informed Dr. Nicole Esposito that she would not be re-appointed to the position of Chief Executive Officer of Manchester Community College for the coming academic year.

Without valid reasons and without an objective evaluation of her performance as CEO, Dr. Esposito is being denied re-appointment. What kind of a system are we moving towards if one person can derail the career of another without facts, without an objective evaluation, and without due process?

At its meeting on Thursday, June 24, 2021, the Board of Regents (BOR) will vote on the dismissal of CEO Esposito. As Chair of the MCC Academic Senate, I have started a petition to bring to the BOR this Thursday to

1

demand that Regional President Rob Steinmetz, CSCC President David Levinson, Chief Operating Officer Alice Pritchard, and the members of the Board of Regents rescind this action against CEO Esposito.

I urge you to join me in signing this petition demanding that the Board of Regents renew for the coming academic year Dr. Esposito's appointment as CEO of Manchester Community College.

**Please reply to me by Wednesday June 23rd at 5pm to add your name to this petition.**

Sincerely,

Angelo Messore

Chair, Manchester Community College Academic Senate

Professor, Political Science and Economics

**Signatories:**

K. Umesh Vig, Director of Student Affairs Operations

Carl Stafford, Retired Professor of Culinary Arts and Hospitality Management

Patrick Sullivan, Professor of English

Christopher Paulin, Professor of History

Maura O'Connor, Professor of Graphic Design

Susan Classen-Sullivan, Professor of Fine Arts

Kevin Skee, Department of Information Technology

Meghan Finley, Associate Professor, Sociology

T.J. Barber, Director of Student Activities

Kimberly Hamilton Bobrow, Professor of English

Nicole Simmons, Academic Associate, STEM

2

## Weaver, Ernestine Y

| | |
|---|---|
| **From:** | Dupille Jr., Leonard |
| **Sent:** | Tuesday, June 22, 2021 6:23 PM |
| **To:** | Bradley, Linda L; Gutterman, Jennifer; Messore, Angelo A; MA-Allpoints |
| **Subject:** | Re: Petition Opposing the Dismissal of CEO Nicole Esposito    June 21, 2021 |

Hi Angelo,

Please add my name to the petition. Supporting a campus leader who has done her best to be responsive to the needs of faculty, staff, and students under very trying circumstances is the right thing to do. To dismiss somebody after only a year, especially this previous year that we've had, seems unfair and suspect at best.

Take care,
Len

---

**From:** Bradley, Linda L <LBradley@mcc.commnet.edu>
**Sent:** Tuesday, June 22, 2021 4:11 PM
**To:** Gutterman, Jennifer <JGutterman@mcc.commnet.edu>; Messore, Angelo A <AMessore@mcc.commnet.edu>; MA-Allpoints <Allpoints@mcc.commnet.edu>
**Subject:** Re: Petition Opposing the Dismissal of CEO Nicole Esposito June 21, 2021

Please add my name to the petition in support of Dr. Esposito. Thank you.

Linda Bradley
Drawing I Adjunct Instructor
Get Outlook for iOS

---

**From:** Gutterman, Jennifer <JGutterman@mcc.commnet.edu>
**Sent:** Tuesday, June 22, 2021 1:56:45 PM
**To:** Messore, Angelo A <AMessore@mcc.commnet.edu>; MA-Allpoints <Allpoints@mcc.commnet.edu>
**Subject:** Re: Petition Opposing the Dismissal of CEO Nicole Esposito June 21, 2021

Please add my name to this petition. I absolutely do not support this action against Dr. Esposito and agree with this petition to stop it.

**Jennifer Gutterman**
Associate Professor
*Program Coordinator - Game Design*
Communication & Game Design Department
they/them

Schedule an Appointment

1

**ESPOSITO - 11/10/21 RESPONSE - 000110**        **ESPOSITO - FOIA 1 - 8/5/21 - 000222**

Manchester Community College
Great Path, MS# 19
P.O. Box 1046
Manchester, CT 06045-1046

**From:** Messore, Angelo A <AMessore@mcc.commnet.edu>
**Sent:** Monday, June 21, 2021 5:07 PM
**To:** MA-Allpoints <Allpoints@mcc.commnet.edu>
**Subject:** Petition Opposing the Dismissal of CEO Nicole Esposito June 21, 2021

Dear Members of the Manchester Community College community:

After a nationwide search in the spring of 2020, Dr. Nicole Esposito was appointed Chief Executive Officer of
Manchester Community College by the Board of Regents of the Connecticut State Colleges and Universities.
Over the past year, Dr. Esposito has shown great skill in guiding MCC through difficult times. She has
repeatedly proven her deep concern for the welfare of our students, and for the academic success of our
college. She has asked probing questions about the consolidation of the 12 community colleges in order to
ensure that our students are well served by the new institution that is being constructed. Dr. Esposito has also
demonstrated a strong commitment to the procedures of shared governance that have long defined
Manchester Community College.

Last week, Dr. Rob Steinmetz, our Regional President, informed Dr. Nicole Esposito that she would not be re-
appointed to the position of Chief Executive Officer of Manchester Community College for the coming
academic year.

Without valid reasons and without an objective evaluation of her performance as CEO, Dr. Esposito is being
denied re-appointment. What kind of a system are we moving towards if one person can derail the career of
another without facts, without an objective evaluation, and without due process?

At its meeting on Thursday, June 24, 2021, the Board of Regents (BOR) will vote on the dismissal of CEO
Esposito. As Chair of the MCC Academic Senate, I have started a petition to bring to the BOR this Thursday to
demand that Regional President Rob Steinmetz, CSCC President David Levinson, Chief Operating Officer Alice
Pritchard, and the members of the Board of Regents rescind this action against CEO Esposito.

I urge you to join me in signing this petition demanding that the Board of Regents renew for the coming
academic year Dr. Esposito's appointment as CEO of Manchester Community College.

**Please reply to me by Wednesday June 23rd at 5pm to add your name to this petition.**

Sincerely,
Angelo Messore
Chair, Manchester Community College Academic Senate
Professor, Political Science and Economics

**Signatories:**
K. Umesh Vig, Director of Student Affairs Operations

2

Carl Stafford, Retired Professor of Culinary Arts and Hospitality Management
Patrick Sullivan, Professor of English
Christopher Paulin, Professor of History
Maura O'Connor, Professor of Graphic Design
Susan Classen-Sullivan, Professor of Fine Arts
Kevin Skee, Department of Information Technology
Meghan Finley, Associate Professor, Sociology
T.J. Barber, Director of Student Activities
Kimberly Hamilton Bobrow, Professor of English
Nicole Simmons, Academic Associate, STEM

**ESPOSITO - 11/10/21 RESPONSE - 000112**          **ESPOSITO - FOIA 1 - 8/5/21 - 000224**

Subject: Petition Opposing the Dismissal of CEO Nicole Esposito           June 21, 2021

Dear Members of the Manchester Community College community:

After a nationwide search in the spring of 2020, Dr. Nicole Esposito was appointed Chief Executive Officer of Manchester Community College by the Board of Regents of the Connecticut State Colleges and Universities. Over the past year, Dr. Esposito has shown great skill in guiding MCC through difficult times. She has repeatedly proven her deep concern for the welfare of our students, and for the academic success of our college. She has asked probing questions about the consolidation of the 12 community colleges in order to ensure that our students are well served by the new institution that is being constructed. She has also demonstrated a strong commitment to the procedures of shared governance that have long defined Manchester Community College.

Last week, Dr. Rob Steinmetz, our Regional President, informed Dr. Nicole Esposito that she would not be re-appointed to the position of Chief Executive Officer of Manchester Community College for the coming academic year.

Without valid reasons and without an objective evaluation of her performance as CEO, Dr. Esposito is being denied re-appointment. What kind of a system are we moving towards if one person can derail the career of another without facts, without an objective evaluation, and without due process?

At its meeting on Thursday, June 24, 2021, the Board of Regents (BOR) will vote on the dismissal of CEO Esposito. As Chair of the MCC Academic Senate, I have started a petition to bring to the BOR this Thursday to demand that Regional President Rob Steinmetz, CSCC President David Levinson, Chief Operating Officer Alice Pritchard, and the members of the Board of Regents rescind this action against CEO Esposito.

I urge you to join me in signing this petition demanding that the Board of Regents renew for the coming academic year Dr. Esposito's appointment as CEO of Manchester Community College.

**Please reply to me by Wednesday June 23rd at 5pm to add your name to this petition.**

Sincerely,

Angelo Messore
Chair, Manchester Community College Academic Senate
Professor, Political Science and Economics

**Signatories:**
K. Umesh Vig, Director of Student Affairs Operations
Carl Stafford, Retired Professor of Culinary Arts and Hospitality Management
Patrick Sullivan, Professor of English

Christopher Paulin, Professor of History
Maura O'Connor, Professor of Graphic Design
Susan Classen-Sullivan, Professor of Fine Arts
Kevin Skee, Information Technology Technician, Department of Information Technology
Meghan Finley, Associate Professor of Sociology, Chair, Sociology Department
T.J. Barber, Director of Outreach & Student Life
Kimberly Hamilton Bobrow, Professor of English
Nicole Simmons, Academic Associate, STEM Division
Nora G. Uricchio, Program Coordinator, Radiation Therapy
Jonathan Morris, Professor of Biology
Jennifer Gutterman, Associate Professor of Game Design
Mehrdad Faezi, Professor of Manufacturing
Lisa Sandoval, Associate Professor of English
Paula Raum, Graphics Specialist, Marketing and Public Relations
Deborah Boyle, Associate Professor, Paralegal Program
Sherri Scudder, Office Assistant, Registrar's Office
Mirriam X. Torres-Thorburn, Educational Counselor CONNTAC, Student Affairs
Debora Fitzgerald, Adjunct Faculty, STEM Division
Tippawan Markmaitree, Academic Associate, STEM Division (Physical Sciences Lab Manager)
Deborah L. Wood, Administrative Assistant, Registrar's Office
Katherine Jones, Secretary, Admissions
Kathleen F. Peters, Professor of Mathematics
Ricardo Aragon, Associate Professor of Culinary Arts and Hospitality Management
Matthew J. Bonesteel Jr., Interim Enrollment Services Coordinator
Stephania Davis, Professor of Communications
Rachel Mintell, Professor of Biology
Amy I. Anderson, Disability Specialist, Disability Services
Timothy Boto, Assistant Director, Educational Technology and Distance Learning
Gail Anne Arroyo, Associate Registrar
Richard P. Gnall, Professor of Computer Science
Wanda I. Reyes-Dawes, Counselor, Advising and Counseling Services
Katherine Player, Financial Aid Assistant, Financial Aid Office
Michelle LaBelle, Veterans Services Associate
Linsey Muldoon, Assistant Professor of English
Diane C. Hillyer, Professor of Mathematics
Marcie J. Stock, Adjunct Faculty, STEM Division
Benjamin Breault, Program Coordinator GEAR UP
Brett Eberhardt, Assistant Professor of Visual Fine Arts
Matthew L. Brodeur, Adjunct Faculty, STEM Division
Nicole Brodeur, Adjunct Faculty, STEM Division
Carolina Flores, Professor of Music
Mary Holland, Associate Professor of Paralegal Studies
Brion van Over, Associate Professor of Communications
Gregg A. Brohinsky, Director, Child Development Center

Georgette E. Hyman, Assistant Director, Disability Services and Testing
Brian Cleary, Director, Academic Support Center
Samantha Gonzalez, Associate Professor of Communications
Allison MacKenzie, Professor of Exercise Science
Anita Sparrow, Registrar
Guocun Yang, Professor of History
Negussie Tirfessa, Professor of Physics
Kate L. Bella, Professor of Mathematics
Julie L. Greene, Director of Career Services and Veterans Services
Daniel M. Long, Professor of Visual Fine Arts
Amy E. Shaw, Instructor of English
Carla E. Adams, Professor of Business Office Technology
Albert S. Kim, Professor of Communications
Myrta Groeneveld, Professor of Mathematics
Alina Ciscel, Associate Professor, Program Coordinator of ESL
Timothy A. Kussow, Professor of Fine Arts
Sandra Rimetz, Professor of Business
Christopher J. Hamelin, Associate Professor of Mathematics
Stacey Bottone, Professor of Business Office Technology
Heidi L. Michaud, Adjunct Faculty, Smart Start English
Pamela G. MacManus, Professor of Biology
Elaine Kotler, Adjunct Faculty, STEM Division
Sara M. Berry, Adjunct Faculty, Social Science, Business and Professional Careers Division
Nancy L. Bray, Professor of Psychology
Michael P. Pence, Assistant Professor of Chemistry
Robert A. Henderson, Director of Cooperative Education
Kathryn M. Kleis, Professor of Criminal Justice
Brittany L. Zavaski, Head Teacher, Child Development Center
Teresa J. Arnold, Development Associate, Institutional Advancement
Brian Lombardo, Media Associate, Marketing and Public Relations
Susan Morison, Associate Professor, Radiography Program Coordinator
Linda Bradley, Adjunct Faculty, Liberal & Creative Arts Division
Leonard Dupille, Professor of Psychology
Linda Armstrong, Excursions Youth Coordinator, Continuing Education
Robert A. Brandt, Associate Professor, Film, Screenwriting and Communication Arts
Gordon Plouffe, Educational Assistant, MCC Class of 2016
Gina Marchesani, Academic Advisor
Katherine A. Kern, Assistant Professor, Culinary Arts and Hospitality Management

Subject: Petition Opposing the Dismissal of CEO Nicole Esposito          June 21, 2021

Dear Members of the Manchester Community College community:

After a nationwide search in the spring of 2020, Dr. Nicole Esposito was appointed Chief Executive Officer of Manchester Community College by the Board of Regents of the Connecticut State Colleges and Universities. Over the past year, Dr. Esposito has shown great skill in guiding MCC through difficult times. She has repeatedly proven her deep concern for the welfare of our students, and for the academic success of our college. She has asked probing questions about the consolidation of the 12 community colleges in order to ensure that our students are well served by the new institution that is being constructed. She has also demonstrated a strong commitment to the procedures of shared governance that have long defined Manchester Community College.

Last week, Dr. Rob Steinmetz, our Regional President, informed Dr. Nicole Esposito that she would not be re-appointed to the position of Chief Executive Officer of Manchester Community College for the coming academic year.

Without valid reasons and without an objective evaluation of her performance as CEO, Dr. Esposito is being denied re-appointment. What kind of a system are we moving towards if one person can derail the career of another without facts, without an objective evaluation, and without due process?

At its meeting on Thursday, June 24, 2021, the Board of Regents (BOR) will vote on the dismissal of CEO Esposito. As Chair of the MCC Academic Senate, I have started a petition to bring to the BOR this Thursday to demand that Regional President Rob Steinmetz, CSCC President David Levinson, Chief Operating Officer Alice Pritchard, and the members of the Board of Regents rescind this action against CEO Esposito.

I urge you to join me in signing this petition demanding that the Board of Regents renew for the coming academic year Dr. Esposito's appointment as CEO of Manchester Community College.

**Please reply to me by Wednesday June 23rd at 5pm to add your name to this petition.**

Sincerely,

Angelo Messore
Chair, Manchester Community College Academic Senate
Professor, Political Science and Economics

**Signatories:**
K. Umesh Vig, Director of Student Affairs Operations
Carl Stafford, Retired Professor of Culinary Arts and Hospitality Management
Patrick Sullivan, Professor of English

Christopher Paulin, Professor of History
Maura O'Connor, Professor of Graphic Design
Susan Classen-Sullivan, Professor of Fine Arts
Kevin Skee, Information Technology Technician, Department of Information Technology
Meghan Finley, Associate Professor of Sociology, Chair, Sociology Department
T.J. Barber, Director of Outreach & Student Life
Kimberly Hamilton Bobrow, Professor of English
Nicole Simmons, Academic Associate, STEM Division
Nora G. Uricchio, Program Coordinator, Radiation Therapy
Jonathan Morris, Professor of Biology
Jennifer Gutterman, Associate Professor of Game Design
Mehrdad Faezi, Professor of Manufacturing
Lisa Sandoval, Associate Professor of English
Paula Raum, Graphics Specialist, Marketing and Public Relations
Deborah Boyle, Associate Professor, Paralegal Program
Sherri Scudder, Office Assistant, Registrar's Office
Mirriam X. Torres-Thorburn, Educational Counselor CONNTAC, Student Affairs
Debora Fitzgerald, Adjunct Faculty, STEM Division
Tippawan Markmaitree, Academic Associate, STEM Division (Physical Sciences Lab Manager)
Deborah L. Wood, Administrative Assistant, Registrar's Office
Katherine Jones, Secretary, Admissions
Kathleen F. Peters, Professor of Mathematics
Ricardo Aragon, Associate Professor of Culinary Arts and Hospitality Management
Matthew J. Bonesteel Jr., Interim Enrollment Services Coordinator
Stephania Davis, Professor of Communications
Rachel Mintell, Professor of Biology
Amy I. Anderson, Disability Specialist, Disability Services
Timothy Boto, Assistant Director, Educational Technology and Distance Learning
Gail Anne Arroyo, Associate Registrar
Richard P. Gnall, Professor of Computer Science
Wanda I. Reyes-Dawes, Counselor, Advising and Counseling Services
Katherine Player, Financial Aid Assistant, Financial Aid Office
Michelle LaBelle, Veterans Services Associate
Linsey Muldoon, Assistant Professor of English
Diane C. Hillyer, Professor of Mathematics
Marcie J. Stock, Adjunct Faculty, STEM Division
Benjamin Breault, Program Coordinator GEAR UP
Brett Eberhardt, Assistant Professor of Visual Fine Arts
Matthew L. Brodeur, Adjunct Faculty, STEM Division
Nicole Brodeur, Adjunct Faculty, STEM Division
Carolina Flores, Professor of Music
Mary Holland, Associate Professor of Paralegal Studies
Brion van Over, Associate Professor of Communications
Gregg A. Brohinsky, Director, Child Development Center

Georgette E. Hyman, Assistant Director, Disability Services and Testing
Brian Cleary, Director, Academic Support Center
Samantha Gonzalez, Associate Professor of Communications
Allison MacKenzie, Professor of Exercise Science
Anita Sparrow, Registrar
Guocun Yang, Professor of History
Negussie Tirfessa, Professor of Physics
Kate L. Bella, Professor of Mathematics
Julie L. Greene, Director of Career Services and Veterans Services
Daniel M. Long, Professor of Visual Fine Arts
Amy E. Shaw, Instructor of English
Carla E. Adams, Professor of Business Office Technology
Albert S. Kim, Professor of Communications
Myrta Groeneveld, Professor of Mathematics
Alina Ciscel, Associate Professor, Program Coordinator of ESL
Timothy A. Kussow, Professor of Fine Arts
Sandra Rimetz, Professor of Business
Christopher J. Hamelin, Associate Professor of Mathematics
Stacey Bottone, Professor of Business Office Technology
Heidi L. Michaud, Adjunct Faculty, Smart Start English
Pamela G. MacManus, Professor of Biology
Elaine Kotler, Adjunct Faculty, STEM Division
Sara M. Berry, Adjunct Faculty, Social Science, Business and Professional Careers Division
Nancy L. Bray, Professor of Psychology
Michael P. Pence, Assistant Professor of Chemistry
Robert A. Henderson, Director of Cooperative Education
Kathryn M. Kleis, Professor of Criminal Justice
Brittany L. Zavaski, Head Teacher, Child Development Center
Teresa J. Arnold, Development Associate, Institutional Advancement
Brian Lombardo, Media Associate, Marketing and Public Relations
Susan Morison, Associate Professor, Radiography Program Coordinator
Linda Bradley, Adjunct Faculty, Liberal & Creative Arts Division
Leonard Dupille, Professor of Psychology
Linda Armstrong, Excursions Youth Coordinator, Continuing Education
Robert A. Brandt, Associate Professor, Film, Screenwriting and Communication Arts
Gordon Plouffe, Educational Assistant, MCC Class of 2016
Gina Marchesani, Academic Advisor
Katherine A. Kern, Assistant Professor, Culinary Arts and Hospitality Management

**From:** Peter Grose
**To:** Gates, Jane; Levinson, David; Pritchard, Alice M; Steinmetz III, Robert R; Heleen, Pamela
**Subject:** Regarding the MCC CEO
**Date:** Wednesday, June 23, 2021 3:12:42 PM

To the Board of Regents and CSCU Leadership -

I am the President-Elect of the Manchester Community College Foundation.  I am writing this message personally, and my opinions do not necessarily reflect those of the MCC Foundation Board of Directors.

I am asking you to continue/renew Dr. Nicole Esposito's contract as Campus CEO of MCC.  I can't think of an action that would more profoundly and negatively impact the ability of the MCC Foundation to raise funds for and support the students and programs at MCC than the abrupt removal of its CEO.

I served on the Campus Advisory Committee for the CEO search process for MCC that selected Dr. Esposito for this position.  Her ties to MCC and energy and enthusiasm for improving this institution for its students, faculty and staff were key reasons why she stood out from the pool of candidates for this position.  I believe she has brought those characteristics to bear in her role as CEO, resulting in positive interactions and community-building at the college.

Dr. Esposito has communicated regularly and effectively with the MCC Foundation, particularly with its leadership team.  We have made positive strides in seeking to better align the Foundation's budgeting and disbursement processes with the college's top priorities.  We have also been planning ways in which we can work together with Dr. Esposito to broaden the financial support for MCC, including strengthening community relationships, cultivating major donor giving and identifying new directors to augment the current Foundation Board.  Particularly as we break out of Covid-pandemic constraints, we are excited about collaborating with Dr. Esposito to grow support for MCC.

To abruptly end Dr. Esposito's role as Campus CEO will strike a blow to these works-in-progress, and throwing MCC into the limbo of another interim CEO era will set back efforts to strengthen support for the college.  The statewide consolidation of community colleges has already eroded the important connections between donors and the local colleges, and this new development would further shake the public's confidence in, and support for, our community college.  For these reasons, I ask that you continue Dr. Esposito's tenure as Campus CEO at MCC.

Peter H. Grose
President-Elect, Manchester Community College Foundation
pgrose53@gmail.com

**Statement on the Firing of MCC CEO Nicole Esposito**

On Thursday June 17th 2021, Manchester Community College CEO Nicole Esposito was fired. CEO Esposito's dismissal is strategic silencing because of her advocacy for MCC, her critical questioning of consolidation costs and processes, and for bringing her concerns to NECHE. The dismissal of CEO Esposito is an explicit warning to any other CEO who might deign to ask any questions or attempt to advocate for the college they are, at least on paper, charged to lead.

Under the One College model, the twelve independently-accredited community colleges have no local autonomy and decision-making abilities. Currently, CEO/Presidents of independently accredited institutions are in the untenable position of being responsible for institutions over which they have insufficient authority.

The firing of CEO Esposito is further proof that local administrators who do not bow to the mandates of CSCC Regional and College administrators will be silenced and punished. Her termination is a clear demonstration of intimidation, bullying, coercion, retaliation, and demand for fealty, that characterizes this CSCU administration. It is reprehensible and inexcusable and the antithesis of what should be permitted in a system of higher learning.

**Signed**

Lois Aime, Norwalk Community College
John Alvord, Norwalk Community College
Paul Barrow, Manchester Community College
Todd Barry, Three Rivers Community College
Melissa Behney, Middlesex Community College
Andre Blaszczynski, Tunxis Community College
Dennis Bogusky, Norwalk Community College
Michael Butcaris, Norwalk Community College
Mike Carta, Three Rivers Community College
Cindy Casper, Norwalk Community College
John Christie, Capital Community College
Francis Coan, Tunxis Community College
Jean Daniels, Norwalk Community College
June Decker, Three Rivers Community College
Terry Delaney, Three Rivers Community College
Michele A. DeLucia, Gateway Community College
Lauren Doninger, Gateway Community College
Kathryn Dowden, Three Rivers Community College
David England, Middlesex Community College
Seth Freeman, Capital Community College
Joe Fucigna, Norwalk Community College
Charles Gabor, Norwalk Community College
Mytra Groeneveld, Manchester Community College
Janet Hagan, Three Rivers Community College
Arthur Hernandez, Gateway Community College
Robert Howard, Norwalk Community College
Rebecca Hussey, Norwalk Community College
William Key, Norwalk Community College
Karen Kessler, Gateway Community College
Diba Khan-Bureau, Three Rivers Community College
Dennis Korchinski, Norwalk Community College
Kevin Lamkin, Capital Community College
Mary Lawrence, Gateway Community College

Brian Lynch, Quinebaug Valley Community College
Lillian Maisfehlt, Gateway Community College
Phil Mayer, Three Rivers Community College
Jill McDowell, Gateway Community College
Kathleen H. Murphy, Gateway Community College
William O'Connell, Norwalk Community College
Lauren O'Leary, Gateway Community College
James O'Shea, Three Rivers Community College
Alissa Parlante, Capital Community College
Jane Perry, Norwalk Community College
Laurel Peterson, Norwalk Community College
Melissa Philion, Quinebaug Valley Community College
Dale Sartor, Norwalk Community College
Althea Seaborn, Norwalk Community College
Joe Selveggio, Three Rivers Community College
Colena Sesanker, Gateway Community College
John Shafer, Middlesex Community College
Jim Sherrard, Three Rivers Community College
Sheila Skahan, Three Rivers Community College
Melissa Slattery, Norwalk Community College
Michael Spry, Asnuntuck Community College
Susan Steiz, Norwalk Community College
Patrick Sullivan Manchester Community College
Daniel Tauber, Capital Community College
Warren Towler, Capital Community College
Robert Tremblay, Gateway Community College
Elle Van Dermark, Asnuntuck Community College
Deborah Weiss, Southern Connecticut State University
Ernest Wiegand, Norwalk Community College
Jennifer Wood, Norwalk Community College
Carmen Yiamouyiannis, Capital Community College
Kudzai Zvoma, Quinebaug Valley Community College

# EXHIBIT 6

ESPOSITO - 11/10/21 RESPONSE - 000121

**From:**        Peter Grose
**To:**          Gates, Jane; Levinson, David; Pritchard, Alice M; Steinmetz III, Robert R; Heleen, Pamela
**Subject:**     Regarding the MCC CEO
**Date:**        Wednesday, June 23, 2021 3:12:42 PM

To the Board of Regents and CSCU Leadership -

I am the President-Elect of the Manchester Community College Foundation.  I am writing this message personally, and my opinions do not necessarily reflect those of the MCC Foundation Board of Directors.

I am asking you to continue/renew Dr. Nicole Esposito's contract as Campus CEO of MCC.  I can't think of an action that would more profoundly and negatively impact the ability of the MCC Foundation to raise funds for and support the students and programs at MCC than the abrupt removal of its CEO.

I served on the Campus Advisory Committee for the CEO search process for MCC that selected Dr. Esposito for this position.  Her ties to MCC and energy and enthusiasm for improving this institution for its students, faculty and staff were key reasons why she stood out from the pool of candidates for this position.  I believe she has brought those characteristics to bear in her role as CEO, resulting in positive interactions and community-building at the college.

Dr. Esposito has communicated regularly and effectively with the MCC Foundation, particularly with its leadership team.  We have made positive strides in seeking to better align the Foundation's budgeting and disbursement processes with the college's top priorities.  We have also been planning ways in which we can work together with Dr. Esposito to broaden the financial support for MCC, including strengthening community relationships, cultivating major donor giving and identifying new directors to augment the current Foundation Board.  Particularly as we break out of Covid-pandemic constraints, we are excited about collaborating with Dr. Esposito to grow support for MCC.

To abruptly end Dr. Esposito's role as Campus CEO will strike a blow to these works-in-progress, and throwing MCC into the limbo of another interim CEO era will set back efforts to strengthen support for the college.  The statewide consolidation of community colleges has already eroded the important connections between donors and the local colleges, and this new development would further shake the public's confidence in, and support for, our community college.  For these reasons, I ask that you continue Dr. Esposito's tenure as Campus CEO at MCC.

Peter H. Grose
President-Elect, Manchester Community College Foundation
pgrose53@gmail.com

# EXHIBIT 7

**Stipulated Agreement Between**
**Dr. Nicole Esposito**
**And**
**Connecticut State Colleges and Universities on behalf of**
**Manchester Community College**

This Stipulated Agreement ("Agreement") is entered into by the Connecticut State Colleges and Universities ("CSCU") on behalf of its constituent unit Manchester Community College ("the College") and Dr. Nicole Esposito.

WHEREAS, Dr. Nicole Esposito, was appointed as Chief Executive Officer of Manchester Community College on June 5, 2020; and

WHEREAS, Dr. Nicole Esposito wishes to resign as CEO of the College, yet continue her employment with the CSCU; and

WHEREAS, the CSCU wishes to engage Dr. Esposito and use her expertise in the field of psychology to provide resources to support a CSCU Mental Health Initiative; and

WHEREAS, the College and Dr. Esposito seek a smooth transition to this new employment arrangement;

NOW, THEREFORE, the parties agree:

1. Dr. Esposito shall upon execution of this Agreement submit her letter of resignation as CEO of Manchester Community College effective June 30, 2021. All rights, privileges and notice requirements associated with such position will terminate upon resignation.

2. Dr. Esposito shall begin work on the CSCU Mental Health Initiative as its Project Director. Duties and responsibilities of this position are, attached and incorporated hereto as Exhibit A.

3. The assignment shall begin on July 1, 2021 and end on June 30, 2022. This assignment is not subject to notice requirements under the section 8.1 of the Management Confidential Personnel Manual. Dr. Esposito shall not be entitled to receive notice of non-continuation. CSCU shall not terminate its financial obligation to compensate Dr. Esposito prior to June 30, 2022.

4. Dr. Esposito's duties will be specifically limited to mutually agreed upon assignments she receives from the Director of Workforce Development, Strategic Partnerships and Sponsored Programs. Dr. Esposito will perform any such assignments from a remote duty station jointly selected. Dr. Esposito will report directly to the Director of Workforce Development, Strategic Partnerships and Sponsored Programs, in accordance with this paragraph.

5. Dr. Esposito's compensation shall continue with full benefits and at her current rate of pay, paid bi-weekly and will be governed by applicable HR Polices.

6. The Dr. Esposito and CSCU recognize the sensitive nature of this matter and agree to handle the aforementioned transition with the highest degree of professionalism and prudence. Nothing herein shall prohibit either the CSCU or Dr. Esposito from responding to inquiries or comments by third parties relevant to Dr. Esposito's past employment and/or the terms of this Stipulated Agreement. CSCU and Dr. Esposito agree to refrain from public or private disparaging remarks.

7. This Agreement shall not be construed as an admission of liability or wrongdoing on the part of Dr. Esposito, CSCU, the College or its agents.

8. Dr. Esposito is not, by signing this Stipulated Agreement, releasing or waiving any right, interest, or entitlement to payment from any benefits to which she is entitled or otherwise owed by virtue of her employment with the CSCU, including but not limited to employer contributions to her State of Connecticut pension plan, health benefits and the accrual of vacation leave.

9. In consideration of the terms and conditions described in this Agreement, Dr. Esposito for herself, her heirs, representatives, and assigns hereby irrevocably, voluntarily, and knowingly covenants not to sue, and releases and forever discharges the College/CSCU and its agents, and employees, any other former officers, servants, agents or employees of the State of Connecticut, both in their official and individual capacities, and the State of Connecticut itself, from any and all claims, grievances, demands, obligations, actions, causes of action, lawsuits, administrative proceedings, rights, damages, costs, loss of services, expenses and compensation of any nature whatsoever in any forum, whether based on tort, contract or other theory of recovery, for any matter from the beginning of time to the date of her signature on this Agreement, arising out of her employment with CSCU and/or the College, including without limitations, any and all damages to Dr. Esposito which have resulted or may

Initialed     /

**ESPOSITO - 11/10/21 RESPONSE - 000125**

result from any acts or omissions of the CSCU and/or the College.

10. CSCU and the College in consideration of the terms and conditions described in this Agreement, hereby irrevocably, voluntarily, and knowingly, covenants not to sue, and release and forever discharges Dr. Esposito and her agents and attorneys, from any and all claims, grievances, demands, obligations, actions, causes of action, lawsuits, administrative proceedings, rights, damages, costs, loss of services, expenses and compensation of any nature whatsoever in any forum, whether based on tort, contract or other theory of recovery, for any matter from the beginning of time to the date of her signature on this Agreement, arising out of Dr. Esposito 's acts or omissions within the scope of her employment as CEO of Manchester Community College not wanton, reckless or malicious.

11. The parties expressly acknowledge that this Agreement is intended to, and will, constitute full and final settlement of all claims and/or rights of action which Dr. Esposito has or may in the future have, arising out of any of the facts and circumstances which are the subject of or related to Dr. Esposito 's employment as CEO of Manchester Community College, including but not limited to, such claims as may be cognizable under Title VII, ADEA, federal law, the United States Constitution, the Connecticut Constitution, and state law and common law claims, including negligent and intentional infliction of emotional distress, as more fully reflected in the release of liability contained above.

12. Dr. Esposito acknowledges that she freely and voluntarily enters into this Agreement without duress, intimidation, undue influence, or any threatened loss of benefit. Dr. Esposito acknowledges the she has read the Agreement carefully and fully understands its content, meaning, intent, and implications.

13. This Stipulated Agreement constitutes the entire agreement of the parties. This Stipulated Agreement may be modified or amended only by a writing signed by Dr. Esposito and an authorized official of the CSCU. Dr. Esposito acknowledges that the CSCU has made no representation or promises to her other than those encompassed in this Stipulated Agreement.

14. The Stipulated Agreement may be executed in multiple counterparts, each of which will be regarded for all purposes as an original constitution one and the same instrument.

Initialed    /

Stipulated Agreement
Page 4 of 8

15. If a court of competent jurisdiction holds any provision of the Agreement unlawful, the remainder of the agreement shall continue in force.

16. The laws of the State of Connecticut will govern this Stipulated Agreement.

17. The parties acknowledge that his document is not exempt from disclosure under the Freedom of Information Act.

[THIS SECTION INTENTIONALLY LEFT BLANK]

Initialed    /

Stipulated Agreement
Page **5** of **8**


DR. NICOLE ESPOSITO


_____
                        Date

On this the _____ day of June 2021 before me, the undersigned officer, personally

appeared NICOLE ESPOSITO, known to me (or satisfactorily proven) to be the person

whose name is subscribed to the within instrument and acknowledged that she executed

the same as her free act and deed.

IN WITNESS WHEREOF, I have hereto set my hand and official seal.


_____
Notary Public/Commissioner of the Superior Court


Initialed    /

CONNECTICUT STATE COLLEGES AND UNIVERSITIES

_____          _____
Alice Pritchard                                      Date
Chief of Staff, Chief Operating Officer

On this the _____ day of June 2021 before me, the undersigned officer, personally

appeared ALICE PRITCHARD, known to me (or satisfactorily proven) to be the person

whose name is subscribed to the within instrument and acknowledged that she executed

the same as her free act and deed.

IN WITNESS WHEREOF, I have hereto set my hand and official seal.

_____
Notary Public/Commissioner of the Superior Court

Initialed    /

**EXHIBIT A**

**CSCU Mental Health Initiative**

**Project Director**

**Scope of Work**

The following scope of work has been developed to support new legislative and system office priorities related to supporting students' mental health, particularly post-pandemic.  The project director will be responsible for supporting the implementation of the requirements of three specific sections of HB 6402 as detailed below including the establishment of a mental health coalition at 16 CSCU campuses (Charter Oak not required).   The CSCU Mental Health Initiative Project Director reports to Lesley Mara, Director, CSCU Strategic Initiatives, Sponsored Research and Outreach.  This scope of work covers the period of July 1, 2021-June 30, 2022.

CAMPUS MENTAL HEALTH COALITIONS

Requires certain higher education institutions, by January 1, 2022, to establish a mental health coalition to assess the presence of mental health services and programs

**Membership**

The bill requires each higher education institution in Connecticut, excluding Charter Oak State College or online institutions, by January 1, 2022, to establish a mental health coalition to assess the presence of mental health services and programs offered by the institution. The assessment requirement does not apply to a school accredited by the International Accreditation of Counseling Services or another nationally or regionally recognized accrediting body for mental health services.

Under the bill, the president of each institution must appoint individuals to the coalition that reflect their institution's student body demographics, including, at least one member from their institution's (1) administration; (2) counseling services office, if any; (3) health services office, if any; (4) senior and mid-level staff; (5) student body; (6) residential life office, if any; (7) faculty; and (8) any other individuals the president designates, including a community provider of mental health services.

**Duties**

The bill requires each higher education institution to ensure that coalition members are educated on the (1) mental health services and programs offered at each institution's campus; (2) the coalition's role and function at the institution; and (3) protocols and techniques to respond to student mental illness that have been developed with consideration given to the students' race, cultural background, sexual orientation, gender identity, religion, socio-economic status, or status as a veteran or service member of the U.S. armed forces.

The bill requires each mental health coalition to do the following:

1. conduct an assessment of the presence of mental health services and programs offered by the institution of higher education (unless exempt from this requirement, see above);

Initialed    /

2. review the results and develop a plan to address weaknesses in the institution's services and programs (presumably this requirement does not apply to exempt institutions); and

3. review and recommend improvements to (a) the variety of mental health services available to the institution's students, including on-campus services, telehealth services, or a community-based provider arranged through an agreement; (b) the comprehensiveness of mental health services available to students, including recommendations for obtaining accreditation from a nationally or regionally recognized accrediting body for mental health services; and (c) the campus-wide policies and procedures adopted under this bill (see § 6).

The bill defines (1) mental health services as counseling, therapy, rehabilitation, crisis intervention, or emergency services for the screening, diagnosis, or treatment of mental illness and (2) mental health programs such as education, outreach, research or training initiatives aimed at students for the prevention of mental illness. Examples of programs include poster and flyer campaigns, electronic communications, films, guest speakers, conferences, or other campus events.

<u>EVALUATION OF THE EFFECTIVENESS OF HIGHER EDUCATION INSTITUTION MENTAL HEALTH SERVICES AND PROGRAMS</u>

Requires the OHE executive director and DMHAS commissioner, in consultation with an epidemiologist or other student mental health specialist, to jointly offer training workshops for assessment best practices in order for each higher education institution to evaluate the effectiveness of mental health services and programs offered at each of its campuses; requires certain institutions to maintain a memorandum of understanding with at least one community-based mental health care provider; requires each institution's governing board to adopt, and update as necessary, a student mental health policy by January 1, 2021

**Provider Partnerships**

The bill requires, by January 1, 2022, a higher education institution that lacks campus resources for providing mental health services to students to enter into and maintain a memorandum of understanding with at least one community-based mental health care provider or, in consultation with DMHAS, with an emergency mobile psychiatric service provider to (1) provide students access to mental health services on or off campus and (2) assist institutions in developing mental health programming. Institutional Student Mental Health Policy (§ 6) The bill requires each higher education institution's governing board to adopt, and update as necessary, a student mental health policy by January 1, 2021. The policy must include (1) the mental health services and programming provided to students each academic year, (2) the availability of, and eligibility requirements for, student mental health leave, and (3) the resources available for crisis response, imminent danger, and psychiatric hospitalization.

<u>GRANT WRITER FOR MENTAL HEALTH FUNDING</u>

Requires BOR to employ a grant writer to apply for grant funding to improve mental health services at community-technical colleges The bill also requires, by January 1, 2022, the Board of Regents for Higher Education to employ a grant writer to identify and apply for available grant funding to implement or improve mental health services and programs offered by the regional community-technical colleges to address student mental illness.

Initialed      /

**ESPOSITO - 11/10/21 RESPONSE - 000131**

# EXHIBIT 8

## Weaver, Ernestine Y

| | |
|---|---|
| **From:** | Pritchard, Alice M |
| **Sent:** | Tuesday, June 15, 2021 2:44 PM |
| **To:** | Kripp, Andrew; Weaver, Ernestine Y; Steinmetz III, Robert R |
| **Cc:** | Gates, Jane |
| **Subject:** | RE: stipulated agreement NE.docx |
| **Attachments:** | stipulated agreement NE.docx |

Few thoughts

Alice Pritchard, Ph.D.
Chief of Staff
CT State Colleges and Universities (CSCU)
61 Woodland Street
Hartford, CT 06105
(860) 723-0016
pritcharda@ct.edu
www.ct.edu



**From:** Kripp, Andrew <AKripp@commnet.edu>
**Sent:** Tuesday, June 15, 2021 2:37 PM
**To:** Weaver, Ernestine Y <EWeaver@commnet.edu>; Pritchard, Alice M <APritchard@commnet.edu>; Steinmetz III, Robert R <RSteinmetz@commnet.edu>
**Cc:** Gates, Jane <JGates@commnet.edu>
**Subject:** RE: stipulated agreement NE.docx

I have not changes but suggest re the JD something less specific and very simple and I think potentially actually valuable:

The assignment to support CSCU Mental Health Initiative will focused on assessing the mental health challenges faced by the Community College Students in the transition back to fulltime on ground classes. The objective will be to quickly assess potential student mental health issues arising out to the transition from virtual leaning to in person learning. Make near term and longer term recommendations to support student mental health issues during this transition period.

Prior to the 7th week of the first semester 2021 provide short term mental health support and mitigation strategies. Options should focus on low cost near term solutions that can be implemented and communicated prior to end of the fall semester 2021.

In addition develop longer term mental health support recommendations that can be implemented during the course of the second semester AY 21/22.

For each set of recommendations KPI's and efficacy measures should be identified and tools and process for assessing success of recommendations implemented.

1

**ESPOSITO - 11/10/21 RESPONSE - 000133**

**Stipulated Agreement Between**
**Dr. Nicole Esposito**
**And**
**Connecticut State Colleges and Universities on behalf of**
**Manchester Community College**

This Stipulated Agreement ("Agreement") is entered into by the Connecticut State Colleges and Universities ("CSCU") on behalf of its constituent unit Manchester Community College ("the College") and Dr. Nicole Esposito.

WHEREAS, Dr. Nicole Esposito, was appointed as Chief Executive Officer of Manchester Community College on June 5, 2020; and

WHEREAS, Dr. Nicole Esposito wishes to resign as CEO of the College, yet continue her employment with the CSCU; and

WHEREAS, the CSCU wishes to engage Dr. Esposito and use her expertise in the field of psychology to provide resources to support a CSCU Mental Health Initiative; and

WHEREAS, the College and Dr. Esposito seek a smooth transition to this new employment arrangement;

NOW, THEREFORE, the parties agree:

1. Dr. Esposito shall upon execution of this Agreement submit her letter of resignation as CEO of Manchester Community College effective June 30, 2021. All rights, privileges and notice requirements associated with such position will terminate upon resignation.

2. Dr. Esposito shall begin work on the CSCU Mental Health Initiative as its Project Director. Duties and responsibilities of this position are, attached and incorporated hereto as Exhibit A.

3. The assignment shall begin on July 1, 2021 and end on June 30, 2022. This assignment is not subject to notice requirements under the section 8.1 of the Management Confidential Personnel Manual. Dr. Esposito shall not be entitled to receive notice of non-continuation. CSCU shall not terminate its financial obligation to compensate Dr. Esposito prior to June 30, 2022.

4. Dr. Esposito's duties will be specifically limited to mutually agreed upon assignments she receives from the Director of Workforce Development, Strategic Partnerships and Sponsored Programs. Dr. Esposito will perform any such assignments from a remote duty station jointly selected. Dr. Esposito will report directly to the Director of Workforce Development, Strategic Partnerships and Sponsored Programs, in accordance with this paragraph.

5. Dr. Esposito's compensation shall continue with full benefits and at her current rate of pay, paid bi-weekly and will be governed by applicable HR Polices.

6. The Dr. Esposito and CSCU recognize the sensitive nature of this matter and agree to handle the aforementioned transition with the highest degree of professionalism and prudence. Nothing herein shall prohibit either the CSCU or Dr. Esposito from responding to inquiries or comments by third parties relevant to Dr. Esposito's past employment and/or the terms of this Stipulated Agreement. CSCU and Dr. Esposito agree to refrain from public or private disparaging remarks.

7. This Agreement shall not be construed as an admission of liability or wrongdoing on the part of Dr. Esposito, CSCU, the College or its agents.

8. Dr. Esposito is not, by signing this Stipulated Agreement, releasing or waiving any right, interest, or entitlement to payment from any benefits to which she is entitled or otherwise owed by virtue of her employment with the CSCU, including but not limited to employer contributions to her State of Connecticut pension plan, health benefits and the accrual of vacation leave.

9. In consideration of the terms and conditions described in this Agreement, Dr. Esposito for herself, her heirs, representatives, and assigns hereby irrevocably, voluntarily, and knowingly covenants not to sue, and releases and forever discharges the College/CSCU and its agents, and employees, any other former officers, servants, agents or employees of the State of Connecticut, both in their official and individual capacities, and the State of Connecticut itself, from any and all claims, grievances, demands, obligations, actions, causes of action, lawsuits, administrative proceedings, rights, damages, costs, loss of services, expenses and compensation of any nature whatsoever in any forum, whether based on tort, contract or other theory of recovery, for any matter from the beginning of time to the date of her signature on this Agreement, arising out of her employment with CSCU and/or the College, including without limitations, any and all damages to Dr. Esposito which have resulted or may

Case 3:21-cv-01149-SRU  Document 64-5  Filed 03/10/22  Page 137 of 177

Stipulated Agreement
Page **3** of **6**

result from any acts or omissions of the CSCU and/or the College.

10. CSCU and the College in consideration of the terms and conditions described in this Agreement, hereby irrevocably, voluntarily, and knowingly, covenants not to sue, and release and forever discharges Dr. Esposito and her agents and attorneys, from any and all claims, grievances, demands, obligations, actions, causes of action, lawsuits, administrative proceedings, rights, damages, costs, loss of services, expenses and compensation of any nature whatsoever in any forum, whether based on tort, contract or other theory of recovery, for any matter from the beginning of time to the date of her signature on this Agreement, arising out of Dr. Esposito 's acts or omissions within the scope of her employment as CEO of Manchester Community College not wanton, reckless or malicious.

11. The parties expressly acknowledge that this Agreement is intended to, and will, constitute full and final settlement of all claims and/or rights of action which Dr. Esposito has or may in the future have, arising out of any of the facts and circumstances which are the subject of or related to Dr. Esposito 's employment as CEO of Manchester Community College, including but not limited to, such claims as may be cognizable under Title VII, ADEA, federal law, the United States Constitution, the Connecticut Constitution, and state law and common law claims, including negligent and intentional infliction of emotional distress, as more fully reflected in the release of liability contained above.

12. Dr. Esposito acknowledges that she freely and voluntarily enters into this Agreement without duress, intimidation, undue influence, or any threatened loss of benefit. Dr. Esposito acknowledges the she has read the Agreement carefully and fully understands its content, meaning, intent, and implications.

13. This Stipulated Agreement constitutes the entire agreement of the parties. This Stipulated Agreement may be modified or amended only by a writing signed by Dr. Esposito and an authorized official of the CSCU. Dr. Esposito acknowledges that the CSCU has made no representation or promises to her other than those encompassed in this Stipulated Agreement.

14. The Stipulated Agreement may be executed in multiple counterparts, each of which will be regarded for all purposes as an original constitution one and the same instrument.

Stipulated Agreement
Page **4** of **6**

15. If a court of competent jurisdiction holds any provision of the Agreement unlawful, the remainder of the agreement shall continue in force.

16. The laws of the State of Connecticut will govern this Stipulated Agreement.

17. The parties acknowledge that his document is not exempt from disclosure under the Freedom of Information Act.

_____          _____
           Date                                    Date

Stipulated Agreement
Page 5 of 6

## EXHIBIT A

### CSCU Mental Health Initiative

### Project Director

### Scope of Work

The following scope of work has been developed to support new legislative and system office priorities related to supporting students' mental health, particularly post-pandemic. The project director will be responsible for supporting the implementation of the requirements of three specific sections of HB 6402 as detailed below including the establishment of a mental health coalition at 16 CSCU campuses (Charter Oak not required).   The CSCU Mental Health Initiative Project Director reports to Lesley Mara, Director, CSCU Strategic Initiatives, Sponsored Research and Outreach.  This scope of work covers the period of July 1, 2021-June 30, 2022.

### CAMPUS MENTAL HEALTH COALITIONS

Requires certain higher education institutions, by January 1, 2022, to establish a mental health coalition to assess the presence of mental health services and programs

#### Membership

The bill requires each higher education institution in Connecticut, excluding Charter Oak State College or online institutions, by January 1, 2022, to establish a mental health coalition to assess the presence of mental health services and programs offered by the institution. The assessment requirement does not apply to a school accredited by the International Accreditation of Counseling Services or another nationally or regionally recognized accrediting body for mental health services.

Under the bill, the president of each institution must appoint individuals to the coalition that reflect their institution's student body demographics, including, at least one member from their institution's (1) administration; (2) counseling services office, if any; (3) health services office, if any; (4) senior and mid-level staff; (5) student body; (6) residential life office, if any; (7) faculty; and (8) any other individuals the president designates, including a community provider of mental health services.

#### Duties

The bill requires each higher education institution to ensure that coalition members are educated on the (1) mental health services and programs offered at each institution's campus; (2) the coalition's role and function at the institution; and (3) protocols and techniques to respond to student mental illness that have been developed with consideration given to the students' race, cultural background, sexual orientation, gender identity, religion, socio-economic status, or status as a veteran or service member of the U.S. armed forces.

The bill requires each mental health coalition to do the following:

1. conduct an assessment of the presence of mental health services and programs offered by the institution of higher education (unless exempt from this requirement, see above);

ESPOSITO - 11/10/21 RESPONSE - 000138

Stipulated Agreement
Page **6** of **6**

2. review the results and develop a plan to address weaknesses in the institution's services and programs (presumably this requirement does not apply to exempt institutions); and

3. review and recommend improvements to (a) the variety of mental health services available to the institution's students, including on-campus services, telehealth services, or a community-based provider arranged through an agreement; (b) the comprehensiveness of mental health services available to students, including recommendations for obtaining accreditation from a nationally or regionally recognized accrediting body for mental health services; and (c) the campus-wide policies and procedures adopted under this bill (see § 6).

The bill defines (1) mental health services as counseling, therapy, rehabilitation, crisis intervention, or emergency services for the screening, diagnosis, or treatment of mental illness and (2) mental health programs such as education, outreach, research or training initiatives aimed at students for the prevention of mental illness. Examples of programs include poster and flyer campaigns, electronic communications, films, guest speakers, conferences, or other campus events.

## EVALUATION OF THE EFFECTIVENESS OF HIGHER EDUCATION INSTITUTION MENTAL HEALTH SERVICES AND PROGRAMS

Requires the OHE executive director and DMHAS commissioner, in consultation with an epidemiologist or other student mental health specialist, to jointly offer training workshops for assessment best practices in order for each higher education institution to evaluate the effectiveness of mental health services and programs offered at each of its campuses; requires certain institutions to maintain a memorandum of understanding with at least one community-based mental health care provider; requires each institution's governing board to adopt, and update as necessary, a student mental health policy by January 1, 2021

### Provider Partnerships

The bill requires, by January 1, 2022, a higher education institution that lacks campus resources for providing mental health services to students to enter into and maintain a memorandum of understanding with at least one community-based mental health care provider or, in consultation with DMHAS, with an emergency mobile psychiatric service provider to (1) provide students access to mental health services on or off campus and (2) assist institutions in developing mental health programming. Institutional Student Mental Health Policy (§ 6) The bill requires each higher education institution's governing board to adopt, and update as necessary, a student mental health policy by January 1, 2021. The policy must include (1) the mental health services and programming provided to students each academic year, (2) the availability of, and eligibility requirements for, student mental health leave, and (3) the resources available for crisis response, imminent danger, and psychiatric hospitalization.

### GRANT WRITER FOR MENTAL HEALTH FUNDING

Requires BOR to employ a grant writer to apply for grant funding to improve mental health services at community-technical colleges The bill also requires, by January 1, 2022, the Board of Regents for Higher Education to employ a grant writer to identify and apply for available grant funding to implement or improve mental health services and programs offered by the regional community-technical colleges to address student mental illness.

# EXHIBIT 9

**Weaver, Ernestine Y**

| | |
|---|---|
| **From:** | Steinmetz III, Robert R |
| **Sent:** | Monday, June 21, 2021 2:22 PM |
| **To:** | Czarnota, Kathleen |
| **Subject:** | Confidential MCC Communications Plan |
| **Attachments:** | Manchester Communications and Follow.docx |

Hi Kathy,

Attached you will find he document I want to walk through. I'll call you in the next 10-15 minutes.

Thanks,

Rob


Rob Steinmetz, Ed.D.
Pronouns: he, him, his
*Regional President*
*Capital-East Region*
*Connecticut Community Colleges*
Phone: 860-723-0624
Email: steinmetzr@ct.edu





1

## Manchester CEO Communications and Follow-Up Plan

*If the agreement is signed*

Friday, June 25, 2021

11:00am – Meeting with Foundation Outgoing and Incoming Presidents (Rosemarie Papa – rnpapa@hotmail.com and Peter Grose – pgrose53@gmail.com)

11:15am – Meeting with Regional Leadership Team

11:30am – Meeting with MCC Cabinet (Patricia Lindo, Fatma Salman, Angelo Simoni, Thomas Reynolds, Jim McDowell, Karyn Case) NOTE: When the timing is correct, check with Karyn to determine if anyone else should be added to this list

11:45am – Email sent to campus community

*Messaging for meetings and email communication*

Greetings, MCC Community.

Effective July 2, 2021, Dr. Nicole Esposito will no longer serve as the Manchester Community College CEO. At that time, we are excited that she will transition to a role leading a system-wide mental health initiative to enhance mental health support for students throughout CSCU. We want to thank Dr. Esposito for her service to MCC and wish her well on this exciting initiative.

In the short-term, I will provide direct leadership to the campus. I will update you with a more long-term interim plan in the coming weeks.

Thank you,

*If the agreement is not signed*

Thursday, June 24, 2021

By 12:00pm – Vote occurs

12:15pm – Meeting with Foundation Outgoing and Incoming Presidents (Rosemarie Papa – rnpapa@hotmail.com and Peter Grose – pgrose53@gmail.com)

12:30am – Meeting with Regional Leadership Team?

12:45am – Meeting with MCC Cabinet (Patricia Lindo, Fatma Salman, Angelo Simoni, Thomas Reynolds, Jim McDowell, Karyn Case) NOTE: When the timing is correct, check with Karyn to determine if anyone else should be added to this list

*Messaging for meetings and email communication*

Greetings, MCC Community.

Effective July 2, 2021, Dr. Nicole Esposito will no longer serve as the Manchester Community College CEO. (NOTE: may still add language about ongoing position at system office). In the short-term, I will provide direct leadership to the campus. I will update you with a more long-term interim plan in the coming weeks.

Thank you,


Updated email language

Call Jason or others legislators?


*Items for future follow-up (do not necessarily need to discuss now)*

- Are there any steps necessary for me to have signatory authority as the MCC leader?
- Request information from the Registry on options for an interim leader. Begin in August with a two-year interim plan.
- Work with executive assistants to add meetings to calendar. Arrange meetings with cabinet, accreditation leaders, and other pertinent individuals/groups.
- Seek immediate updates on: reopening plans, enrollment and course schedule, accreditation, budget, open positions and RTFs, etc.

# EXHIBIT 10

**Pritchard, Alice M**

| | |
|---|---|
| **From:** | Kripp, Andrew |
| **Sent:** | Wednesday, August 18, 2021 3:58 PM |
| **To:** | Pritchard, Alice M; Weaver, Ernestine Y |
| **Subject:** | RE: Investigation outcomes |

I did reach out to her on her cell. I told her I wanted to be sure she got the email I had sent at around 1:00pm today.

She did confirm getting the email and said she was referring it to her attorneys and needed to read it herself.

I believe what she did was click the button that eliminates the read notice back to sender.

**From:** Kripp, Andrew
**Sent:** Wednesday, August 18, 2021 2:16 PM
**To:** Pritchard, Alice M <APritchard@commnet.edu>; Weaver, Ernestine Y <EWeaver@commnet.edu>
**Subject:** RE: Investigation outcomes

I did not get any OOO message either.

I would suggest if I don't see she has opened it I call her to draw her attention to the important email.

What do you think?

**From:** Kripp, Andrew
**Sent:** Wednesday, August 18, 2021 2:14 PM
**To:** Pritchard, Alice M <APritchard@commnet.edu>; Weaver, Ernestine Y <EWeaver@commnet.edu>
**Subject:** RE: Investigation outcomes

Just an update no answer yet

**From:** Kripp, Andrew
**Sent:** Wednesday, August 18, 2021 1:09 PM
**To:** Pritchard, Alice M <APritchard@commnet.edu>; Weaver, Ernestine Y <EWeaver@commnet.edu>
**Subject:** FW: Investigation outcomes
**Importance:** High

Sent with delivery confirmation and read confirmation,

Email to Rob next within 5 min will copy you Alice.

**From:** Kripp, Andrew
**Sent:** Wednesday, August 18, 2021 1:07 PM
**To:** Esposito, Nicole C <NEsposito@mcc.commnet.edu>
**Subject:** Investigation outcomes
**Importance:** High

Dr. Esposito;

1

Attached please find the results of the investigation completed by Peter Murphy of Shipman and Goodwin.

You will note that none of the allegations were substantiated.

In addition to the investigation report I have also included a final offer to assist in your transition from CSCU.

You have until 12:00pm Tuesday August 24, 2021, to accept and sign the attached agreement.

If you elect not to sign the agreement by the above date and time the CSCU BOR will be convened to consider your non-renewal as previously communicated.

If you have any questions you may contact me using the information below.

Andrew J. Kripp
Vice President Human Resources, CSCU

Email: AKripp@commnet.edu
Office: (860) 723 0604
Cell: (860) 372 6054

2

# EXHIBIT 11

ESPOSITO - 11/10/21 RESPONSE - 000147

# MADSEN, PRESTLEY & PARENTEAU, LLC
*Representing Individuals in Employment Law and Related Litigation*

Attorneys At Law
Hartford ● New London

**October 28, 2021**

402 Asylum Street
Hartford, Connecticut  06103
Telephone: (860) 246-2466
Facsimile: (860) 246-1794

**Via E-mail:**
**Inez.Diaz-Galloza@ct.gov**
**Sarah.Bold@ct.gov**

Inez Diaz-Galloza
Sarah Bold
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106

<b>Re:  Dr. Nicole Esposito/CSCU & Board of Regents</b>

Dear Inez and Sarah,

We are writing to demand that CSCU and the Board of Regents immediately reinstate Dr. Esposito to full active status as Campus CEO of Manchester Community College.  Since a three person committee appointed by the Chair of the Board of Regents has not held a hearing on Dr. Esposito's appeal and affirmed the decision to suspend Dr. Esposito within the deadlines established by Article 8.5 of CSCU's HR Manual, CSCU and the Board of Regents must immediately reinstate Dr. Esposito.

As part of the "position statement" provided by CSCU on October 26, 2021 detailing "Employer's Reasons for Terminating Dr. Esposito's employment," CSCU stated that "On August 24, 2021 she [Dr. Esposito] was placed on administrative leave with pay effective August 24, 2021.  **Exhibit C.**  Administrative leave is allowable under Article 8.4 of the Connecticut State Colleges and Universities Human Resources Policies for Management & Confidential Professional Personnel ("HR Manual") attached hereto as **Exhibit D**."

Article 8.4 of the HR Manual, which CSCU invoked as the authority for its action against Dr. Esposito on August 24, 2021, refers to "Suspension," and Article 8.2 of the HR Manual makes clear that a suspension under Article 8.4 is an example of discipline for which cause is required.  "No employee shall be disciplined except for cause.  Discipline is defined as reprimand, **suspension**, or termination."  (HR Manual, Article 8.2)(emphasis added).

Since CSCU has now confirmed that it invoked its authority under Article 8.4 of the HR Manual when it suspended Dr. Esposito on August 24, 2021, it must adhere to the limits on that authority established by Article 8.5 of the HR Manual.  Article 8.5 of the HR Manual requires, in

mandatory language, that "[t]o discipline an employee (per 8.2) the following steps **shall** be followed:

    A.    Before any disciplinary action is taken a meeting **shall** be arranged with the employee and the designee of the employer to discuss the situation.  The employee **shall** have the opportunity to present relevant information.  Upon the agreement of both parties discussion may be continued to a mutually agreed time.

    B.    After the employer has issued discipline the employee may request a formal hearing by presenting said request not later than five (5) days after the receipt of the disciplinary notice.  Said hearing **shall** be scheduled within thirty (30) days following a timely request by the employee.

        . . . .

    D.    Hearings for Presidential/Campus CEO Staff **shall** be held by a committee of three appointed by the Chairman of the Board of Regents or his/her designee. Such hearings shall not be governed by formal rules or procedures.  The committee appointed by the Chairman of the Board or his/her designee shall make a good faith effort to be fair and impartial while eliciting relevant information on the matter in question.

    E.    In either a Presidential/Campus CEO or non-Presidential/non-Campus CEO hearing the hearings officers have ten (10) days from the conclusion of the hearing to notify the employee of his/her final and binding decision.  Said decision(s) shall be without appeal.

(HR Manual, Article 8.5)(emphasis added).

CSCU suspended Dr. Esposito on August 24, 2021 even though it never provided her with any of the pre-disciplinary process required by Article 8.5(A) before taking that disciplinary action against her.

On August 27, 2021, Dr. Esposito submitted a timely request for a formal hearing relating to her suspension in accordance with Article 8.5(B).  Consequently, Article 8.5(B) and Article 8.5(D) required that the Chairman of the Board of Regents appoint a committee of three to preside over a formal hearing for Dr. Esposito's appeal of her suspension within thirty (30) days of August 27, 2021.  Under Article 8.5(E) of the HR Manual, the three hearing officers appointed by the Chairman of the Board of Regents were required to issue a final and binding decision within ten days of the hearing.

Since CSCU and the Board of Regents never scheduled a hearing on Dr. Esposito's appeal relating to her suspension, and the Chairman of the Board of Regents never appointed three hearing officers to decide Dr. Esposito's appeal from her suspension, and since no hearing officers appointed by the Chairman of the Board of Regents issued a final decision upholding the decision to suspend Dr. Esposito for cause within the deadlines established by Article 8.5, CSCU and the Board of Regents are required to immediately reinstate Dr. Esposito to full and active status as Campus CEO of Manchester Community College.

CSCU and the Board of Regents lack the authority to indefinitely suspend an employee without due process.  When CSCU suspends an employee under Article 8.4 and the employee appeals that discipline under Article 8.5, CSCU cannot simultaneously maintain an employee on an indefinite suspension and fail to provide the employee with an appeal within the deadlines established by Article 8.5.  In addition, when a Campus CEO submits a timely appeal from a suspension under the HR Manual, CSCU and the Board of Regents must reinstate her unless a committee of three appointed by the Chairman of the Board of Regents holds a hearing and issues a decision denying the appeal and upholding the suspension within the deadlines mandated by Article 8.5 of the HR Manual.

Since CSCU's suspension of Dr. Esposito was not upheld by a committee of three appointed by the Chairman of the Board of Regents within the deadlines established by Article 8.5 of the HR Manual, CSCU and the Board of Regents must immediately end Dr. Esposito's suspension and reinstate her to full and active status as Campus CEO of Manchester Community College.  *Potkay v. Ament*, 34 F. Supp. 3d 937 (E.D. Wis. 2014)(granting temporary restraining order and preliminary injunction in favor of employee where employer acted in bad faith and mischaracterized a termination as a reduction in force in order to deprive plaintiff of her due process rights).

Very truly yours,

*/s/Todd Steigman*

# EXHIBIT 12



ESPOSITO - 11/10/21 RESPONSE - 000152

ESPOSITO - 11/10/21 RESPONSE - 000153



**From:** "Levinson, David" <DLevinson@commnet.edu>
**Date:** October 7, 2020 at 12:52:41 PM EDT
**To:** "Esposito, Nicole C" <NEsposito@mcc.commnet.edu>
**Subject: RE: Students First Plan**

Great!

---

**From:** Esposito, Nicole C <NEsposito@mcc.commnet.edu>
**Sent:** Wednesday, October 7, 2020 12:22 PM
**To:** Levinson, David <DLevinson@commnet.edu>
**Subject:** Re: Students First Plan

Will do! Let me reach out to some of the CEO's and see if we can find a good day and time.

Thank you again for the opportunity.

Kindly,
Nicole

Nicole Esposito, Ed.D

Chief Executive Officer
Manchester Community College
SSC L201

ESPOSITO - 11/10/21 RESPONSE - 000154

Great Path, MS #01
PO Box 1046
Manchester, CT 06045-1046
P: 860-512-3103 I F: 860-512-3101

Get Outlook for iOS

**From:** Levinson, David <DLevinson@commnet.edu>
**Sent:** Wednesday, October 7, 2020 12:18:18 PM
**To:** Esposito, Nicole C <NEsposito@mcc.commnet.edu>
**Subject:** RE: Students First Plan

Thanks, Nicole. That would be fine. Would you want to set it up? Please let me know some dates/times that would be convenient for all.

Best,
David

**From:** Esposito, Nicole C <NEsposito@mcc.commnet.edu>
**Sent:** Wednesday, October 7, 2020 12:17 PM
**To:** Levinson, David <DLevinson@commnet.edu>
**Subject:** Re: Students First Plan

Dear David,

I would appreciate your time. I think it would be helpful to have a preliminary meeting with a few of the CEO's in our region.

Kindly,
Nicole

Nicole Esposito, Ed.D

Chief Executive Officer
Manchester Community College
SSC L201
Great Path, MS #01

ESPOSITO - 11/10/21 RESPONSE - 000155

PO Box 1046
Manchester, CT 06045-1046
P: 860-512-3103 | F: 860-512-3101

Get Outlook for iOS

---

**From:** Levinson, David <DLevinson@commnet.edu>
**Sent:** Wednesday, October 7, 2020 12:12:55 PM
**To:** Esposito, Nicole C <NEsposito@mcc.commnet.edu>; Pritchard, Alice M <APritchard@commnet.edu>; Ojakian, Mark <MOjakian@commnet.edu>
**Cc:** Ellis, Rose R <REllis@qvcc.commnet.edu>
**Subject:** RE: Students First Plan

Thanks, Nicole. I would welcome such an opportunity. I will be at your monthly meeting on Monday, providing an update of a new matters concerning Connecticut State Community College. Perhaps we can have a preliminary discussion at that time? However, I want to be respectful of the agenda.
Thus, I am copying Rose for her thoughts.

Best,
David

David L. Levinson, Ph.D.
Interim President
Connecticut State Community College
levinsond@ct.edu



---

**From:** Esposito, Nicole C <NEsposito@mcc.commnet.edu>
**Sent:** Wednesday, October 7, 2020 12:08 PM
**To:** Pritchard, Alice M <APritchard@commnet.edu>; Levinson, David <DLevinson@commnet.edu>; Ojakian, Mark

4

ESPOSITO - 11/10/21 RESPONSE - 000156

<MOjakian@commnet.edu>
**Subject:** Students First Plan

Good Afternoon,

I am reaching out to respectfully request an opportunity for the CEO's to be more routinely involved in the Students First planning. Personally, I am eager to be more directly involved and believe the CEO's can offer valuable input to keep us moving forward. As you know, the campus CEO's bring unique perspectives and valuable vantage points. I think several of us would like to be active participants and serve as change agents during this time. We can offer input regarding what is working well, where we can reduce cost, and what we are finding to be challenges. We can also offer solutions to ensure the Students First plan is as successful as possible.

Our current financial position has created a unique opportunity for the CEO's to weigh in and be more helpful.

Perhaps we can create a small CEO sub-group dedicated to Students First planning? This group can meet with you periodically, and directly, to provide our input and assistance.

Thank you for your consideration. I do hope we can be more helpful.

Kindly,
Nicole

Nicole Esposito, Ed.D

Chief Executive Officer
Manchester Community College
SSC L201
Great Path, MS #01
PO Box 1046
Manchester, CT 06045-1046
P: 860-512-3103 | F: 860-512-3101

6

Get Outlook for iOS

ESPOSITO - 11/10/21 RESPONSE - 000157

ESPOSITO - 11/10/21 RESPONSE - 000158

# EXHIBIT 13

ESPOSITO - 11/10/21 RESPONSE - 000159



ESPOSITO - 11/10/21 RESPONSE - 000160

ESPOSITO - 11/10/21 RESPONSE - 000161



**From:** Dresdner, Lisa <LDresdner@nvcc.commnet.edu>
**Sent:** Thursday, April 8, 2021 8:53 PM
**To:** Pritchard, Alice M <APritchard@commnet.edu>
**Cc:** Lombella, James P <JLombella@commnet.edu>; Buckley, Alison <ABuckley@commnet.edu>
**Subject:** Re: Authority/Responsibility with Financial Aid

Good evening, all --

To be clear, I am quite capable of thinking on my own. I have the education, experience, and training to know how to ask critical questions. To imply otherwise, to suggest that I am "being fed" information that I would simply parrot, is highly insulting and, in fact, misogynistic.

Am I genuinely concerned? Yes, and for the reasons I state in my e-mail.

I look forward to finding a solution that protects the colleges as well as all the CEOs.

2

ESPOSITO - 11/10/21 RESPONSE - 000162

Lisa

**From:** Pritchard, Alice M <APritchard@commnet.edu>
**Sent:** Thursday, April 8, 2021 6:38 PM
**To:** Lombella, James P <JLombella@commnet.edu>; Buckley, Alison <ABuckley@commnet.edu>; Dresdner, Lisa <LDresdner@nvcc.commnet.edu>
**Subject:** RE: Authority/Responsibility with Financial Aid

Looping in Rob too since he is dealing with this as well.

Alice Pritchard, Ph.D.
CT State Colleges and Universities (CSCU)
Chief of Staff/COO
61 Woodland Street
Hartford, CT 06105
860-723-0016
pritcharda@ct.edu
www.ct.edu

**From:** Lombella, James P <JLombella@commnet.edu>
**Sent:** Thursday, April 8, 2021 5:21 PM
**To:** Pritchard, Alice M <APritchard@commnet.edu>; Buckley, Alison <ABuckley@commnet.edu>
**Subject:** FW: Authority/Responsibility with Finanial Aid

Ok, I need your input and thoughts on this? See below...
(also just to clarify both Gennaro and I agreed that much of what NECHE is requiring us to do seems like the cart before the horse. Just wanted you to have the context around that statement below). I definitely know she is being fed this from somewhere. When we talked yesterday she seemed genuinely concerned as if someone just put a big scare in her. Just my observations. Is a letter even possible?

James Lombella, Ed.D.
*Regional President*
North-West Region; Connecticut Community Colleges
Connecticut State Colleges and Universities
Phone: 860.723.0625
lombellaj@ct.edu

ESPOSITO - 11/10/21 RESPONSE - 000163



This email and any attached documents may contain confidential information. Such information is intended solely for the use of the individual(s) to whom this email was intended to be sent. Any printing, disclosure, reproduction, distribution of the information herein by other than the intended recipient(s) is strictly prohibited.   Do not distribute this email without careful consideration.  If you believe that you have received this email in error, please notify the sender by telephone at the number listed above. Any material that is not confidential may constitute a public record under the laws of the State of Connecticut.

---

**From:** Dresdner, Lisa <LDresdner@nvcc.commnet.edu>
**Sent:** Thursday, April 8, 2021 4:15 PM
**To:** Lombella, James P <JLombella@commnet.edu>
**Subject:** Authority/Responsibility with Finanial Aid

Dear Jim,

Thank you for your time yesterday in talking through my concerns about signing the E-App update form that deals with Title IV Federal Funding. I also appreciate you getting Gennaro on the call to give me his perspective.

I still have grave concerns about signing this document because it puts me in a highly vulnerable position. Signing it requires me to take full responsibility for all information in the document at the risk of a "fine of not more than $58,328 or imprisonment of not more than five years, or both, for misinformation that is material to receipt and stewardship of federal student financial aid funds." However, the new reporting structure removes my authority over NVCC's Financial Aid Services and places that authority with the Associate Vice President for Financial Aid Services and Title IV Compliance, Steve McDowell.

I very much appreciate your belief in my authority with a dotted line and your genuine support of me. But dotted line management has been explained in our organization as primarily task-based or project management. The absolute authority goes hand-in-hand with the solid line. I think that this structure has been put into place without fully comprehending the consequences of the implementation, as even Gennaro agreed that it was a bit of the cart before the horse. Leaders of the individual colleges, in spite of our current independent accreditation, do not have the authority in this structure to execute--in this instance--their legally mandated responsibilities for the federal government.

Additionally, I understand that we are to look at the Shared Services model as a third-party vendor that, with thirty days' notice, we could effectively "fire." Yet that is simply not feasible: unlike with an actual third-party vendor, we have no possibility of an alternative supplier or some method to directly take corrective action. If a shared service fails or disappoints, the only option we appear to have is to nag them. That doesn't seem like a good strategy given, in this case, the severity of the potential penalties.

ESPOSITO - 11/10/21 RESPONSE - 000164

Transitions certainly add difficulty, and that makes them a time for extra attention; yet we put ourselves in a critical time bind right at the start. The document was sent to me for signature *on the day it was due, April 6*, but Steve McDowelll requested on February 8 that the Directors of Financial Aid make the required changes. With inadequate follow-up, the result was an extremely tight deadline for a signature, which does not indicate effective stewardship over the process nor give me, the apparent but not legitimate responsible party, reasonable time to approve it.

I recognize the additional challenges faced in moving toward one college, one accreditation, and one OPEID number to ensure students in the Connecticut State Community College are eligible for Title IV funding. I trust that you know that I am completely dedicated to shepherding NVCC's movement in that direction. Insofar as my responsibilities, I am glad to project-manage this work, and to do the tracking, cajoling, and, if necessary, the nagging. But I don't feel safe signing a document without the commensurate authority. I would feel much safer if there were concrete evidence that the organization was committed to effective execution. One solution could be a letter from Steve McDowell, who has solid line authority, stating that he takes ultimate responsibility for ensuring proper compliance with what I will need to be signing now and until we are one college. In short, I want to be indemnified for signing the Title IV documents when I do not have solid line authority.

Thank you for your understanding. I am hopeful that we can work out a reasonable solution.

All the best,

*Lisa*

---

Lisa Dresdner, Ph.D.
CEO, Naugatuck Valley Community College
750 Chase Parkway
Waterbury, CT 06708
203-575-8004
Ldresdner@nv.edu



# EXHIBIT 14

ESPOSITO - 11/10/21 RESPONSE - 000165



ESPOSITO - 11/10/21 RESPONSE - 000167



**From:** Esposito, Nicole C <NEsposito@mcc.commnet.edu>
**Sent:** Tuesday, April 6, 2021 4:48:59 PM
**To:** Weaver, Ernestine Y <EWeaver@commnet.edu>
**Subject:** Fwd: Financial Aid Documents

Ernestine,

ESPOSITO - 11/10/21 RESPONSE - 000168

I want to notify our legal team about the concern I express below. The federal documents I am asked to sign indicate a very specific (and, frankly, concerning and scary) fine for any mismanagement of these federal dollars that are no longer (really) under my authority. It states that I would pay more than a 58k fine and spend up to 5 years in prison. However, all reporting lines in financial aid departments have moved and are now under direct authority of system office/one college staff. I am asking if legal has vetted this already(?), and if not, I hope the CEO's can be provided some reasonable legal protections (or explanation of risk) should anything present itself as problematic down the road.

Thank you in advance for your assistance and clarification.

Kindly,
Nicole

Nicole Esposito, Ed.D

Chief Executive Officer
Manchester Community College
SSC L201
Great Path, MS #01
PO Box 1046
Manchester, CT 06045-1046
P: 860-512-3103 I F: 860-512-3101

Get Outlook for iOS

---

**From:** Esposito, Nicole C <NEsposito@mcc.commnet.edu>
**Sent:** Tuesday, April 6, 2021 4:38 PM
**To:** Steinmetz III, Robert R; Gray, Jennifer L
**Subject:** Re: Financial Aid Documents

Hi Rob,
Thanks for the response. I am familiar with other financial aid models that allow for an external "vendor" (for a lack of better words) to serve the campus. However, what we have here in CT seems a bit different. For example, if I find that something is not managed correctly etc... would I have the authority to dissolve the contract with the vendor (currently our system office and one college staff)?My understanding is that in other outsourced models, the independently accredited college would have the ability to do so. However, in our structure, this would not be allowed. This seems to be a different model than what you are familiar with.

3

ESPOSITO - 11/10/21 RESPONSE - 000169

With that being said, I completely understand all of the benefits of having this managed centrally, and I know that colleges have had hiccups with financial aid (MCC included), but I am asking a broader legal question here. Specifically, if I am expected to still be signing these federal documents, but ultimately the reporting lines of all my financial aid staff report to those "above" me in the newly created leadership structure, then will I be held accountable/responsible for anything that could happen at that higher level? Are we able to confirm that Steve McDowell (VP of Financial Aid) would assume responsibility for his financial aid staff housed on my campus? Including any possibility of mismanagement or mistakes etc...I know this is unlikely as he is helping to clean up the process, but I want to cover my bases here as this has some serious legal implications per the federal financial aid document language.

If I am understanding you correctly, it sounds like the CEO's are still accountable for all federal financial aid money, functions, etc... but will have no direct reports from financial aid departments? I know we have created "dotted communication lines" to the CEO's but, as you point out, this last correction for the PPA was never brought to my attention until just the other day. This is potentially a staff issue in financial aid and I was unaware that a correction needed to be made. I worry that if this was to occur again, but with the additional challenge of these individuals not reporting to me, it puts the CEO in a vulnerable position.

As my direct supervisor, I ask that you provide me a written directive to sign these documents now that the department reporting lines have officially moved to the one college structure.

To add, I think it would be very helpful to have a broad conversation with all CEO's in our region (or perhaps statewide) rather than just with me. Others have very clearly expressed similar concerns/questions but we haven't received clarification yet. Perhaps I am just the first one to run into this since the reporting lines changed? Not sure...

Again, thanks for getting back to me and helping all of the CEO's navigate this sensitive, but important, issue.

Best,
Nicole

Nicole Esposito, Ed.D

Chief Executive Officer
Manchester Community College
SSC L201
Great Path, MS #01
PO Box 1046
Manchester, CT 06045-1046
P: 860-512-3103 I F: 860-512-3101

Get Outlook for iOS

ESPOSITO - 11/10/21 RESPONSE - 000170

**From:** Steinmetz III, Robert R <RSteinmetz@commnet.edu>
**Sent:** Tuesday, April 6, 2021 3:36 PM
**To:** Esposito, Nicole C; Gray, Jennifer L
**Subject:** RE: Financial Aid Documents

Hi Nicole,

Below are a few of my thoughts:

While independently accredited, the CEO does remain ultimately responsible for Title IV at the college.

As has been discussed, we should think of the CT State financial aid office as a third party providing the financial aid service to the campus.

There are many examples of this type of relationship occurring, including similar relationships in large college systems and third party companies providing the service. My most recent example is QVCC using Financial Aid Services (FAS) to act as the college's financial aid director. We are relying on FAS to appropriately manage all aspects of financial aid, and the campus CEO still has ultimate responsibility and signs off on required documents.

If you have concerns about the integrity, accuracy or compliance of CT State financial aid, I think we should call a meeting with appropriate parties to discuss these specific concerns.

I have continued to receive examples where, in fact, campus-based financial aid offices have continued to have compliance issues and moving to a statewide approach would actually improve compliance with Title IV requirements.

The specific request that spurred your email is a great example. The update to the PPA should have been completed by the end of February, before the reporting lines transitioned. I'm not sure why it did not happen, but we are now working on signing the PPA past the required timeframe.

Ultimately, failure to sign the documents will result in MCC losing eligibility to provide federal financial aid to students.

If your concerns continue, I would suggest the next step is to have a meeting with Steve, Alison, David and Alice to discuss the matter and determine how to move forward.

Please let me know if you'd like me to coordinate a conversation.

Best,

Rob


Rob Steinmetz, Ed.D.
Pronouns: he, him, his
*Regional President*
*Capital-East Region*
*Connecticut Community Colleges*

5

ESPOSITO - 11/10/21 RESPONSE - 000171

Phone: 860-723-0624
Email: steinmetzr@ct.edu





---

**From:** Esposito, Nicole C <NEsposito@mcc.commnet.edu>
**Sent:** Thursday, April 1, 2021 11:10 AM
**To:** Steinmetz III, Robert R <RSteinmetz@commnet.edu>; Gray, Jennifer L <JGray@commnet.edu>
**Subject:** Financial Aid Documents

Rob and Jenn,

Now that Financial Aid has moved into the one-college structure with only a communication line to MCC, I am growing more concerned about signing the federal financial aid documents that state "I can personally be fined up to $58,000 and sent to prison for up to 5 years" if this is mismanaged (intentionally or unintentionally) in some way. This is a difficult situation to be put in as the CEO of MCC, but I no longer have the control/authority over financial aid staff or department as this is reported and essentially now managed by that centralized team. Please understand that I am not attempting to be difficult here, but I really hope to avoid any possibility of being personally fined or spending time in prison. I have spent a lot of time conducting research in prison setting during my years of clinical work....and I can assure you, it's not a pleasant place to spend your time....lol

Please provide me direction on this.

-Nicole

Nicole Esposito, Ed.D
Chief Executive Officer
*She, her, hers*

*Manchester Community College*
*SSC L201*
*Great Path, MS #01*
*PO Box 1064*
*Manchester, CT 06045-1046*
*P: 860-512-3103 / F: 860-512-3101*

# EXHIBIT 15

**Vig, Umesh Kunwar**

| | |
|---|---|
| **From:** | Reyes-Dawes, Wanda I |
| **Sent:** | Friday, August 6, 2021 9:37 AM |
| **To:** | Vig, Umesh Kunwar; Pence, Michael P; Kleis, Kathryn M; Stafford, Carl; Dupille Jr., Leonard; Ariel, Tracy |
| **Subject:** | Re: Strengths & Weaknesses |



Thank you, Umesh.

**From:** Vig, Umesh Kunwar <UVig@mcc.commnet.edu>
**Sent:** Thursday, August 5, 2021 4:16 PM
**To:** Reyes-Dawes, Wanda I <WReyes-Dawes@mcc.commnet.edu>; Pence, Michael P <MPence@mcc.commnet.edu>; Kleis, Kathryn M <KKleis@mcc.commnet.edu>; Stafford, Carl <CStafford@mcc.commnet.edu>; Dupille Jr., Leonard <LDupille@mcc.commnet.edu>; Ariel, Tracy <TAriel@mcc.commnet.edu>
**Subject:** Strengths & Weaknesses

Dear Mike and Everyone,

Please see below some of my feedback regarding today's Interview with ▮▮▮▮▮▮▮

- ▮▮▮▮▮▮▮described the community college as a learning-centered community committed to access, excellence and relevance. She emphasized that the mission of the community college is to provide affordable access to each individual desirous of advancing their academic and professional growth along with maintaining academic rigor. She referred to the fact that Manchester Community College community has spent a lot of time on revising the institution's mission. ▮▮▮▮talked about her egalitarian philosophy while working with a diverse student body, which clearly resonates with the mission of Manchester Community College.
- ▮▮▮▮has a very calm demeanor, and she delivered a very engaging presentation with excellent presentation skills.
- ▮▮▮▮has a very clear and comprehensive understanding of the role of a Program Coordinator in a diverse setting and believes that diversity is one of the biggest assets at Manchester Community College and that she herself represents diversity. She has an excellent understanding of the concept of diversity and inclusion in reference to the Americans with Disabilities Act (ADA) while working with the student population with physical and learning disabilities.
- She handled some of the situational questions with great finesse and exhibited great courage, patience, comprehensive understanding of various rules, regulations and protocols as are appropriate in dealing with situations of conflict between faculty and students on a College Campus. ▮▮▮▮answered all the questions very appropriately and exhibited a unique balance of extensive details and being succinct when needed.
- ▮▮▮▮exhibited that she is very current on the National Trends in regards to the pedagogy of the DARC Program and Counseling.
- She talked extensively about the need for having strong Transfer Articulations with other institutions which will benefit our students.

In summary, ██████████ interviewed extremely well and was very articulate and able to respond very effectively to follow-up or clarifying questions and addressed crucial issues relating to the DARC Program and Counseling with great finesse. She was very relaxed, used humor appropriately, and demonstrated her ability to think on her feet and handled herself with great aplomb. She seems to have exceptional leadership skills, a great personality, a very calm demeanor and very effective communication and presentation skills and would be an excellent role model for our students as well as the faculty she would supervise as the Program Coordinator. ██████ has a very clear understanding of the collegial culture which exists at Manchester Community College and will serve to diversify the Faculty at MCC.

I hope this helps or do you want me to add more 😊.

Have a wonderful evening.

Umesh

*K. Umesh Vig*
*Director of Student Affairs Operations*
*Principal Designated School Official (PDSO)*
*Manchester Community College*
*Mail Station #9, Great Path (Room SSC L 287)*
*Manchester, CT 06045-1046*
*Tel: 860-512-3204 & Fax: 860-512-3201*
*Email: UVig@manchestercc.edu*
*"I Think Therefore I Am"     Rene Descartes*

**From:** Reyes-Dawes, Wanda I <WReyes-Dawes@mcc.commnet.edu>
**Sent:** Thursday, August 5, 2021 3:31 PM
**To:** Pence, Michael P <MPence@mcc.commnet.edu>; Kleis, Kathryn M <KKleis@mcc.commnet.edu>; Stafford, Carl <CStafford@mcc.commnet.edu>; Dupille Jr., Leonard <LDupille@mcc.commnet.edu>; Ariel, Tracy <TAriel@mcc.commnet.edu>; Vig, Umesh Kunwar <UVig@mcc.commnet.edu>
**Subject:** Re: Strengths & Weaknesses

Thank you, Michael.

---

**From:** Pence, Michael P <MPence@mcc.commnet.edu>
**Sent:** Thursday, August 5, 2021 3:19 PM
**To:** Kleis, Kathryn M <KKleis@mcc.commnet.edu>; Stafford, Carl <CStafford@mcc.commnet.edu>; Dupille Jr., Leonard <LDupille@mcc.commnet.edu>; Ariel, Tracy <TAriel@mcc.commnet.edu>; Vig, Umesh Kunwar <UVig@mcc.commnet.edu>; Reyes-Dawes, Wanda I <WReyes-Dawes@mcc.commnet.edu>
**Subject:** Strengths & Weaknesses

Wanda sent me a fantastic list to get us started. I have edited and added a few and here is what we currently have below.
Please feel free to make suggestions for additions and edits. I would like to send this off first thing tomorrow.
Thank you all again for your work and patience with this search.
Mike



## DT - Strengths

- Stated no discomfort level with diversity, although not listing any specifics discussed the large cultural diversity he worked with while counselling for the Prison System & Ex-offender population
- •Would handle student complaint by getting both sides of the story from instructor and student

## DT Weaknesses

- Technology acumen; no online teaching experience and limited knowledge of platforms, i.e. only Zoom
- Did not really answer posed questions; rambled
- No formal presentation shared and started at 3:57 p.m. from the original starting time of 3:30 p.m.  Didn't inform committee there was not a visual component to the teaching demo during the 25 minutes of attempting to fix screen sharing and audio issues
- Made contradictory statements during presentation, frequent topic switches, lacked focus, said at least 5 times "but that is a topic for the future" for 5 different topics within a 15 minute presentation
- No assessment experience, per candidate
- During question about integrating diversity in classroom did not discuss classroom teaching at all and at one point used the phrase "Those people" to indicate a racial group
- No Certification (CIT) or atleast doesn't remember if he did the CIT or not; shared "he's an old person, doesn't know what he had for breakfast"
- Not a good fit for the requirements of the position

## NP – Strengths

- Presentation was a relevant topic, phenomenal, and engaging; would want to be one of her students
  - *Primum Non Nocere* - First, Do No Harm
  - Peterson's 5 Ethical Principles
  - Comfortable pace
  - Great tone
- Questions answered professionally and succinctly
- Previous experience as DARC Program Coordinator
- Innovative ideas, i.e., textbooks costs, etc.
- Importance of building of relationships with other sister colleges and relevant agencies (had in the past and would like to continue)
- Importance of internship experiences for our students that can potentially turn into permanent job offers
- DARC Self-Study - reviewed and worked on implementing recommendations
- Ethics at core of program and embedded throughout students' DARC program courses: Uses the CCB Code of Ethics, the professional standard here in CT, as the basis for all of these discussions and assignments.
- Empowerment Theory - Worked under Bobbi Fox and learned; encourages others to be who they are as she serves as the navigator
- Diversity in Thought/Diversity in Action thought process
- Discussed importance of Cultural competency in DARC clinical practice and gave examples of how teaching this is integrated into the classroom and program
- Taught DARC Internship course (Ex: had 11 students in class and all 11 were hired at internship sites)
- Passion for DARC students and their future opportunities exuded throughout interview.
- Great fit for the position requirements

## NP Weaknesses

- During two questions went off topic to discuss her ideas for programs and course changes.  Even this was after the main points of the question had been addressed. (Yeah I know I'm reaching here.)
- 

_____

Michael Pence
Assistant Professor of Chemistry
Chair, Dept. of Physical Sciences